1   Peter Rukin (SBN 178336)
    *prukin@rukinhyland.com*
2   Jessica Riggin (SBN 281712)
    *jriggin@rukinhyland.com*
3   Valerie Brender (SBN 298224)
    *vbrender@rukinhyland.com*
4   Dylan Cowart (SBN 324711)
    *dcowart@rukinhyland.com*
5   RUKIN HYLAND & RIGGIN LLP
    1939 Harrison Street, Suite 290
6   Oakland, CA 94612
    Tel: (415) 421-1800
7   Fax: (415) 421-1700

8   Attorneys for Plaintiff,
    JOHN FLEMING
9

10                    **UNITED STATES DISTRICT COURT**

11                 **NORTHERN DISTRICT OF CALIFORNIA**

12

13   JOHN FLEMING, on behalf of himself and all        Case No.  3:19-cv-00463-WHO
     others similarly situated,
14
                                                        **PLAINTIFF'S STATEMENT OF RECENT**
15                        Plaintiff,                    **DECISION IN SUPPORT OF PLAINTIFF'S**
                                                        **OPPOSITION TO DEFENDANTS' MOTION**
16            v.                                        **TO DISMISS OR, IN THE ALTERNATIVE,**
                                                        **TRANSFER VENUE TO THE U.S. DISTRICT**
17   MATCO TOOLS CORPORATION, a Delaware                **COURT FOR THE NORTHERN DISTRICT**
     corporation; NMTC, Inc. d/b/a MATCO TOOLS,         **OF OHIO**
18   a Delaware corporation; FORTIVE
     CORPORATION, a Delaware corporation; and
19   DOES 1-20, inclusive,

20                        Defendants.

21

22

23

24

25

26

27

28

1    Plaintiff John Fleming hereby respectfully submits the following supplemental authority in

2    support of his Opposition to Defendants' Motion to Dismiss or, in the Alternative, Transfer Venue

3    to the U.S. District Court for the Northern District of Ohio: *Gerardo Vazquez, et al., v. Jan-Pro*

4    *Franchising International, Inc.,* Opinion Re: District Court's decision granting Defendant's Motion

5    for Summary Judgment, Case No. 17-16096, Dkt. 83-1, (9th Cir. May 2, 2019). A true and correct

6    copy of the *Vazquez* decision is attached hereto as Exhibit A.

7

8     Dated:  May 2, 2019                              Respectfully submitted,

9

10                                                      RUKIN HYLAND & RIGGIN LLP

11

12                                                      By: */s/*  Valerie Brender
                                                        Valerie Brender
13                                                      Counsel for Plaintiff

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GERARDO VAZQUEZ, GLORIA ROMAN, and JUAN AGUILAR, on behalf of themselves and all other similarly situated, *Plaintiffs-Appellants*, <br><br> v. <br><br> JAN-PRO FRANCHISING INTERNATIONAL, INC., *Defendant-Appellee.* | No. 17-16096 <br><br> D.C. No. 3:16-cv-05961-WHA <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Argued and Submitted December 18, 2018
San Francisco, California

Filed May 2, 2019

Before: Ronald M. Gould and Marsha S. Berzon, Circuit
Judges, and Frederic Block, District Judge.*

Opinion by Judge Block

---

* The Honorable Frederic Block, United States District Judge for the Eastern District of New York, sitting by designation.

## SUMMARY[**]

### California State Law / Employment Law

The panel vacated the district court's dismissal on summary judgment of a complaint brought by a putative class against a defendant international business that had developed a sophisticated "three-tier" franchising model, seeking a determination whether workers were independent contractors or employees under California wage order laws; and remanded for further proceedings.

In a decision post-dating the district court's decision, the California Supreme Court in *Dynamex Ops. W. Inc. v. Superior Court*, 416 P.3d 1 (Cal. 2018), adopted the "ABC test" for determining whether workers are employees under California wage order laws. The test requires the hiring entity to establish three elements to disprove employment status: (A) that the worker is free from the control of the hiring entity in connection with work performance – both under the performance contract and in fact; (B) that the worker performs work outside the hiring entity's usual business; and (C) that the worker is customarily engaged in an independent business of the same nature as the work performed.

The panel held that *Dynamex* applied retroactively, that none of the defendant-hiring entity's other efforts to avoid reaching the merits were viable, and that the case must be

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

remanded to the district court to consider the merits in light of *Dynamex*.

The panel held that under Massachusetts law, prior related decisions rendered by federal courts located in Massachusetts did not have preclusive effect on this case under the doctrines of either res judicata or law of the case.

The panel held that *Dynamex* should be applied retroactively. Specifically, the panel held that California law calls for the retroactive application of *Dynamex*. The panel also held that applying *Dynamex* retroactively was consistent with due process. The panel held that *Dynamex* expanded the definition of "suffer or permit" for California wage order cases.

The panel offered guidance for the district court on remand. The panel held that the district court should consider all three prongs of the ABC test. The panel also held that the district court need not look to *Patterson v. Domino's Pizza, LLC*, 333 P.3d 723 (Cal. 2014) (involving a plaintiff employed by a franchisee in a case that was not a wage and hour case), in applying the ABC test because the franchise context does not alter the *Dynamex* analysis. The panel noted that other courts have considered three-tier franchise structures in applying the ABC test. The panel further noted that the district court should consider a number of formulations in determining whether the defendant was plaintiffs' employer and not merely an indirect licensor of a trademark.

## COUNSEL

Shannon Liss-Riordan (argued), Lichten & Liss-Riordan P.C., Boston, Massachusetts, for Plaintiffs-Appellants.

Jeffrey M. Rosin (argued), O'Hagan Meyer PLLC, Boston, Massachusetts, for Defendant-Appellee.

Catherine K. Ruckelshaus and Najah A. Farley, National Employment Law Project, New York, New York, for Amici Curiae National Employment Law Project, Equal Rights Advocates, Dolores Street Community Services, Legal Aid at Work, and Worksafe, Inc.

Norman M. Leon, DLA Piper LLP, Chicago, Illinois; Jonathan Solish, Bryan Cave LLP, Santa Monica, California; James F. Speyer, Arnold & Porter Kaye Scholer LLP, Los Angeles, California; for Amicus Curiae The International Franchise Association.

# TABLE OF CONTENTS

OVERVIEW ........................................................................7

THE ISSUES ....................................................................9

*DEPIANTI* ...........................................................................9

    I. The Factual Background..........................................10

    II. Massachusetts and Georgia Decisions ...................13

        A. Answer by the Massachusetts Supreme Judicial
           Court .............................................................. 13

        B. Parallel Litigation in Georgia.......................... 14

        C. Final Order from the District Court of
           Massachusetts ................................................ 14

    III. The First Circuit's Decision...................................15

THE PRESENT CASE ....................................................16

    I. Res Judicata and Law of the Case ...........................17

    II. Retroactivity ..........................................................21

        A. *Dynamex* Applies Retroactively Under
           California Law. ............................................... 22

        B. Applying *Dynamex* Retroactively Is Consistent
           with Due Process............................................ 26

    III. The Merits.............................................................29

        A. The Facts....................................................... 29

           1. The Contracts Among the Various Entities
               .................................................... 29

           2. The Practical Realities .............................. 32

        B. The District Court's Decision ......................... 33

        C. *Dynamex* ....................................................... 35

        D. Application of *Dynamex* on Remand.............. 37

1.  There Is No *Patterson* Gloss to the ABC Test........................................................... 37

2.  Other Courts Have Considered Three-Tier Franchise Structures in Applying the ABC Test........................................................... 40

3.  Prong B of the ABC Test May Be the One Most Susceptible to Summary Judgment.. 42

    i.   *Are Unit Franchisees Necessary to Jan-Pro's Business?*...................................43

    ii.  *Do Unit Franchisees Continuously Work in Jan-Pro's Business System?* ............45

    iii. *Does Jan-Pro Hold Itself Out as a Cleaning Business?* .............................46

CONCLUSION.................................................................48

## OPINION

BLOCK, District Judge:

In this putative class action we are tasked with having to decide the applicability of a recent decision by the high court of California, *Dynamex Ops. W. Inc. v. Superior Court*, 416 P.3d 1 (Cal. 2018)—postdating the district court's decision. *Dynamex* adopted the so-called "ABC test" for determining whether workers are independent contractors or employees under California wage order laws. We hold that the test does apply, vacate the lower court's grant of summary judgment dismissing the complaint, and remand for further proceedings consistent with this opinion.

## OVERVIEW

This case dates back over a decade. In 2008, a putative class action was filed in the District of Massachusetts by a Massachusetts plaintiff, Giovani Depianti, and two Pennsylvania plaintiffs, against the Defendant-Appellee, Jan-Pro International Franchising, Inc. ("Jan-Pro"), a Georgia corporation. By the end of that year, there was an additional plaintiff from Massachusetts plus seven more from other states, including the three individual Plaintiffs-Appellants ("Plaintiffs") in this case, who are California residents. They all had a common cause to pursue: that Jan-Pro, a major international janitorial cleaning business, had developed a sophisticated "three-tier" franchising model to avoid paying its janitors minimum wages and overtime compensation by misclassifying them as independent contractors.

Because of the variety of state laws involved, the Massachusetts district court chose Depianti's claim as a test case and, over Jan-Pro's opposition, severed the California

plaintiffs' claims and sent them to the Northern District of California, Plaintiffs' place of residence.  Depianti's case ultimately made its way to the First Circuit Court of Appeals, which in 2017 affirmed the district court's dismissal of the complaint, but not on the merits.  *See Depianti v. Jan-Pro Franchising Intl, Inc.*, 873 F.3d 21 (1st Cir. 2017) ("*Depianti–CA1*").  The claims of all the other plaintiffs before the Massachusetts district court were also dismissed without reaching the merits.  But the California plaintiffs have remained steadfast and, as their litigation enters its second decade, they have now brought their battle to this Court.

Jan-Pro obviously has a financial interest in not opening the floodgates to nationwide liability for multiple years of back wages and overtime pay.  However, the case has broader ramifications.  The National Employment Law Project, which asserts that it has "a strong interest in this case because of the impacts of [Jan Pro's] franchising schemes and those of similar janitorial companies on low-wage and immigrant workers and their communities," has submitted an *amicus* brief (joined by other similarly interested not-for-profit organizations) to bring to the Court's attention "details about the kinds of franchising and labor intermediary structures used by Jan-Pro, and their impacts on workers, competing employers, and on state and federal coffers."  And in support of Jan-Pro, the International Franchise Association ("IFA"), "the oldest and largest trade association in the world devoted to representing the interests of franchising," rails against applying the ABC test adopted by the California Supreme Court because it "would sound the death knell for Franchising in California," casting the case as "of profound importance to franchising" not only in California but also for the "national economies."

## THE ISSUES

Because *Dynamex* postdated the district court's decision, we issued an order directing the parties to brief its effect on the merits of this case. Plaintiffs devoted most of their supplemental brief to the merits, concluding that "in light of *Dynamex*, there can be no question that the District Court's order granting summary judgment to Jan-Pro must be reversed," and that we should "remand the case for further proceedings."

By contrast, Jan-Pro devoted only two pages of its sixteen-page supplemental brief to the merits, citing but one clearly distinguishable case. It argued principally that "the *Dynamex* decision should not be applied retroactively," and that, in any event, it should prevail under the doctrines of the law of the case and res judicata.

For the reasons that follow, we conclude that *Dynamex* does apply retroactively, that none of Jan-Pro's other efforts to avoid reaching the merits are viable, and that the case must be remanded to the district court to consider the merits in light of *Dynamex*. To explain why neither the law of the case nor res judicata is applicable, we begin with a recitation of *Depianti's* complex procedural history.

### *DEPIANTI*

The First Circuit's *Depianti* opinion, characterizing "the nearly decade long life-cycle" of the *Depianti* litigations as a "Whirlwind Procedural Tour," 873 F.3d at 24, aptly traces that tour. It also elucidates the nature of Jan-Pro's franchise business and the structure of the three-tier franchise model it created in its effort to establish janitorial cleaners, such as Depianti and Plaintiffs, as independent contractors.

## I. The Factual Background

As the First Circuit explained, Jan-Pro "organizes commercial cleaning franchises" throughout the United States. *Id.* at 23. Under its particular franchise model, Jan-Pro "contracts with what are known as intermediary 'master franchisees' or 'master owners' (regional, third party entities) to whom it sells exclusive rights to the use of the 'Jan-Pro' logo, which is trademarked." *Id.*[1] "These master owners, in turn, sell business plans to 'unit franchisees.'" *Id.* Thus, Jan-Pro's business model is two-tiered, "with (1) Jan-Pro acting as franchisor and the master owner acting as franchisee, in one instance and (2) the master owner acting as franchisor to the unit franchisee, in the other." *Id.*[2]

The First Circuit explained how this two-tiered system works:

> Jan-Pro and its master owners are separate corporate entities and each has its own staff. Moreover, master owners may sell or transfer their individual businesses without approval from Jan-Pro. Jan-Pro also reserves the right to inspect any premises serviced by either the master owner or any of the master owner's franchisees to ensure the Jan-Pro standards are being maintained. Still, master owners have their own entity names and internal

---

[1] As of 2009, which at the time of the decision in 2017 was the year of the most up-to-date figure in the record, "ninety-one different master owners existed." *Depianti–CA1*, 873 F.3d at 23.

[2] Our opinion refers to the intermediate entities as either regional "master franchisees" or "master franchisors" depending on whether the focus is on their relationships with Jan-Pro or with the unit franchisees.

business structures, and are responsible for their own marketing, accounting, and general operations.

As for master owners and their unit franchisees, under the terms of the model franchise agreement, master owners agree to provide their franchisees with an initial book of business, as well as start-up equipment and cleaning supplies. Moreover, the master owner furnishes a training program for its unit franchisees. Once initial set-up and training is complete, the master owner agrees to (1) assist in the unit franchisee's customer relations (by, for example, providing substitute employees or contractors to supply services in the event of an emergency impacting the unit franchisee); (2) provide the unit franchisee with invoicing and billing services; (3) advance the unit franchisee amounts that have been billed but not yet collected from customers; and (4) make available to the unit franchisee any improvement or changes in services or business methods that are made available to other franchisees. Additionally, the agreement notes that a unit franchisee is at all times an independent contractor solely in business for itself. As such, the unit franchisee may, for example, hire its own employees and decide what to pay them, as well as decide whether or not to pursue certain business opportunities.

*Id.* at 23–24.

In June 2003, Depianti signed a franchise agreement with Bradley Marketing Enterprises, Inc. ("BME"), one of Jan-Pro's master franchisees. He was promised $100,000 in gross annual billings by BME, and paid this master franchisor $23,400 for his unit franchise. In his lawsuit, he alleged "that his status as a unit franchisee of BME was a farce and that he was actually a direct employee of Jan-Pro." *Id.* at 24.[3]

A Massachusetts statute presumes an individual performing a service, such as Depianti, to be an employee unless:

> "(1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
>
> "(2) the service is performed outside the usual course of the business of the employer; and
>
> "(3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed."

Mass. Gen. Laws. Ch. 149, § 148B(a). The burden is on the employer to overcome that presumption by proving all three

---

[3] "The regional master franchisees were not named as defendants, apparently because their contracts with the unit franchisees contain mandatory arbitration clauses." *Depianti v. Jan-Pro Franchising Int'l, Inc.*, 39 F.Supp.3d 112, 117 n.1 (D. Mass. 2014).

prongs. *Somers v. Converged Access, Inc.*, 911 N.E.2d 739, 747 (Mass. 2009). If it fails, the individual in question is an employee. *Id.*

Both sides moved for summary judgment. But the district court, uncertain "as to how the multi-leveled franchise model employed by Jan-Pro would impact application of the [statutory] three prongs," *Depianti–CA1*, 873 F.3d at 25, certified the following question to the Massachusetts Supreme Judicial Court ("SJC"): "Whether a defendant may be liable for employee misclassification under [Massachusetts law] where there was no contract for service between the plaintiff and defendant." *Id.* (alterations omitted).[4]

## II. Massachusetts and Georgia Decisions

### A. Answer by the Massachusetts Supreme Judicial Court

The SJC answered the question in the affirmative but did not interpret it "as asking for direct application of the elements of the statute to the particular franchise arrangement that existed between Jan-Pro, BME, and Depianti." *Id.* at 27. The SJC commented that it took no position "on the question whether the necessary predicates for liability can be established here, a matter involving determinations as to the summary judgment record that are solely within the purview of the United States District Court." *Id.* (quoting *Depianti v. Jan-Pro Franchising Int'l,*

---

[4] The district court also certified two other questions to the SJC that are not here relevant.

*Inc.,* 990 N.E.2d 1054, 1068, n.16 (Mass. 2013) ("*Depianti–SJC*")).

## B.  Parallel Litigation in Georgia

At the same time that the Depianti case was being litigated in the District of Massachusetts, a separate declaratory judgment action initiated by Jan-Pro against Depianti was being litigated in the Georgia state courts. That action ultimately resulted in a final summary judgment—entered by the Georgia Court of Appeals ("GCA") one month after the SJC issued its answer to the district court's certified question—that "no employment relationship between Jan-Pro and Depianti existed under [the Massachusetts three-prong statute] and that Jan-Pro was, therefore, not liable to Depianti in tort or contract." *Depianti–CA1*, 873 F.3d at 25. The GCA's decision became final when the Georgia Supreme Court denied certiorari. *Id.* at 30–31.

The rationale for the GCA's decision was that "Depianti was free from the control and direction of Jan-Pro; the cleaning services he performed were outside the usual course of Jan-Pro's business; and Depianti was engaged in an independently-established business." *Id.* at 26 (citing *Jan-Pro Franchising Int'l, Inc. v. Depianti*, 310 Ga. App. 265 (2011) ("*Depianti–Georgia*")).

## C.  Final Order from the District Court of Massachusetts

Critically, the Georgia litigation became final before the Massachusetts district court took action on the SJC's answer to its certified question. Jan-Pro then asked the district court to dismiss the Massachusetts action on res judicata grounds. The court agreed. *Depianti v. Jan-Pro Franchising Int'l, Inc.*, 39 F. Supp. 3d 112, 125–26 (D. Mass. 2014)

("*Depianti–D.Mass*"). It explained that it was obliged to accord full faith and credit to the GCA's decision; therefore, it was "not necessary for the court to conduct an independent examination of the merits" of that decision. *Id.* at 126.

This, therefore, was the district court's direct holding. However, in dicta, it nonetheless "considered the merits" and concluded "that *Depianti–Georgia* appears to be consistent with Massachusetts law, in general," as well as with the SJC's answer to the certified question. *Id.* In that latter regard, the district court recounted that the high court of Massachusetts did not address the merits—whether Depianti was a contractor or employee. *See id.* at 127–28. After deciding Depianti's individual claims on res judicata grounds, the district court severed the California plaintiffs from the litigation. *See Depianti v. Jan-Pro Franchising Int'l, Inc.*, No. 08-cv-10663-MLW, 2016 WL 4771056, at *3 (D. Mass. Sept. 13, 2016).

### III. The First Circuit's Decision

On appeal, the First Circuit did not address the merits, either. Instead, it explained why it agreed with the district court that Georgia's final judgment was entitled to preclusive effect, noting that "a state court judgment is entitled to the same preclusive effect in federal court as it would be given in the state in which it was rendered." *Depianti–CA1*, 873 F.3d at 29 (alterations and quotation omitted). Thus, Georgia's res judicata statute, *see* Ga. Code Ann. § 9-12-40, was applicable. "And, in order for the doctrine to apply in Georgia, 'three prerequisites [had to] be satisfied: (1) identity of the parties or their privies; (2) identity of the cause of action; and (3) previous adjudication on the merits by a court of competent jurisdiction.'" *Depianti–CA1*, 873 F.3d at 29 (quoting

*Brown & Williamson Tobacco Corp. v. Gault*, 627 S.E.2d 549, 551 (Ga. 2006)).

Depianti did not take issue with the first two prerequisites, but questioned whether the Georgia judgment was final "because the superior court never crafted a declaratory judgment to close out the case." *Id.* at 31. The First Circuit rejected this argument because "[o]nce the GCA spoke and the Georgia Supreme Court denied certiorari, the shape of that declaration was foreordained." *Id.* Therefore, "the GCA's judgment was final for purposes of res judicata." *Id.* at 29.[5]

As for the merits, the First Circuit commented: "While both parties briefed the issue, we need not venture into the murky world of whether the GCA correctly applied [the Massachusetts three-prong] test in concluding Depianti was not an employee of Jan-Pro. Because res judicata dictates the outcome here, no more is needed." *Id.* at 32 n.11. Thus, as the court explained, "the res judicata consequences of a final . . . judgment on the merits [are not] altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case." *Id.* at 32 (alterations in original) (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981)).

### THE PRESENT CASE

With this understanding of the *Depianti* litigations, we first address the two arguments posited by Jan-Pro to avoid application of *Dynamex:* (1) that the *Depianti* final judgment

---

[5] The court also rejected Depianti's argument "that the Georgia courts never had personal jurisdiction over him." *Depianti–CA1*, 873 F.3d at 31.

is entitled to preclusive effect in this litigation under either the principle of res judicata or the doctrine of law of the case; and (2) that *Dynamex* should not be applied retroactively. For the reasons that follow, we reject both arguments and hold that in light of *Dynamex*, vacatur of the district court's grant of summary judgment for Jan-Pro and remand is the provident course. We do, however, offer guidance to the district court regarding the merits.

## I. Res Judicata and Law of the Case

The term "res judicata" traditionally referred to claim preclusion while issue preclusion was called "collateral estoppel." *See* 18 Charles Alan Wright et al., *Federal Practice and Procedure* § 4402 (3d ed. Nov. 2018 update). However, modern opinions have used "res judicata" to refer to both forms of preclusion. *See id.*; *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). Jan-Pro uses the generic term "res judicata" without specifying which form of preclusion is applicable.

"The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor*, 553 U.S. at 891. Where the allegedly preclusive decision was a diversity action, federal common law requires us to apply "the law that would be applied by state courts in the State in which the federal diversity court sits." *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001); *see also Taco Bell Corp. v. TBWA Chiat/Day Inc.*, 552 F.3d 1137, 1144 (9th Cir. 2009). Because the allegedly preclusive decisions were rendered by federal courts located in Massachusetts, we look to Massachusetts preclusion law.

For an earlier adjudication to have preclusive effect, whether on a claim preclusion or issue preclusion theory, Massachusetts requires, among other criteria, that the

adjudication be a final judgment on the merits, and that the precluded party was either a party in the first action or in privity with a party. *See Bourque v. Cape Southport Assocs.*, 800 N.E.2d 1077, 1080 (Mass. App. Ct. 2004). Because res judicata is an affirmative defense, the burden is on the party asserting it to demonstrate that it applies. *See Fabrizio v. U.S. Suzuki Motor Corp.*, 289 N.E.2d 897, 898 (Mass. 1972); *Carpenter v. Carpenter*, 901 N.E.2d 694, 699 (Mass. App. Ct. 2009).

Jan-Pro asserts that Plaintiffs were in privity with Depianti because they (1) raise the same factual and legal issues Depianti did; (2) Depianti's claims were considered a "test case" for related misclassification claims; and (3) the same counsel representing Plaintiffs also represented Depianti, asserted identical legal theories, and relied on similar evidence. None of these circumstances suffice to establish privity under Massachusetts law.

As an initial matter, *Depianti–D.Mass* cannot have preclusive effect because that decision was not the final judgment in the litigation. *Depianti–D.Mass* was affirmed by the First Circuit without reaching, even in the alternative, the merits of the application of the ABC test to Jan-Pro's business. *See Springfield Pres. Tr., Inc. v. Springfield Library & Museums Ass'n, Inc*., 852 N.E.2d 83, 91 (Mass. 2006) (holding that superior court judgment on the merits was not preclusive because the appeals court affirmed the judgment "on other grounds having nothing to do with the merits").

Therefore, we need only address the First Circuit's decision in *Depianti–CA1*. Although Plaintiffs were initially parties in the district court, *Depianti–D.Mass* addressed only the claims of a single individual, Depianti. And Plaintiffs were severed from the Massachusetts case before the First

Circuit rendered its decision. *See Depianti–CA1*, 873 F.3d at 24 n.1. Thus, Plaintiffs were not parties to *Depianti–CA1*. And in Massachusetts, "the determination whether a nonparty is in privity with a party depends on the nature of the nonparty's interest, whether that interest was adequately represented by a party to the prior litigation, and whether binding the nonparty to the judgment is consistent with due process and common-law principles of fairness." *Degiacomo v. City of Quincy*, 63 N.E.3d 365, 370–71 (Mass. 2016).

Massachusetts has repeatedly held that "mere alignment of interests is insufficient to support preclusive effect against a nonparty." *Cruickshank v. MAPFRE U.S.A.*, 116 N.E.3d 1233, 1237 (Mass. App. Ct. 2019); *see also Bourque*, 800 N.E.2d at 1081. Therefore, although Plaintiffs' interests and Depianti's interests may align, that overlap is insufficient to establish privity for preclusion purposes.

Critically, Jan-Pro has not shown that Plaintiffs were "adequately represented by a party to the prior litigation." *Degiacomo*, 63 N.E.3d at 370. Massachusetts law, like federal common law, provides that "[a] party's representation of a nonparty is 'adequate' for preclusion purposes only if, at a minimum: (1) the interests of the nonparty and her representative are aligned . . . ; *and* (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." *Id.* at 373–74 (emphasis added) (quoting *Taylor*, 553 U.S. at 900).

Here, the Massachusetts district court treated Depianti's claims as a "test case," but it never certified a class and therefore never inquired whether Depianti would adequately protect the interests of the other workers Jan-Pro maintains Depianti was representing. *See* Fed. R. Civ. P. 23(a)(4).

And by the time the First Circuit rendered its decision, Plaintiffs had already been severed from the case. Depianti had no legal relationship with Plaintiffs, such as being a trustee, fiduciary, guardian, or agent, categories of relationships that courts have traditionally recognized as establishing privity. *See Taylor*, 553 U.S. at 894. And the First Circuit specifically noted: "Depianti is the only remaining plaintiff whose rights are at issue in this appeal. Thus, while many of the allegations in the complaint were lobbed against Jan-Pro by the putative class as a whole, our focus falls squarely on Depianti." 873 F.3d at 24 n.1. That caution was not surprising, as the First Circuit's decision rested solely on the res judicata effect of the Georgia judgment, and Depianti was the only franchisee who was a party in that litigation.

In short, Depianti could not have understood that he was representing anyone else, and the First Circuit explicitly recognized that it had no reason to, and was not, protecting the interests of non-parties.

Finally, binding Plaintiffs to the Massachusetts litigation would not accord with "due process and common-law principles of fairness." *Degiacomo*, 63 N.E.3d at 370–71. Foundational to due process is the principle that each individual should have his day in court before being subject to its judgment. The Supreme Court has often reiterated the general rule, subject to limited exceptions, that "one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Taylor*, 553 U.S. at 893 (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)). Here, because the District of Massachusetts chose Depianti's Massachusetts law claims as a "test case" (rather than hearing Plaintiffs' California law claims simultaneously), it

did not certify a class to ensure that Depianti adequately represented Plaintiffs' interests. *See Depianti*, 2016 WL 4771056, at *5. Instead, it severed Plaintiffs' claims so that they could represent their own interests. Binding Plaintiffs to the final decision in Massachusetts would therefore foreclose their claims without having provided them an adequate opportunity to litigate them.

In sum, Plaintiffs were not in privity with Depianti for res judicata purposes under Massachusetts law.

Jan-Pro also argues that we cannot apply *Dynamex* due to the law of the case doctrine. This argument is just a repackaging of its res judicata argument. *Depianti–D.Mass* is not the law of the case, as its dicta that Depianti was not an employee of Jan-Pro under the ABC test was expressly not affirmed by the First Circuit. *See Depianti–CA1*, 873 F.3d at 32 n.11. Therefore, it no longer governs even in the *Depianti* case itself. Thus, even assuming that the ultimate Massachusetts holding would have any impact once Plaintiffs were severed from that litigation—which we doubt, *see* 18B Charles Alan Wright et al., *Federal Practice and Procedure* § 4478.4 (2d ed. Sept. 2018 update) ("Following a § 1404(a) transfer, the receiving court should treat pre-transfer rulings by the transferring court in much the same way as one district judge treats the ruling of a colleague.")—there is no "law of the case" in the Massachusetts litigation holding that Jan-Pro is not Plaintiffs' employer.

## II. Retroactivity

Jan-Pro's argument that *Dynamex* should not be applied retroactively is based on California law, but because it is largely framed in terms of reliance and fairness interests, it

also invokes due process concerns.[6] We first discuss whether California law calls for the retroactive application of *Dynamex*. Concluding that it does, we explain why applying *Dynamex* retroactively does not violate Jan-Pro's due process rights.

## A. *Dynamex* Applies Retroactively Under California Law.

As the Supreme Court of California has explained, it "is basic in our legal tradition" that "judicial decisions are given retroactive effect." *Newman v. Emerson Radio Corp.*, 772 P.2d 1059, 1062 (Cal. 1989). This is true even for decisions that overrule precedent. *See Sierra Club v. San Joaquin Local Agency Formation Comm'n*, 981 P.2d 543, 556 (Cal. 1999). As in the federal system, appellate courts in California apply intervening state supreme court rules retroactively when reviewing cases, even if the judgment in the trial court was entered prior to the ruling from the California Supreme Court. *See, e.g.*, *Penn v. Prestige Stations, Inc.*, 83 Cal. App. 4th 336, 339 (2000). The California Supreme Court has repeatedly quoted then-Justice Rehnquist in explaining that "[t]he principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student." *Evangelatos v. Superior Court*, 753 P.2d 585, 596 (Cal. 1988) (emphasis omitted) (quoting *United States v. Sec. Indus. Bank*, 459 U.S. 70, 79 (1982)).

---

[6] The IFA's *amicus* brief in support of Jan-Pro focused on the retroactive application of *Dynamex*, supplementing Jan-Pro's analysis concerning both California law and due process. In analyzing retroactivity, we address the IFA's arguments together with Jan-Pro's.

At times, the California Supreme Court has stated that there is an exception to the rule of retroactivity "when a judicial decision changes a settled rule on which the parties below have relied." *Williams & Fickett v. Cty. of Fresno*, 395 P.3d 247, 262 (Cal. 2017) (quoting *Claxton v. Waters*, 96 P.3d 496, 503 (Cal. 2004)). The court has said that "[p]articular considerations relevant to the retroactivity determination include the reasonableness of the parties' reliance on the former rule, the nature of the change as substantive or procedural, retroactivity's effect on the administration of justice, and the purposes to be served by the new rule." *Id.* (quoting *Claxton*, 96 P.3d at 503).

The parties conceptualize this rule and its exception in different ways. Jan-Pro and the IFA would have us assess the exception *de novo* and hold that it applies. At a minimum, the IFA argues, the extent of reliance is a factual question, and so we should remand to allow the district court to determine how much Jan-Pro relied on pre-*Dynamex* law before deciding whether to apply *Dynamex* retroactively. Plaintiffs, meanwhile, urge us to hold that the California courts have already held that *Dynamex* applies retroactively, and that we are obliged to follow those courts' conclusions.

The IFA's argument is conceptually problematic. It would make little sense for a court to assess the retroactive effect of *Dynamex* by developing a factual record concerning a party's reliance on previous law. Such an approach could lead to the surprising result that *Dynamex* applies retroactively to some parties but not to others. We thus decline the IFA's invitation to remand for further factual development on the question of reliance.

Plaintiffs base their argument that *Dynamex* has already been determined to apply retroactively on three points. First, emphasizing the general rule in favor of retroactivity,

Plaintiffs point out that in *Dynamex* the Supreme Court of California denied (albeit without comment) a petition by an *amicus*, the California Employment Law Council, to modify the *Dynamex* opinion for "Clarification That Independent Contractor Test is Prospective Only." Second, Plaintiffs also point out that lower courts in California are now applying the ABC test retroactively. Finally, they argue that only the Supreme Court of California has the power to declare one of its decisions non-retroactive.

Plaintiffs are correct on at least their first two points.[7] With respect to their first argument, the IFA argues that "*Dynamex* is silent on the question of retroactivity," and reminds us that "it is well-settled that the California Supreme Court's refusal to hear a matter does not constitute a ruling on the merits." But actions sometimes speak louder than words. By denying the petition, even without comment, the court strongly suggested that the usual retroactive application, rather than the exception, should apply to its newly announced rule. To be sure, as the IFA argues, a denial of a request for clarification is not a holding on the merits. But in an unusual case such as this, it is a data point for us to consider in light of California's general tradition that judicial pronouncements have retroactive effect.

In support of their second argument (that lower California courts are now applying *Dynamex* retroactively), Plaintiffs cite two cases, *Garcia v. Border Transp. Grp., LLC*, 28 Cal. App. 5th 558 (2018), and *Johnson v. VCG-IS, LLC*, No. 30-2015-00802813, 2018 WL 3953771 (Cal. Super. Ct. July 18, 2018). The IFA acknowledges a third

---

[7] We do not address Plaintiffs' state law argument that only the Supreme Court of California has the power to designate its own rulings as prospective-only, as we find Plaintiffs' other arguments convincing.

case, *Juarez v. Jani-King of Cal., Inc.*, No. 4:09-cv-03495, Dkt. No. 240 (N.D. Cal. Dec. 14, 2018), but argues that all three have no "precedential or persuasive value on the retroactivity issue."

Focusing on *Garcia*, the IFA points out that the court applied *Dynamex* retroactively only because the defendant never raised retroactivity, as was its burden.  *See Garcia*, 28 Cal. App. 5th at 572 n.12.  But the *Garcia* court did go on to observe, as we do, "that *Dynamex* applied the ABC test to the class certification question before it, and the Supreme Court denied later requests to modify the opinion to apply the ABC test only prospectively."  *Id.*  Additionally, the court said, "to the extent *Dynamex* merely extended principles stated in [*S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 769 P.2d 399 (Cal. 1989)] and [*Martinez v. Combs*, 231 P.3d 259 (Cal. 2010)], it represented no greater surprise than tort decisions that routinely apply retroactively."  *Id.* (internal quotation marks and citations omitted).[8]  The analysis in *Garcia* is persuasive.  And "[a]n intermediate state appellate court decision is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1093 (9th Cir. 2017) (internal quotation omitted) (quoting *Estrella v. Brandt*, 682 F.2d 814, 817 (9th Cir. 1982)).

----

[8] *See also Newman*, 772 P.2d at 1064 ("With few exceptions and even after expressly considering suggestions to the contrary, California courts have consistently applied tort decisions retroactively even when those decisions declared new causes of action or expanded the scope of existing torts in ways defendants could not have anticipated prior to our decision.").

In particular, *Dynamex* did not fabricate the ABC test anew, but instead carefully explained how the test remains "faithful . . . to the fundamental purpose of [California's] wage orders." *Dynamex*, 416 P.3d at 40. *See Waller v. Truck Ins. Exchange, Inc.*, 900 P.2d 619 (Cal. 1995) (rejecting argument against retroactivity because the law in question was "but a logical extension" of well-established principles).

Given the strong presumption of retroactivity, the emphasis in *Dynamex* on its holding as a clarification rather than as a departure from established law, and the lack of any indication that California courts are likely to hold that *Dynamex* applies only prospectively, we see no basis to do so either.

As a last resort, Jan-Pro and the IFA offer policy arguments about fairness, reliance, and stability. These arguments are more in keeping with a due process theory, which we address next.

## B.  Applying *Dynamex* Retroactively Is Consistent with Due Process.

Because we are convinced that California law requires us to apply *Dynamex* retroactively, we can only avoid doing so if there is a constitutional reason we may not. By invoking issues of reliance and fairness, Jan-Pro and the IFA imply a due process challenge. Although neither Jan-Pro nor the IFA spells out a complete due process argument, both allude to it repeatedly. The IFA in particular cites to several decisions that rest on due process considerations—most notably *Moss v. Superior Court*, 950 P.2d 59, 81 (Cal. 1998).

As an initial matter, we note that the present case involves the retroactive application of civil, rather than criminal, liability. That alone distinguishes *Moss*, where the

Supreme Court of California held that the Fourteenth Amendment's due process guarantee bars the retroactive application of a rule leading to a contempt sanction, which is a criminal penalty. *See Moss*, 950 P.2d at 80–81.

As to caselaw involving civil (and purely economic) liability, the Supreme Court has made clear that legislative acts "adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality" and are evaluated under a rational basis test. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976); *see also Morseburg v. Balyon*, 621 F.2d 972, 979 (9th Cir. 1980) (applying the *Turner Elkhorn* presumption to state law). Specifically, "the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Id.* "This is true even though the effect of the legislation is to impose a new duty or liability based on past acts." *Id.* at 16. The decision to impose retroactive liability requires a separate justification, but the "burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984).

This case implicates a judicial rule rather than a legislative enactment. "Even more deference is owed to judicial common-law developments, which by their nature must operate retroactively on the parties in the case." *Gibson v. Am. Cyanamid Co.*, 760 F.3d 600, 622 (7th Cir. 2014) (emphasis removed) (holding that a new rule announced by the Wisconsin Supreme Court imposing retroactive liability is constitutional).

Applying *Dynamex* retroactively is neither arbitrary nor irrational. The *Dynamex* court explained that "wage orders are the type of remedial legislation that must be liberally

construed in a manner that services its remedial purpose." 416 P.3d at 32. Moreover, *Dynamex* made clear that California wage orders serve multiple purposes. One is to compensate workers and ensure they can provide for themselves and their families. *Id.* But second, wage orders accord benefits to entire industries by "ensuring that . . . responsible companies are not hurt by unfair competition from competitor businesses that utilize substandard employment practices." *Id.* And finally, wage orders benefit society at large. Without them, "the public will often be left to assume responsibility for the ill effects to workers and their families resulting from substandard wages or unhealthy and unsafe working conditions." *Id.* It is with these purposes in mind that the California Supreme Court embraced the ABC test and found it to be "faithful" to the history of California's employment classification law "and to the fundamental purpose of the wage orders." *Id.* at 40.

By applying *Dynamex* retroactively, we ensure that the California Supreme Court's concerns are respected. Besides ensuring that Plaintiffs can provide for themselves and their families, retroactivity protects the janitorial industry as a whole, putting Jan-Pro on equal footing with other industry participants who treated those providing services for them as employees for purposes of California's wage order laws prior to *Dynamex*. And retroactive application ensures that California will not be burdened with supporting Plaintiffs because of the "ill effects" that "result[] from substandard wages." *Id.* at 32. Moreover, liability is placed on the entity that created the business structure at issue. *Cf. Turner Elkhorn*, 428 U.S. at 18 ("[T]he imposition of liability for the effects of disabilities bred in the past is justified as a rational measure to spread the costs of the employees' disability to those who have profited from the fruits of their labor . . . ."); *United States v. Dico, Inc.*, 266 F.3d 864, 880

(8th Cir. 2001) (applying the Comprehensive Environmental Response, Compensation and Liability Act retrospectively because Congress so intended and "acted purposefully to allocate the cost of hazardous waste cleanups sites 'to those who were responsible for creating the sites.'" (quoting *Franklin Cty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 552 (6th Cir. 2001))).

### III. The Merits

### A.  The Facts

Plaintiffs were unit franchisees who purchased their franchises from two different regional master franchisors. Plaintiff Vasquez purchased his franchise from master franchisor New Venture of San Bernardino, LLC for $2,800; plaintiff Roman bought hers from Connor-Nolan, Inc., also for $2,800; and plaintiff Aguilar, with a business partner, also acquired his from Connor-Nolan, Inc., but for $9,000. *See Roman v. Jan-Pro Franchising Int'l, Inc.*, No. 16-cv-05961, 2017 WL 2265447, at *1 (N.D. Cal. May 24, 2017).

The First Circuit's *Depianti* decision factually explained the uncontested multi-tiered franchise model and several aspects of Jan-Pro's franchise agreements with its master franchisees.  But it was only a "brief synopsis of the factual background," *Depianti–CA1*, 873 F.3d at 23, sufficient for the limited purpose of resolving the case on res judicata grounds, not on the merits.   What follows is a more comprehensive set of facts taken from the record in this case.

### 1.  The Contracts Among the Various Entities

Jan-Pro's franchise agreements provide for several streams of payments. Two are of particular importance. First, master franchisors are obligated to pay 10% of the

franchise fee paid to them by unit franchisees to Jan-Pro. Second, master franchisors are required to pay Jan-Pro 4% of the revenues which they collect from unit franchisees' customers for their cleaning services.

Regional master franchisees purchase franchises for exclusive operations in a given regional area. Among other things, they advertise cleaning services under the "Jan-Pro" name. They do not, however, typically perform any cleaning services; unit franchisees do the cleaning. Regional master franchisors submit bids for cleaning services to unit franchisees who can accept or reject the bid. Unit franchisees may also solicit for their own accounts.

Although the regional master franchisees operate their own independent businesses and can set their own terms with unit franchisees, the regional master franchisees' agreements with Jan-Pro include many requirements for how the businesses are to be conducted. For example, regional master franchisees must use the "Jan-Pro" name, logo, and trademark; maintain specific amounts of insurance; attend training sessions hosted by Jan-Pro; provide training for unit franchisees; and allow Jan-Pro to inspect the regional master franchisees' books, records, and premises. Regional master franchisees must also sell a specified number of unit franchises.

Furthermore, the franchise agreements between Jan-Pro and the regional master franchisees give Jan-Pro authority to enforce any agreement between the regional master franchisee and its respective unit franchisees. If the franchise agreement between Jan-Pro and a regional master franchisee terminates, the agreement allows Jan-Pro to assume the regional master franchisee's rights and obligations to its unit franchisees. Similarly, in the event that a regional master franchisee defaults on its obligations to

cleaning customers, the agreement provides that Jan-Pro may assume all of the regional master franchisee's rights and obligations to those customers. Moreover, Jan-Pro requires that regional master franchisees specify in their contracts with unit franchisees that Jan-Pro is a third-party beneficiary of those contracts. Finally, Jan-Pro reserves the right to unilaterally promulgate binding "policies and procedures" that pertain both to the businesses of the regional master franchisees and that of the unit franchisees.

There are inconsistencies between Jan-Pro's agreements with its regional master franchisees on one hand, and the agreements between the regional master franchisors and their unit franchisees on the other. Although the agreements between Jan-Pro and its regional master franchisees require that the regional master franchisees use a specific form when contracting with unit franchisees, Jan-Pro's CEO testified that Jan-Pro only provides its regional master franchisees with a "template" for agreements with unit franchisees. Whatever the reason, the unit franchisee agreements do not always fulfill the requirements enumerated in Jan-Pro's agreements with regional master franchisees. For example, none of Plaintiffs' unit franchise agreements include a clause naming Jan-Pro as a third-party beneficiary. They do, however, contemplate that Jan-Pro may promulgate policies and procedures and require unit franchisees to comply with them.

In most ways, however, Plaintiffs' agreements substantially follow Jan-Pro's requirements. For example, all the agreements describe the unit franchisee as an independent contractor and disclaim an employment relationship. All the agreements require Plaintiffs to obtain the regional master franchisor's consent before assigning their franchise, with failure to obtain consent constituting

grounds for termination. All the agreements also include non-competition clauses that forbid Plaintiffs from engaging in either janitorial services or the franchising of janitorial services outside of their Jan-Pro franchise.

## 2. The Practical Realities

In their depositions, the parties dispute the on-the-ground realities. As a practical matter, there may be less control at all levels than what is contemplated in the agreements. For example, it appears that at least one Plaintiff operated and solicited a cleaning business outside of her Jan-Pro unit franchise in apparent violation of her franchise agreement's non-compete clause. And as mentioned, regional master franchisors do not use Jan-Pro's form agreement with unit franchisees, nor do they include the third-party beneficiary provision. Moreover, despite Jan-Pro's reservation of the power to do so, a Jan-Pro Vice President testified that the company's officials rarely make site visits to its regional master franchisees. They also rarely, if ever, inspect the books and records of their regional master franchisees.

Additionally, there is considerable daylight between the parties as to Jan-Pro's involvement in the setting of prices by the regional master franchisees. Plaintiffs refer to a proprietary system called "EZ-Bid," which was developed by Jan-Pro and lets regional master franchisees quickly generate bids. Jan-Pro counters that the regional master franchisors that contracted with Plaintiffs did not use this system. Furthermore, Jan-Pro employees testified that the "EZ-Bid" system simply incorporates publicly available standards for estimating cleaning costs.

The parties also dispute whether unit franchisees in general, and Plaintiffs in particular, knew about the franchise

structure and understood that Jan-Pro and their regional master franchisors were separate entities.  Plaintiffs are not sophisticated parties, and English is not their first language.  Based on their deposition testimony, and drawing inferences in favor of Plaintiffs, a fair characterization may be that Plaintiffs understood themselves to be "Jan-Pro cleaners" but did not necessarily think they were contracting with a company called "Jan-Pro Franchising International."

In terms of advertising, Jan-Pro on its website describes itself as a cleaning company, and lists its regional master franchisees as "locations."  In turn, many regional master franchisees, including the ones that contracted with Plaintiffs, hold themselves out as "Jan-Pro International" on their websites.

## B.  The District Court's Decision

The district court began its analysis by noting that Jan-Pro contended that *Patterson v. Domino's Pizza, LLC*, 333 P.3d 723 (Cal. 2014), supplied the relevant standard. *See Roman*, 2017 WL 2265447, at *2.  In that case, the plaintiff was employed by a franchisee and alleged that she had been subject to sexual harassment by a supervisor for the franchisee.  *Patterson*, 333 P.3d at 725.  Accordingly, she sought to hold the franchisor vicariously liable.  As the district court pointed out, *Patterson* held that "a franchisor could not be held liable vis-à-vis its franchisee unless it 'enter[ed] the arena' of overseeing the day to-day operations of the franchise," because "[a]ny other guiding principle would disrupt the franchise relationship."  *Roman*, 2017 WL 2265447, at *2 (quoting *Patterson*, 333 P.3d at 739).

Plaintiffs contended, however, that in this wage and hour case, *Martinez v. Combs*, 231 P.3d 259 (Cal. 2010), applies. That case set forth three alternative definitions of "to

employ": "(a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." *Roman*, 2017 WL 2265447, at *2 (emphasis in original) (quoting *Martinez*, 231 P.3d at 278).

The district court recognized that "no binding decision ha[d] addressed the standard applicable to determining whether a franchisor is an employer of a franchisee," and "in the absence of controlling authority" it applied "the *Martinez* standard, with the gloss of *Patterson*." *Roman*, 2017 WL 2265447, at *3. In particular, for *Martinez*'s first prong, it merged the "'exercise' of control" standard with "the 'right' to control" standard from *Patterson*. *Id.* With this standard in mind, the court concluded that the unit franchisees "failed to raise a genuine dispute of fact about whether Jan-Pro directly or indirectly exercised control over their activities or whether it had the right to control their day-to-day activities." *Id.* This holding also doomed Plaintiffs' claim under the third prong of *Martinez* since they "failed to establish an employment relationship" with Jan-Pro. *Id.* at *5.

The district court next considered the "suffer or permit" second prong in *Martinez*, which "impose[d] liability based on the defendant's 'knowledge of and failure to prevent the work from occurring.'" *Id.* at *6 (quoting *Martinez*, 231 P.3d at 282). It rejected its application because "Jan-Pro lacked the authority to stop [the] plaintiff unit franchisees from working." *Id.*[9]

---

[9] The district court also rejected Plaintiffs' claim that Jan-Pro became their employer "because the regional master franchisees became ostensible agents of Jan-Pro, and so Jan-Pro must answer for the

## C. *Dynamex*

*Dynamex* expanded the definition of "suffer or permit" for California wage order cases. Surveying California caselaw wrestling with the pervasive issue of how to discern whether a plaintiff is an independent contractor or an employee, *see Dynamex*, 416 P.3d at 15–25, the California Supreme Court recognized that the caselaw supplied three alternative definitions of "employee" status in the context of wage orders, one of which is when a putative employer "suffers or permits" a putative employee to work. Before *Dynamex*, as *Martinez* explained, this term was understood to mean that a putative employer had "knowledge of and fail[ed] to prevent the work from occurring." 231 P.3d at 282.

*Dynamex* clarified the definition of "suffer or permit." Under *Dynamex*, a "hiring entity" (the putative employer) "suffers or permits" a putative employee to work if it cannot

---

liabilities, if any, of the regional master franchisees." *Roman*, 2017 WL 2265447 at *6. It concluded that "[t]here is simply no evidence that [the unit franchisees] formed a belief, reasonable or otherwise, that their respective regional master franchisees acted as agents of any other principal." *Id.* Nor did Plaintiffs "offer any argument suggesting that our defendant through affirmative action or neglect allowed such a belief to be formed." *Id.* On appeal, citing *Ochoa v. McDonald's Corp.*, 133 F. Supp. 3d 1228 (N.D. Cal. 2015), Plaintiffs argue that the district court applied the wrong standard because all that matters is that they formed a reasonable belief that their regional master franchisors were acting under some principal's authority. But in *Ochoa*, the workers "submitted declarations stating that they believed McDonald's was their employer." 133 F. Supp. 3d at 1239–40. Here, in contrast, Plaintiffs have supplied no evidence that they were even aware of Jan-Pro International, Inc., the ostensible principal they are suing. Thus, we agree with the district court's reasoning that Plaintiffs were not Jan-Pro's employees on an ostensible agency theory.

overcome the "ABC test." 416 P.3d at 35. In particular, *Dynamex* embraced the Massachusetts version of the test. *See id.* at 34 n.23; Mass. Gen. Laws ch. 149, § 148B(a). As in Massachusetts, the test requires the hiring entity to establish three elements to disprove employment status: (A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; (B) that the worker performs work that is outside the usual course of the hiring entity's business; and (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed. *Dynamex*, 416 P.3d at 35. And, as in Massachusetts, all three elements must be established to disprove employment status. *Id.* Thus, by judicial fiat, California incorporated Massachusetts's employment classification statute into its labor laws.

As the California Supreme Court explained, the "suffer or permit to work standard in California wage orders" is meant to be "exceptionally broad," *id.* at 31, because "wage orders are the type of remedial legislation that must be liberally construed in a manner that serves [their] remedial purposes," *id.* at 32.

The district court had no opportunity to consider whether Plaintiffs are employees of Jan-Pro under the *Dynamex* standard, and neither party had the opportunity to supplement the record with regard to the *Dynamex* criteria. Given the fact-intensive nature of the *Dynamex* inquiry, we leave it to the district court to consider the question in the first instance with the benefit of a more developed record. *See Wright v. Riveland*, 219 F.3d 905, 918 (9th Cir. 2000) (remanding to the district court for a "fact-intensive inquiry").

## D. Application of *Dynamex* on Remand

As an aid to the court, we offer the following observations and guidance. *See United States v. Gladding*, 775 F.3d 1149, 1153 (9th Cir. 2014) (providing "guidance on remand" for a novel legal issue); *M.S. ex rel. Simchick v. Fairfax Cty. Sch. Bd.*, 553 F.3d 315, 326 n.13 (4th Cir. 2009) ("Our court regularly issues opinions to provide guidance on remand in the interest of judicial efficiency." (alteration omitted) (quoting *Goodman v. Praxair, Inc.*, 494 F.3d 458, 466 n.2 (4th Cir. 2007))).  On remand, the court should consider all three prongs of the ABC test and, in doing so, may wish to consider authorities from other jurisdictions that apply the test.  *See, e.g.*, *Shuster v. BAC Home Loans Servicing, LP*, 211 Cal. App. 4th 505, 507–08 (2012) (looking to "the weight of authority from other jurisdictions" for "an issue of first impression in California").

### 1.  There Is No *Patterson* Gloss to the ABC Test.

As summarized earlier, the district court employed a gloss from *Patterson* in holding that Plaintiffs were not employees under *Martinez*'s first definition of employment. However, *Patterson*, unlike *Dynamex*, was not a wage and hour case; therefore, it has no application to the ABC test applicable to wage and hour cases.

It is true that the California Supreme Court's opinion in *Patterson* included extensive dicta about the "special features of the franchise relationship," which necessarily include a degree of control over the franchisee by the franchisor in its legitimate effort to protect its brand.  *See Patterson*, 333 P.3d at 732–34; *accord Depianti–Georgia*, 712 S.E.2d at 651 ("We recognize that the franchise model inherently involves some overlap between the business

model created by the master franchisor and the ultimate business run by the unit franchisee." (footnote omitted)).

But *Patterson* focused on the liability of a franchisor for a sexual assault against an employee of the franchisee. In other words, it was a case about vicarious liability in the tort context. *Dynamex*, which did not mention *Patterson*, is about wage orders. There is no reason that the tests for employee status must necessarily be the same in wage order cases as in vicarious liability tort cases. *See Dynamex*, 416 P.3d at 19 ("*Borello* . . . call[ed] for resolution of the employee or independent contractor question by focusing on the intended scope and purposes of the particular statutory provision at issue."); *Linton v. Desoto Cab Co., Inc.*, 15 Cal. App. 5th 1208, 1216, 1219 (2017) ("[T]he goal of . . . the Labor Code's wage and hour provisions is to protect a class of workers who otherwise would not enjoy statutory protections. . . . Outside of tort, rather than rigidly applying the common law test, we look to the history and fundamental purposes of the statute at issue." (alterations, internal citations, and quotation marks omitted)).

The classic justifications for imposing (or withholding) vicarious liability based on control (or lack thereof) have little to do with the rationale for wage orders. The purposes of imposing vicarious liability in tort cases include "preventing future injuries, assuring compensation to victims, and spreading the losses caused by an enterprise equitably." *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 907 P.2d 358, 366 (Cal. 1995). Where a supervising entity has the right of direct control over subordinates, it is in a position to foresee, manage, and prevent tortious conduct by those subordinates. Imposing liability on the entity therefore improves private enforcement of such conduct.

Wage orders, on the other hand, have more to do with creating incentives for economic entities to internalize the costs of underpaying workers—costs that would otherwise be borne by society. *See, e.g.*, *Kerr's Catering Serv. v. Dep't of Indus. Relations*, 369 P.2d 20, 24–25 (Cal. 1962) ("[L]egislation which is enacted with the object of promoting the welfare of large classes of workers whose personal services constitute their means of livelihood must certainly be regarded as of direct and vital concern to every community and as calculated to confer direct or indirect benefits upon the people as a whole . . . ." (quoting *People v. Vandersee*, 294 P.2d 77, 79 (Cal. Dist. Ct. App. 1956))). The ABC test for ascertaining employment status in the wage context reflects this difference in purpose by eschewing reliance on control over the performance of the worker as a necessary condition for an employment relationship.[10] Recognizing this conceptual difference, *Dynamex* favorably cited two Massachusetts decisions that applied the ABC test in the franchise context. *See Dynamex*, 416 P.3d at 40 (citing *Awuah v. Coverall North America, Inc.*, 707 F. Supp. 2d 80 (D. Mass. 2010), and *Coverall N. Am., Inc. v. Comm'r of Div. of Unemployment Assistance*, 857 N.E.2d 1083 (Mass. 2006)).

The general policy arguments that Jan-Pro and the IFA raise are of limited persuasive value. Their concerns would apply just as much in Massachusetts, where courts have routinely applied the codified ABC test to franchises (and have routinely held against franchisors). Furthermore, in adopting the ABC test, *Dynamex* laid out multiple public

---

[10] Of course, under prong A of the ABC test, a showing that a worker *is* under the control and direction of the hiring entity in connection with the performance of the work remains sufficient to establish an employment relationship. *See Dynamex*, 416 P.3d at 35.

policy arguments, many of which equally apply in the franchise context. *See Dynamex*, 416 P.3d at 31–36.

Thus, the franchise context does not alter the *Dynamex* analysis, and the district court need not look to *Patterson* in applying the ABC test.

### 2. Other Courts Have Considered Three-Tier Franchise Structures in Applying the ABC Test.

Other courts have specifically examined three-tier franchise structures before, with at least one concluding that the franchisor is an employer.

As *Depianti–SJC* explained, the ABC test applies to a dispute between a putative employee and a hiring entity even if they are not parties to the same contract. As long as the putative employee was providing a service to the hiring entity even *indirectly*, the hiring entity can fail the ABC test and be treated as an employer. *See Depianti–SJC*, 990 N.E.2d at 1068 ("Jan-Pro's contractual arrangement with [a regional master franchisee] . . . would provide a means for Jan-Pro to escape its obligation, as an employer, to pay lawful wages under the wage statute."). *Depianti–SJC* explained the court's reasoning with a hypothetical (edited for consistency with the parties of this case):

> [C]ompany A contracts with company B for services, and company B enters into arrangements with third parties to perform the work it undertook under its contract with company A. We agree that ordinarily, in such circumstances, company A would not be liable for misclassification of the third-party workers. This is because ordinarily, in such circumstances, company B would be the

> agent of any misclassification. However, here [Plaintiffs] allege[] that Jan-Pro, and not [the regional master franchisor], designed and implemented the contractual framework under which [they were] misclassified as an independent contractor. The lack of a contract between [Plaintiffs] and Jan-Pro does not itself preclude liability. Where a party is the agent of misclassification, it may be directly liable under [the ABC test], even where it utilizes a proxy to make arrangements with its employees.

*Id.* at 1068 n.17. Thus, as a doctrinal matter, Jan-Pro could be Plaintiffs' employer under the ABC test even though it is not a party to any contract with Plaintiffs.

At least one court in Massachusetts has employed this reasoning to conclude that a top-level franchisor in a nearly identical business structure was the employer of bottom-level franchisees. *See Da Costa v. Vanguard Cleaning Sys., Inc.*, No. 15-04743, 2017 WL 4817349, at *5 (Mass. Supp. Sept. 29, 2017) (concluding that unit franchisees provided a service to top-level franchisor because franchisor's revenue was "directly dependent on commercial cleaning work of the . . . unit franchisees"). An arbitrator, also in Massachusetts, reached the same conclusion in a well-reasoned decision concerning yet another three-tiered janitorial franchising case. *See Riberio v. System4 LLC*, AAA No. 01 15 0003 8637 (Aug. 23, 2016), *confirmed by* 275 F. Supp. 3d 297 (D. Mass. 2017).[11]

---

[11] The full order of the arbitrator was attached to a motion to take judicial notice by Plaintiffs, which we granted.

### 3. Prong B of the ABC Test May Be the One Most Susceptible to Summary Judgment.

In applying the ABC test on remand, the district court may choose to allow further development of the record. Application of Prongs A and C is most likely to trigger the need for further factual development, because the considerations relevant to those prongs are the most factually oriented. But the ABC test is conjunctive, so a finding of any prong against the hiring entity directs a finding of an employer-employee relationship. Prong B may be the most susceptible to summary judgment on the record already developed. We leave it to the district court, of course, to determine whether summary judgment is warranted on the current record or whether more factual development is appropriate.

More specifically, Prong B requires the hiring entity to establish that it was not engaged in the same usual course of business as the putative employee. This factor reflects the distinction between workers who are truly independent contractors and those whose work involves the hiring entity's usual course of business. *See Dynamex*, 416 P.3d at 37 ("[W]hen a retail store hires an outside plumber to repair a leak in a bathroom on its premises or hires an outside electrician to install a new electrical line, the services of the plumber or electrician are not part of the store's usual course of business and the store would not reasonably be seen as having suffered or permitted the plumber or electrician to provide services to it as an employee.").

Analytically, courts have framed the Prong B inquiry in several ways. They have considered whether the work of the employee is necessary to or merely incidental to that of the hiring entity, whether the work of the employee is continuously performed for the hiring entity, and what

business the hiring entity proclaims to be in. *See, e.g.*, *Mattatuck Museum–Mattatuck Historical Soc'y v. Adm'r, Unemployment Comp. Act*, 679 A.2d 347, 351 (Conn. 1996); *Carey v. Gatehouse Media Mass. I, Inc.*, 92 Mass. App. Ct. 801, 804–10 (2018).

All of these formulations should be considered in determining whether Jan-Pro was Plaintiffs' employer and not merely an indirect licensor of a trademark. We note that the Georgia Court of Appeals did not consider any of these relevant precedents when construing the Massachusetts independent contractor statute in *Depianti–Georgia*.

### i.  Are Unit Franchisees Necessary to Jan-Pro's Business?

A common test for comparing the businesses of a hiring entity and a putative employee is to see whether the putative employees were "necessary" or "incidental" to the hiring entity's business. In some cases, this inquiry can be conducted through a common-sense observation of the nature of the businesses. For example, in *Carpetland U.S.A., Inc. v. Ill. Dep't of Emp't Sec.*, 776 N.E.2d 166 (Ill. 2002), the Supreme Court of Illinois reasoned that "floor measurers" are necessary to the business of a carpet retailer and, thus, were in the same business as the retailer.[12] *Id.* at 187. In contrast, the putative employee in *Great N. Constr., Inc. v. Dep't of Labor*, 161 A.3d 1207 (Vt. 2016), performed "highly specialized restoration work" that was not a "key component" of the hiring entity, which was a "general

---

[12] The court also analyzed whether the workers conducted their business "outside of all the places of business of the enterprise for which such service is performed." *Carpetland*, 776 N.E.2d at 169. This formulation is an alternative version of Prong B embraced by some states but explicitly rejected by *Dynamex*. *See Dynamex*, 416 P.3d at 34 n.23.

contracting firm doing a mix of residential and commercial work." *Id.* at 1217 (internal quotation omitted). Thus, the Supreme Court of Vermont held, the putative employee was an independent contractor.

In other cases, courts view the "necessary" versus "incidental" distinction in more economic terms. In *Sebago v. Boston Cab Dispatch, Inc.*, 28 N.E.3d 1139, 1150–51 (Mass. 2015), the court analyzed two cases from Illinois involving drivers for hire. In the first case, *Parks Cab Co. v. Annunzio*, 107 N.E.2d 853 (Ill. 1952), taxi cab operators paid a flat fee to lease taxicab medallions. In the second case, *O'Hare–Midway Limousine Serv., Inc. v. Baker*, 596 N.E.2d 795 (Ill. App. Ct. 1992), chauffeurs leased limousines from a rental company and paid a percentage of their earnings to the company. The *Sebago* court explained that the taxi cab drivers in *Parks Cab* were incidental to the operations of the medallion lessors because the medallion companies' revenues were not affected by how much the taxi cab drivers worked. In contrast, the owners of the limousine company in *O'Hare–Midway* derived their profits from the earnings of the limousine chauffeurs. Thus, the work of the chauffeurs was necessary to the success of the limousine company. In a similar vein, the Supreme Judicial Court of Maine held that a company that described itself as a "real estate and timber management company" was in the same usual course of business as a timber harvester in part because it derived a profit from the sale of timber by the harvester. *See McPherson Timberlands, Inc. v. Unemployment Ins. Comm'n*, 714 A.2d 818, 821–22 (Me. 1998).

Both approaches may inform this case. First, Jan-Pro's business ultimately depends on someone performing the cleaning. That work is performed solely by the unit franchisees. Thus, Jan-Pro fundamentally depends on a

supply of unit franchisees for its business (and, accordingly, requires its regional master franchisees to sell a minimum number of unit franchises). Second, Jan-Pro earns a percentage of the payments that customers pay for cleaning services. Thus, unlike the medallion owners in *Parks Cab*, Jan-Pro is not indifferent to how much work unit franchisees do or how well they perform that work. It is not simply renting out its trademark and goodwill to independent entities that could use it to perform cleaning services. Rather, Jan-Pro is actively and continuously profiting from the performance of those cleaning services as they are being performed.

### ii. Do Unit Franchisees Continuously Work in Jan-Pro's Business System?

In analyzing Prong B, some courts have also looked to whether the services of the putative employee are continuously used by the hiring entity. This approach also helps capture the distinction between independent contractor arrangements designed to evade requirements placed on employers and traditional contractors like electricians and plumbers, who perform incidental services for otherwise unrelated businesses. *Cf. Holbrook v. Olympia Hotel Co.*, 166 N.W. 875, 878 (Mich. 1918) ("It would seem that occasionally renovating the rooms of a building, or the building itself, owned and occupied by the owner as a home, with paint or paper or both, is not in the usual course of the trade, business, profession or occupation of the owner, unless he is himself in the business of painting and decorating."). This was the approach taken by the Supreme Court of Connecticut in *Mattatuck Museum*. The court held that a hiring entity cannot meet its burden under Prong B when it "performs the [putative employee's] activity on a regular or continuous basis, without regard to the

substantiality of the activity in relation to the enterprise's other business activities." *Mattatuck Museum*, 679 A.2d at 351.   The Supreme Court of Utah has used similar reasoning in the Prong B context. *See Bigfoot's Inc. v. Bd. of Review*, 710 P.2d 180 (Utah 1985); *Black Bull, Inc. v. Indus. Comm'n*, 547 P.2d 1334 (Utah 1976).

The district court should consider, therefore, whether Jan-Pro's business model relies on unit franchisees continuously performing cleaning services.

### iii. Does Jan-Pro Hold Itself Out as a Cleaning Business?

Finally, in determining the usual course of a hiring entity's business, courts consider how the business describes itself. *See Athol Daily News v. Bd. of Review*, 786 N.E.2d 365, 372 (Mass. 2003).  For example, in *Gerbder Dental Ctr. Corp. v. Me. Unemployment Ins. Comm'n*, 531 A.2d 1262 (Me. 1987), the Supreme Judicial Court of Maine held that the operator of a dental office was the employer of dentists who worked there in part because it "publicly advertised the provision of dental services." *Id.* at 1264.  Jan-Pro's websites and advertisements likewise promote Jan-Pro as being in the business of cleaning.  For example, the website describes Jan-Pro as an "environmentally responsible commercial cleaning company" and explains that Jan-Pro provides "cleaning services."

Jan-Pro argues that it is in the business of "franchising" rather than cleaning.  Various courts and arbitrators, however, have been skeptical of such characterizations, especially in the cleaning franchise industry.  This skepticism was pointedly expressed by a district court in Massachusetts:

> [F]ranchising is not in itself a business, rather a company is in business of selling goods or services and uses the franchise model as a means of distributing the goods or services to the final end user without acquiring significant distribution costs. Describing franchising as a business in itself, as Coverall seeks to do, sounds vaguely like a description of a modified Ponzi scheme—a company that does not earn money from the sale of goods and services, but from taking in more money from unwitting franchisees to make payments to previous franchisees.

*Awuah*, 707 F. Supp.2d at 84; *see also Da Costa*, 2017 WL 4817349, at *6 (Mass. Supp. Sept. 29, 2017) ("Vanguard cannot reasonably maintain that commercial cleaning is not part of its ordinary course of business to avoid classifying its workers as employees while simultaneously touting that it is 'a leader in the commercial cleaning industry.'"); *Riberio*, AAA No. 01 15 0003 8637, at *29 (Aug. 23, 2016).

In *Curry v. Equilon Enters., LLC*, 23 Cal. App. 5th. 289 (2018), the sole case that Jan-Pro cited in addressing the substantive aspects of the ABC test, the court held that Shell is in the business of owning gasoline and real estate, which is a different course of business than that of gas station operation. Although *Curry*'s ABC analysis is somewhat slim on its own terms,[13] the dichotomy of "gasoline

---

[13] In *Curry*, the court was not sure that *Dynamex* applied at all. Because the court had already conducted a cursory "course of business" analysis outside of the ABC test context, it included the same analysis by reference in quickly working through the ABC test "out of an abundance of caution." *See Curry*, 23 Cal. App. at 314–15. Thus, the

ownership" versus "gas station operation" is significantly less troublesome than the "the business of franchising" that Jan-Pro purports to be in.  *Curry* is therefore of limited use in the ABC test analysis.

## CONCLUSION

The judgment of the district court granting summary judgment for the defendant is vacated and the case is remanded to the district court for further proceedings consistent with this opinion.

Each side shall bear its own costs on appeal.

---

court did not have occasion to apply any of the ABC test-specific precedents referenced in this opinion.