# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN FLEMING, on behalf
of himself and all
others similarly situated,

        Plaintiff,

vs.                         No. 3:19-cv-00463-WHO

MATCO TOOLS CORPORATION,
a Delaware corporation;
NMTC, INC. dba MATCO
TOOLS, a Delaware
corporation; FORTIVE
CORPORATION, a Delaware
corporation; and
DOES 1-20, inclusive,

        Defendants.

                    /

VIDEO DEPOSITION OF JOHN FLEMING

APPEARING REMOTELY FROM

CONTRA COSTA COUNTY, CALIFORNIA

November 13, 2020

9:05 a.m.

REPORTED BY:

Audrey Klettke, CSR No. 11875

Dana Freed, CSR No. 10602

APPEARING REMOTELY FROM SANTA CLARA COUNTY, CALIFORNIA

```
 1    operating there in the dry cleaning capacity from 1994

 2    to 2007.

 3         Q.  Do you know what the name of the litigation is?

 4         A.  Circo versus Bowman I think.  Circo versus

 5    Vicki Bowman.

 6         Q.  Do you know, is that in federal court or in

 7    state court?

 8         A.  It's in superior court, County of Santa Cruz,

 9    California.

10         Q.  Any other party -- any other litigation that

11    you have been a party to other than family law matters

12    or matters while you were a police officer?

13         A.  Also in the course of my dry cleaning business

14    I had a dry cleaning plant in Salinas.  I sold that

15    business to a man named Wong Bang Jong [phonetic].  He

16    in turn sold it to another party.  And that party went

17    bankrupt unbeknownst to me.  And I don't remember the

18    names of anybody.  That was in about year 1990 or 2000.

19    I was sued for a violation of the lease.  I ended up

20    having a judgment and paid that judgment.  And I was

21    granted a judgment against that Wong Bang Jong fellow

22    who has subsequently passed away.  I don't know the

23    names of all the -- the landlord.

24             I didn't anticipate you asking me that

25    question.  I would have to think about it a little bit.
```

```
 1    But I might be able to remember the real estate

 2    company.

 3         Q.  Any other cases that you have been a party to?

 4         A.  Just small claims court.  That's it.

 5         Q.  It sounds like you owned a dry cleaning

 6    business and you have also -- you also owned a separate

 7    dry cleaning plant; is that correct?  Or is that part

 8    of a business or is that a separate entity?

 9         A.  I owned a chain of dry cleaning stores.  I had

10    eight stores.  I had two plants.  That's -- that's what

11    it was.

12         Q.  Were you the sole proprietor or did you have

13    other business partners in that?

14         A.  Sole proprietor.

15         Q.  When did you own that again?  I'm sorry.

16         A.  I started the business in '93, I think.  And I

17    sold it -- I was out of business by 2007.

18         Q.  2000 what?  I'm sorry?

19         A.  '7.

20         Q.  '7.  Okay.  And that's because you sold the

21    business at that point?

22         A.  Yes, sir.

23         Q.  Any other businesses that you have owned in

24    your life?

25         A.  Yes.  I have owned a construction company.
```

1     Q.   When did you own a construction company?

2     A.   I can't remember the exact years, but from

3  about 1987 off and on I was active.  I kept my general

4  contractor's license active.  Probably through the mid

5  '90s.

6     Q.   What was the name of that business?

7     A.   Fleming Construction.

8     Q.   I didn't ask you this, but what was the name of

9  your dry cleaning business?

10     A.   Classic cleaners.

11     Q.   Were both of those incorporated or LLCs?

12     A.   No.  They were both sole proprietorships.

13     Q.   Why did you get out of the construction

14  business?

15     A.   I operated the construction business during the

16  time that I was also a police officer.  I considered

17  staying in that business when I decided to get out of

18  law enforcement.  But I looked at the cash flow in

19  construction and -- sometimes you get a lot of money

20  coming in and sometimes you don't.  So I thought to

21  myself I need a steady business that has a steady

22  income.  And so I researched dry cleaning.  And

23  although I had no experience in that field, I found

24  that it was a business that has a very predictable

25  income, and I liked that idea.

 1          A.   That's correct.

 2          Q.   And then you have got various other information

 3     listed down below, additional income.   Is that

 4     information accurate?

 5          A.   Yes.

 6          Q.   Okay.   And then I don't want to ask you about

 7     everything here.   But if you can take a minute and go

 8     through it.   And let me know if to the best of your

 9     recollection the information provided in here is

10     accurate --

11               (Audio issue.)

12               MR. ROWLEY:   I'm asking him to just look

13     through it and let me know if there is anything in it

14     that appears to be inaccurate at least as of 2012.

15               THE WITNESS:   (Witness complies.)

16               That appears to be accurate to me.

17          Q.   BY MR. ROWLEY:   So about 2012 you applied to

18     purchase a distributorship from Matco; is that correct?

19          A.   That's correct.

20          Q.   How did you hear about the opportunity?

21          A.   My son was interested in -- I think actually it

22     was Snap-On.   And so I did some research and discovered

23     that Matco seemed to be the better option.

24          Q.   Why did you think that Matco was a better

25     option at that time than Snap-On?

1       A.  I actually looked at the franchise disclosures.

2   And I saw that Snap-On was a much larger company, but

3   the amount of lawsuits and distributor complaints

4   against Snap-On was substantially higher than those

5   against Matco.

6       Q.  So you got a franchise disclosure from both

7   Snap-On and Matco and compared them at the time, it

8   sounds like; is that correct?

9       A.  That's correct.

10      Q.  Were there other issues that factored into your

11  decision to select Matco over Snap-On at that time?

12      A.  I imagine there were, but I don't remember what

13  they were at the time.

14      Q.  Did you talk to anybody about the Matco

15  opportunity, anybody from Matco to start with?

16      A.  Darren -- I'm sorry.  I am drawing a blank on

17  his last name right now.

18      Q.  Darren was the first name?

19      A.  Darren, D-a-r-r-e-n.  He lives in Utah.  It

20  will come to me in a minute.

21      Q.  And what did you talk with Darren about

22  regarding the Matco opportunity?

23      A.  He came to my house and just -- I don't

24  remember the exact discussion, but he had all kinds of

25  brochures and whatnot.

1       Q.   How was is that you got hooked up with Darren?

2   Did you reach out to Matco through phone call, website,

3   a letter?  How did he know to come to your house?

4       A.   I don't remember.

5       Q.   Was anybody else there when you met with

6   Darren; your spouse, for example?

7       A.   My wife was there, yes.

8       Q.   Anyone else?

9       A.   No.

10      Q.   You say your son wanted to own a franchise.

11  Were you planning on working one with him?  Or why was

12  it that you were involved in looking at franchises for

13  you son to look at?

14      A.   My son had a serious drug issue, drug problem

15  when he was young.  I raised him.  And then he went to

16  live with his mother when he was 18 and got involved

17  with methamphetamines and so forth.  He ended up going

18  to prison, doing burglaries and things like that.

19          When he was about 26 he got out and was doing

20  very well.  So he was born in 1976.  You can do the

21  math.  And he -- he came to live with me and he got a

22  job in the auto parts industry.  And he did very well

23  and stayed clean and sober for ten years.  It was at

24  that time I was retired and I had money available to

25  me.  And I had a desire to help my son get involved in

```
 1    some sort of business to help him further his life.
 2    He -- and so that's when he expressed his interest that
 3    he wanted to have a Matco -- or a tool business, I
 4    should say.
 5         So I decided to help him financially to do
 6    that.  The problem was he was a convicted felon.  And
 7    neither Snap-On or Matco was going to allow him to own
 8    a franchise.  So I decided to help him to get into the
 9    business.  And to do so I had to be the franchisee.
10    And that's what I did.  And unfortunately he got back
11    into drugs, and I haven't seen him for six or seven
12    years.
13        Q.  Very sorry to hear that.
14             So in terms of owning a business -- so at the
15    time that you purchased the Matco franchise, was he
16    working at his other job still?
17        A.  He was still working at the --
18             (Audio issue.)
19             THE WITNESS:  He was working for a company
20    called -- I think it's called Mid County Supply.
21        Q.  BY MR. ROWLEY:  So based on your experience
22    owning a business, though, it sounds like you wanted to
23    give him an opportunity to own his business as well; is
24    that correct?
25        A.  That's correct.
```

1        Q.  And since he couldn't personally own and

2    operate his own business, you decided to purchase a

3    Matco franchise that ultimately you hoped he would be

4    able to kind of operate, correct?

5        A.  That's correct.

6        Q.  And during the course that you owned that

7    franchise, did he in fact work in the business?

8        A.  I'm sorry.  I missed the first half of that

9    question.

10       Q.  Sure.  While you owned your Matco

11   distributorship, did he in fact work with you at the

12   business?

13       A.  He did not work with me.  It was my intention

14   or my hope that at some point in time he could do so.

15   But I started to kind of like the business and I

16   thought -- and I saw that there was a need to expand in

17   the area.  There was another territory available.  So I

18   contacted Matco and put him -- or signed on for the

19   second franchise and allowed him to run that franchise.

20       Q.  All right.  Did he run that franchise for a few

21   years?

22       A.  I don't know the exact length of time, but I

23   think it was three to four years.

24       Q.  Did you help him run the franchise?

25       A.  No, I did not.

1      Q.  Did you help him with kind of business planning

2   or how to do the job or anything?  You just bought the

3   franchise and stepped away?

4      A.  Correct.

5      Q.  What happened with that franchise, if you know?

6   He surrendered it?

7      A.  I basically -- what happened was the last year

8   that he was there -- I don't really remember.  I think

9   it was 2017.  It was about -- he would take his truck

10   out, but I guess he wasn't going to any calls.  He was

11   just parking his truck somewhere.

12          He had gotten involved -- because of the Matco

13   business and going through body shops, they got him

14   back involved with methamphetamines.  And so he was

15   doing drugs and so forth.  And there was about a two-

16   or three-month period that I was unaware that he was

17   not going to his calls and taking care of business.

18          And so I think it was the 4th of July that I

19   discovered -- I think 4th of July of 2017, but I'm not

20   certain of that.  And so basically I told him, you

21   know, Park your truck.  You are done.

22          And I called Matco up and I said, you know -- I

23   think at the time I talked to Doug Williamson and said,

24   you know, We are done.  And I will try to collect what

25   money is left out there.

1          But at that time Juan Zarate came in.  And so

2    Juan took the route.  I guess you guys sold him the

3    franchise or something.  I don't know how that works.

4    And so Juan started servicing the route that my son had

5    developed.

6         Q.  What happened with the truck?  Did he buy the

7    truck too?  Do you know what happened with the truck?

8         A.  The truck was a used truck and it was leased.

9    And I sold it and covered the cost of what I owed on

10   it.

11        Q.  And so I'm curious, because your son's LinkedIn

12   identifies him as an account manager at Kimball Midwest

13   and also been working for Snap-On Tools after he left

14   Matco.  Is that consistent with your understanding?

15        A.  My understanding is he was hired by -- and I

16   don't know anything about LinkedIn.  My understanding

17   was that he was hired by Snap-On Tools and shortly

18   thereafter terminated.  I believe it was probably

19   because of drug testing or -- I don't know this for a

20   fact.

21             In terms of Kimball Tools, Kimball approached

22   me and offered me a job because they felt that I knew

23   the Salinas area.  I did not feel a conflict of

24   interest with Matco in that their product line is

25   completely different but they do have the same customer

1    base.  So I went to work for Kimball Tools.

2          I had not talked to my son in years.  They have

3    a training class in Reno, Nevada.  So I went to Reno.

4    And the girl that was providing the training told me --

5    she says, That's really weird, because we had another

6    John Fleming that had worked for us -- my son and I

7    have the same name -- that had worked for us and he was

8    also with Matco Tools.

9          And then I knew at that point.  That was the

10   first time I realized that my son had worked for

11   Kimball Midwest.  And was one of the reasons that I did

12   not want to continue working with Kimball Midwest.

13        Q.  So going back to when you first purchased --

14   you first purchased the franchise.  Did you look at any

15   other kind of franchise opportunities other than Matco

16   or -- Matco or Snap-On around that time or before that?

17        A.  I was a little disappointed that I was not able

18   to go back to work for the federal government because I

19   had broken my foot.  I was at the bank talking with the

20   bank manager, who has done my banking for many, many

21   years -- and I was talking to her about, you know, what

22   was I going to do going forward.  And she told me

23   she -- she suggested about a Fed Ex franchise, because

24   she had had some other people that were customers at

25   the bank.

 1            And so then I started looking at franchises,

 2    and I looked at Fed Ex and I looked at the tool stuff

 3    because my son was encouraging me to look at the tool

 4    industry.  And you can Google those franchises.  Matco

 5    is one of the top, according to the Franchise 500 or

 6    whatever it is -- was up there towards the top in terms

 7    of satisfaction.

 8            And so I thought, you know, I like going out

 9    and meeting people.  I speak Spanish.  I like the

10    Salinas area.  Because I have had a dry cleaning plant

11    in Salinas, I know people in Salinas.  So that's why I

12    kind of gravitated in that direction.

13        Q.  You mentioned before that -- I believe you said

14    that you kind of liked doing the business while you

15    were doing it, at least initially.  What was it that

16    you liked about it?

17        A.  Yeah, I liked meeting people -- new people.  I

18    like going out and just jaw jacking with the guys.

19    That's all.  The people are my friends.

20        Q.  Did you have -- when you started your Matco

21    franchise, did you have an attorney look at any of the

22    materials?

23        A.  I did not.

24        Q.  Did you get advice from your accountant or

25    bookkeeper or tax people?

1      A.  Just the MDBS system that Matco provides.

2      Q.  Did you use any kind of hand ledger or anything

3   like that?

4      A.  No.

5      Q.  Did your wife help you with any of the

6   accounting stuff?

7      A.  No.

8      Q.  Did you have any employees that you paid money

9   to while you were on Matco franchise?

10     A.  No.

11     Q.  Did you pay any sort of wage to your wife or

12  yourself?

13     A.  The first year or two.  I don't remember

14  exactly when I was operating as a sole proprietor, and

15  then I did go into being a corporation.  At that point

16  I started paying myself a salary.  I think it was

17  $2,000 a month.

18     Q.  Why did you switch from sole proprietor to a

19  corporation?

20     A.  Recommendation of Matt Rasmussen.

21     Q.  What did he tell you would be advantageous for

22  you to be a corporation as opposed to a sole

23  proprietor?

24     A.  I don't remember.

25     Q.  You understood, though, there were some

1    money you made as a result of, you know, how much you

2    sold the tools for, for example, right?

3        A.   That's not correct.

4        Q.   Well, let's say, for example, you purchased a

5    tool from Matco that was $10.  Would Matco -- and

6    somebody paid you cash for that tool, say $25 you got.

7    Would that -- are you saying that system would tell you

8    that you made $15 on that tool before your other

9    expenses were deducted?

10       A.   The system tells you what you received in terms

11   of receipts.  It tells you what your expenses are with

12   respect -- in terms of purchases, in terms of your

13   fuel, in terms of your truck payment, in terms of your

14   store.  All that kind of stuff is in there.

15            But to say that there is a statement at the

16   bottom line that says this is your profit and loss, I

17   don't really remember.

18       Q.   And the information you are talking about about

19   expenses is all stuff that you just chose to put in

20   there, right?  So if you put in expenses of $1,000,

21   lets say, for your gas, it would show $1,000, right?

22       A.   I kept the receipts for that.

23       Q.   When you put those expenses in, did you go back

24   and look at those receipts and tally them all up and

25   give an exact number for those?

1        A.   The system allows you on a daily basis -- say,

2    for example, I fill up the truck with fuel.   Then I get

3    in the truck, put it in the computer I just spent $90

4    for diesel fuel in my truck.   It's got the date and

5    time and I enter it into the computer.   And then I put

6    the receipt in an envelope.   End of the year I have

7    these envelopes full of receipts.   But I think the

8    software that Matco has created and asks the

9    distributors to purchase and use in the functioning of

10   their business actually keeps pretty good track of your

11   expenses.

12        Q.   So when you ran your business, you used that

13   software to track your expenses.   So you were, you'd

14   say, fairly rigorous about putting all your expenses

15   into that software; is that correct?

16        A.   I didn't do it on a daily basis.   But if there

17   was -- I would accumulate maybe -- we were talking

18   about gasoline, for example.   I would enter it.   Maybe

19   I would have four or five times and now it's $600.   On

20   that date I would put the $600 -- I would add up the

21   receipts, staple them together, and enter the total

22   amount into the computer.

23        Q.   So, again, all of the expenses you had while

24   you owned and operated a Matco franchise, it's your

25   testimony that your practice was to put those in the

 1  computer and save the receipts in this envelope?

 2      A.  That's correct.

 3      Q.  So there wouldn't be any expenses that you

 4  purportedly had, as far as you know, during the time

 5  that you owned and operated a business -- a Matco

 6  franchise that wouldn't be in your mind collected in

 7  this system?  Is that correct?

 8      A.  I'm thinking.  I'm thinking.

 9          There are other things that may not have been

10  reflected in the system.  I am thinking in particular

11  there is no -- I don't think there is a space in there

12  to enter the storage of the truck.  I had to store my

13  truck.  And I don't remember.  I think it was $200 a

14  month for storage, for the storage space.  That sort of

15  thing.

16          I am sure there are some things that were not

17  entered in there that I would add in at the end of the

18  year in my tax returns.  But I think the vast majority

19  of my expenses were in there.

20      Q.  Before you purchased the Matco franchise, other

21  than an individual came to your house, did you talk to

22  anybody about Matco franchise?

23      A.  No.

24      Q.  Let me ask you this:  Have you -- you

25  understand that you are a party to a litigation against

1    Matco, right?

2         A.   I understand that.

3         Q.   And I don't want you to tell me what -- any

4    words that were spoken between you and your counsel.

5    But when did you first talk to somebody from your

6    attorney's office?

7         A.   Oh, I would say probably October or November of

8    2018.

9         Q.   How did you get in contact with somebody from

10   the law office.  Did they reach out to you?

11        A.   They sent me a letter, yes.

12        Q.   And what did that letter say?

13        A.   I don't remember.

14        Q.   Do you still have it?

15        A.   I don't think so.

16        Q.   You don't remember anything even generally what

17   the letter said?

18        A.   Basically that there was an indication that

19   Matco was operating improperly and that -- treating

20   people as not -- not as employees, as they should.  And

21   at that point in time I had become -- no pun intended,

22   but disenfranchised with Matco, and realized that

23   Matco, in my opinion, was essentially abusing the

24   franchisees.

25        Q.   And so prior to receiving that solicitation

 1  from the plaintiff's counsel, you hadn't spoken to any

 2  attorney about possibly pursuing any claims against

 3  Matco, correct?

 4      A.  That's correct.

 5      Q.  Have you paid any costs for this case so far?

 6      A.  I have not.

 7      Q.  Have you been asked to pay any costs, or do you

 8  have any understanding whether you will be required to

 9  pay any costs?

10      A.  I have an understanding that if something --

11  that if we should not prevail, that there is some cost

12  that would be associated in terms of your cost.  But I

13  don't know what the details are.

14      Q.  So you have an understanding that if you lose

15  the case, for example, you could be liable, for

16  example, for the cost of today's deposition, which

17  could be 5- to $10,000, and there's going to be many

18  depositions in this case?

19      A.  I understand that.

20      Q.  And so let me ask you this:  Have you spoken to

21  any current Matco distributors about whether they are

22  supportive of your litigation?

23      A.  Current distributors?

24      Q.  Yes, sir.

25      A.  I have not.

```
 1        Q.  Have you asked them how much money they make

 2   from owning their own business?

 3        A.  I would never ask somebody that.

 4        Q.  So you testified here that you think Matco

 5   takes advantage of people.  Is it your testimony --

 6   have you gone to talk to any current Matco distributors

 7   and asked them if they are supportive of you attempting

 8   to basically end their businesses?

 9            MS. BRENDER:  Objection; that calls for a legal

10   conclusion.

11            MR. ROWLEY:  That's what you are asking for,

12   Counsel.  I'm asking him if he has talked to any of the

13   people and asked them whether or not they are

14   supportive of his litigation to basically say they can

15   no longer own a business and they have to be employees

16   punching a time clock.

17            (Unreportable crosstalk.)

18            MS. BRENDER:  Objection; argumentative.  Calls

19   for a legal conclusion.  Mischaracterizes the

20   complaint.

21        Q.  BY MR. ROWLEY:  You can answer.

22        A.  I don't think I am asking anybody to shut down

23   their business.

24        Q.  Do you understand what your attorneys are

25   alleging in the case?
```

1       Q.  So let's just focus on the franchise that you

2    owned and operated yourself with regard to that

3    franchise.  Is it fair to say you would spend 80 or 90

4    percent of your time on the road visiting shops?

5       A.  I don't know about that percentage, but maybe

6    60 to 70 percent.

7       Q.  And what did you do the other 30 or 40 percent

8    of the time?

9       A.  Well, there is lot a checking in the tools that

10   are shipped to you.  There is stocking the truck.

11   There is cleaning the truck.  There is, you know,

12   maintenance of the vehicle, that sort of thing.

13      Q.  It's fair to say that at least 60 or 70 percent

14   of your time was spent kind of on the road doing sales?

15      A.  Not doing sales.  It was more trying to collect

16   my money.

17      Q.  When you were collecting your money, you were

18   also trying to make more sales, right?

19      A.  In all honesty, the way the business model

20   works for Matco -- when I first got out there in

21   Salinas, Matco did not have the distributor there for

22   years.  I --

23          People are bouncing around on the screen.  I

24   just lost Valerie.  She disappeared.

25          MR. ROWLEY:  Looks like Valerie dropped out.

```
 1    Let's stop for a minute.  Valerie are you still there?
 2             VIDEOGRAPHER:  Okay.  You want to take a break?
 3             MR. ROWLEY:  Yeah.  We got to give Valerie a
 4    chance to come back.  So we'll take a break.
 5             VIDEOGRAPHER:  Going off the record.  The time
 6    is 10:04.
 7             (Recess was taken from 10:04 to 10:21.)
 8             VIDEOGRAPHER:  Back on the record.  The time is
 9    10:21.
10             MR. ROWLEY:  So if we could have marked as
11    Exhibit 1 the franchise application, which is Matco
12    4815 to 4825.
13             (Exhibit 1 remotely introduced and provided
14    electronically to the reporter.)
15             MR. ROWLEY:  And then ultimately have marked as
16    Exhibit 2 the distributorship agreement, which is 4889,
17    4953.
18             (Exhibit 2 remotely introduced and provided
19    electronically to the reporter.)
20        Q.  BY MR. ROWLEY:  That's the document,
21    Mr. Fleming, that says 4 in your chat there.  If you
22    could open that up.
23        A.  I can't get to the chat box.  You guys have all
24    shrunken down to about an inch.  And I can't find any
25    buttons to enlarge you.  I have lost the whole thing.
```

```
 1              VIDEOGRAPHER:  Well, we may to go off the

 2    record and have you re-sign in.

 3              THE WITNESS:  Actually, I tried to sign the

 4    thing off but -- and log back in, but I wasn't able to

 5    do that.  I guess it says hide thumbnail video.  I can

 6    hide it, but I don't think that's going to put me out

 7    of there.

 8              MR. ROWLEY:  There is a button and there is a

 9    square with an arrow coming out of it.  If you click on

10    that it should go back to full screen.

11              THE WITNESS:  There is not.  I which there was.

12              How about I --

13              MR. ROWLEY:  Is there a thumbnail up in the

14    corner?  Is that what it is?  It's like a small little

15    picture?

16              THE WITNESS:  I can see all four of us at this

17    point, but all of us are little thumbnails.  And I am

18    trying to find something to make it big or to get to

19    that chat box that you are talking about, and I can't

20    find it.

21              MR. ROWLEY:  Off the record.

22              VIDEOGRAPHER:  You want to go off the record?

23              MR. ROWLEY:  Yeah.

24              VIDEOGRAPHER:  Going off the record.  The time

25    is 10:23.
```

John Fleming
November 13, 2020

```
 1          (Recess was taken from 10:23 to 10:28.)

 2          VIDEOGRAPHER:  Back on the record.  The time is

 3   10:28.

 4      Q.  BY MR. ROWLEY:  Now that we've fixed that,

 5   Mr. Fleming, if you could open for me the document

 6   called 4-DBA Matco, which is control numbered 4889

 7   through 4953.

 8      A.  I opened chat and there is nothing there.

 9   There is a box that says "resume group chat."

10      Q.  Oh, since you came back in, it's probably gone.

11   Let me put it in there again.  Hold on.

12      A.  Let me reopen this.  There you go.  4-DBA Matco

13   something, yeah.

14      Q.  Yes, sir.

15      A.  Okay.

16      Q.  I believe you previously testified that you

17   read through this when you got it and compared it, at

18   least, to the Snap-On distributorship agreement,

19   correct?

20      A.  What I testified to was the franchise

21   disclosure.

22      Q.  Did you read through this distributorship

23   agreement when you got it?

24      A.  When I signed it, yes.  I never compared this

25   to the Snap-On distributorship agreement because I
```

```
 1    never saw that.
 2         Q.  Was there anything in this agreement that you
 3    did not understand at the time that you read it?
 4         A.  I don't think so.
 5         Q.  There is a -- when you purchased the
 6    franchise -- how much did you pay for the franchise; do
 7    you recall?
 8         A.  I don't remember.
 9         Q.  Do you know if it was $70,000 or something
10    else?
11         A.  I don't think it was that much, no.
12         Q.  How did you pay for that?  Did you pay it
13    yourself?  Did you finance it?
14         A.  I paid cash.
15         Q.  Did you ever take a line of credit from Matco?
16         A.  Well, yeah, your tool bill.
17         Q.  Did you take any sort of separate line of
18    credit?
19         A.  I don't remember what happened with my son's
20    truck.  So I can't really tell you for sure.
21         Q.  When you purchased the truck for your son, did
22    you pay for the franchise cost for that as well?
23         A.  I believe I did, yes.
24         Q.  Do you recall how much that one was?
25         A.  I do not.
```

1    Q.  So that's not going to come out right on the

2  record.  One of the strange things of a deposition.  So

3  it's my fault because I asked the question a weird way.

4       Did Matco ever do anything to you because you

5  didn't make a purchase of a featured item at a sales

6  meeting?

7    A.  There was no punishment.  I didn't get fired

8  from my job, if that's what you are asking.

9    Q.  With regard to your truck, did you ever use

10  that truck for personal business?

11   A.  No.

12   Q.  When you got the truck was it already

13  configured for inventory, or did you have to configure

14  it?  Or how did that work?

15   A.  The truck was built.  The district manager, who

16  at that time was Paul Molder, came and helped me stock

17  the truck and showed me how it should be stocked.

18   Q.  Did he change that around over time, after you

19  kind of figured out the nature of the route?

20   A.  There were certain things that I discovered.

21  Small things in the back of the truck tended to go into

22  somebody's pocket a little easier and they would steal

23  it from me.  So I learned to put the small valuable

24  things right where I was standing in the front of the

25  truck.  To that extent, yes, I changed things around.

 1      Q.  Did you ever sell anything that not Matco --

 2   not from Matco off your truck?

 3      A.  Very little because that would have been a

 4   violation of my agreement.

 5      Q.  But you did sell some things, you sold candy

 6   and snacks at various points, right?

 7      A.  That's correct.

 8      Q.  Did you have an arrangement with some kind of

 9   beef jerky company to sell some of their products?

10      A.  I did have an arrangement with --

11          (Audio issue.)

12          THE WITNESS:  There is a man named Paul that

13   comes around and sells jerky to the Matco distributors.

14   The jerky that Matco has, when you got it, it was

15   usually stale and the customers didn't like it.  So

16   everybody bought their jerky from Paul because

17   everybody liked it.  And I think they still do.

18      Q.  BY MR. ROWLEY:  Did you do that throughout the

19   time that you were a distributor?

20      A.  Most of the time.  After I was a distributor

21   for a period of time, I found out -- the other

22   distributors told me, Don't buy your jerky from Matco.

23   Buy it from this guy.

24      Q.  Were there a few other tools that you sold as

25   well that you didn't get from Matco?

1        A.  I sold trade-in tools.  Occasionally somebody

2   would trade in a toolbox or something of that nature.

3   Might be a Snap-On.  But Matco was aware of that

4   practice.  And Matco would actually finance those --

5   say a Snap-On toolbox for an end user.

6        Q.  Were there other kind of unique tools that your

7   clients wanted occasionally that you bought elsewhere

8   and sold to them or kept on the truck to be available?

9        A.  Not that I stocked on the truck.  But

10  occasionally there were some things that a customer

11  would want and order that Matco didn't have available.

12  For example, a customer wanted -- insisted that they

13  wanted an Autel scanner.  They didn't like the Backhoe

14  scanner.  They wanted to buy the Autels.  So I got that

15  from ISN for the customer.

16       Q.  I'm sorry.  You got that from whom?

17       A.  ISN.

18       Q.  Is that a different business or something?

19       A.  It's an integrated supply network.  It's a

20  different business, yes.

21       Q.  Now were you aware that other Matco

22  distributors would sell other items off their truck

23  that weren't Matco?

24       A.  There are some distributors that sell, I think,

25  to my knowledge a lot more than just Matco.  I tried to

 1    an affirmative manner, but I don't think he actually

 2    said a word "yes."

 3         Q.  Were you with him in person?

 4         A.  Yes.

 5         Q.  Where were you at?

 6         A.  I think we were at my house.

 7         Q.  Anything else about that conversation that you

 8    can recall?

 9         A.  No.

10         Q.  So when you operated your franchise -- let me

11    ask you this.  Let's focus on the franchise you

12    purchased for your son.

13             When he needed to make tool purchases, did you

14    pay for those, or did he have his own line of credit?

15    Or you don't know how that worked?

16         A.  I funded him to begin with.  And from that

17    point forward he ran everything.  He paid --

18             (Audio issue.)

19             THE WITNESS:  The tool bills you pay through

20    MDBS.  And he was responsible for all of that.  He was

21    responsible for ordering his tools, paying for his

22    tools, and running his business.

23         Q.  BY MR. ROWLEY:  When -- let's focus again on

24    the franchise that -- let me ask you this:  Did Matco

25    know that he was working in your franchise when you

1    owned it?

2        A.   He went to the Matco school, and Matco was

3    aware that he was actually the driver of the truck.

4    Doug Williamson, the district manager, would go and

5    occasionally ride with them.  So Matco was very well

6    aware that it was my son operating that particular

7    franchise.

8        Q.   And did you pay money directly to your son?

9        A.   He received money out of a checking account

10   that he put the money in.  There was a checking account

11   for him.  There was a checking account for my truck.

12   It was Truck 1 and Truck 2.  He was paid for his labor

13   out of the account for truck -- Truck 2.

14       Q.   So when Matco would send money to you, you

15   would put, depending on which truck, it in -- if it was

16   his truck in his account, and he would just manage

17   that?

18       A.   Matco never sent money to me.

19       Q.   So if you collected money, you would put it --

20   if it was collected for -- if he collected money, he

21   would put it in the Truck 2 account; and if you

22   collected it, you would put in the Truck 1 account?

23       A.   That's correct.

24       Q.   And then he would use the money in that account

25   to pay himself, pay Matco, pay expenses, whatever

1    needed to be done, right?

2        A.  That's correct.

3        Q.  So this account that you had, was it in your

4    own name, was it in your company's name?  Did that

5    change over time?

6        A.  There was two accounts, like I said, and both

7    of them were under the name of "John's Tool."

8        Q.  And that was that DBA you picked when you

9    started the business; is that correct?

10       A.  That's correct.

11       Q.  And you later decided, as we talked about, to

12   become a corporation or LLC, right?

13       A.  What do you call it?  S corp.

14       Q.  S corp?

15           But you can't recall why you picked S corp as

16   opposed to C Corp or LLC or anything?

17       A.  It was under the advice of my tax advisor.

18       Q.  And on the -- did your corporation file tax

19   returns?

20       A.  Yes.

21       Q.  And on those tax returns did you deduct

22   business expenses?

23       A.  I would assume so, yeah.

24       Q.  Did you take depreciation and things like that

25   on the vehicle?

 1         A.  No, because it was a lease.

 2         Q.  Did your company -- when you were a DBA, that

 3    you just filed as a personal income tax return,

 4    correct?

 5         A.  Yes.

 6         Q.  And there again you took -- you deducted

 7    business expenses, right?

 8         A.  Well, sure.

 9         Q.  And the expenses -- I think you testified to

10    this before, but just so we have it one place.

11         The expenses you deducted on your income tax

12    were mostly the same as what you put into Matco's

13    system; is that correct?

14         MS. BRENDER:  I am going to object on the

15    taxpayer privilege.  I think we are entering into

16    territory that is crossing the line into that.  So I am

17    going to instruct the witness not to answer.

18         MR. ROWLEY:  -- parties to his actual returns.

19    But the whole point of that privilege is they say,

20    well, you can ask him about what they did.  I'm

21    entitled to know what expenses he had and what expenses

22    he deducted.  He doesn't just get to pretend that he

23    didn't get a tax benefit for all these expenses.

24         MS. BRENDER:  Yeah.  I'm actually aware of no

25    case that's given any credit to a company for a

1  purported tax benefit due to a deduction in an

2  independent contractor declassification case.  If you

3  have some authority for that, I'm happy to look at it.

4  But --

5       MR. ROWLEY:  I'm not going to argue with you

6  about it online.  I mean, you can -- if you're

7  instructing not to answer, that's your instruction.  Is

8  that your instruction?

9       MS. BRENDER:  That's my instruction.

10       MR. ROWLEY:  All right.  We'll bring a motion

11  on this.

12       Q.  BY MR. ROWLEY:  What happened to the money that

13  you did make from the franchise?  Did you ever make any

14  money?

15       A.  I really don't have a handle on that.  I was

16  able to cover my expenses because of the fact that I

17  have other sources of income.  I was able to also

18  handle my family expenses.  My wife would come to me

19  from time to time and say could you swing a thousand

20  dollars here, a thousand dollars there.  So I would

21  give her some money.  But it was very, very little.

22       Q.  So the expenses that you did have, though, they

23  were covered by the revenue that you brought in?

24       A.  The business expenses.  I am talking about two

25  different buckets here.  I am talking about my personal

1    expenses, which, you know, my home and all that sort of

2    thing, is pretty much covered aside from the Matco

3    because I -- I have those assets.

4          So in terms of covering my expenses with

5    respect to Matco, paying my tool bill, paying my lease,

6    the storage of the truck and those sort of things, I

7    was able to do that, and once in a while would have a

8    few thousand dollars left over.  But it was not a very

9    substantial amount of money.

10   Q.   When you started your first Matco franchise you

11   were given a list of potential customers, right?

12   A.   That's correct.

13   Q.   And what kind of -- just generally speaking,

14   what kind of businesses were on your list?

15   A.   Auto repair shops.

16   Q.   Any other types of businesses besides auto

17   repair --

18          (Unreportable crosstalk.)

19          THE WITNESS:  I don't believe there was any

20   machine shops or anything like that.

21   Q.   BY MR. ROWLEY:  Did you have any input on which

22   customers you got on the list?

23   A.   No.

24   Q.   Was that -- were you presented more than one

25   list of calls that you could choose from?

 1      A.  No.

 2      Q.  Was that -- could you sell tools to customers

 3   who weren't on your list?

 4      A.  No.

 5      Q.  Did you ever try?

 6      A.  Yes.

 7      Q.  When?

 8      A.  People began to approach me.  I would go to say

 9   an auto repair shop.  For example -- I'm just throwing

10   a generic name out there, Joe's Auto Body.  And I'm at

11   Joe's Auto Body and a guy get's out of my truck from

12   Bill's Auto Body next door and says, I want to buy

13   something.  Okay.  Well, I will sell you something.

14         But the computer would not allow me to put the

15   guy from Bill's Auto Body -- put his name in my

16   computer as a new shop.  So I would just put Bill --

17   the guy from Bill's Auto Body into Joe's Auto Body's

18   shop.  And that's the only way I could sell to somebody

19   that was not on my list of calls.

20      Q.  Do you know how many times that happened?  Was

21   that a pretty regular occurrence, like monthly, weekly,

22   yearly, very rarely?

23      A.  It was at least weekly.

24         I shouldn't say that.  To begin with it was

25   weekly.  But then as time went by, you know, you have a

1    set customer base.  The truth is after a year or two I

2    realized I don't want to sell anything because I'm not

3    getting the money.  I have to collect the money.  So

4    the vast majority of my time was spent looking for

5    people to pay me the money they owe me.  And I would

6    oftentimes tell somebody, I don't want to sell you

7    anything because I don't want to be chasing you down

8    for the bill.

9         Q.  Well, you could sell it for cash, right?

10        A.  But that's the nature of the business.  These

11   people don't have the cash to pay for it.  A lot of the

12   stuff -- let's say an Ingersoll Rand impact gun.  You

13   could buy it for $200 at a one-stop auto supply.  And

14   Matco buys it, sells it, puts the Matco name on it;

15   sells it to me for $300 and expects me to sell it to

16   somebody for 4- or $500 and finance it.  And that's the

17   way the nature of the business works.

18        The only reason these guys buy the Matco stuff

19   is because they like the Matco name, but they can

20   finance it.  They are not interested in paying cash.

21        Q.  Did you ever call Matco and ask them to add new

22   customers to your route?

23        A.  I talked to Doug Williamson and I talked to

24   Paul Molder.  And at that point in time I said, Look,

25   there is so many shops up here.  I don't even care if

```
 1    time.  I don't really remember the order that this
 2    occurred, but I know it was before I went to Ohio.
 3    That we went out in my truck and passed out catalogs
 4    and business cards to the various shops that were on
 5    the list of calls.
 6        Q.  You and Paul did that together?
 7        A.  Yes.
 8        Q.  Okay.  Other than that time, kind of the first
 9    six months, did he ever ride along with you?
10        A.  Paul?
11        Q.  Yeah.
12        A.  Yeah, of course.  Yeah, he did.
13        Q.  How often did he do that, like, in the first
14    six months?
15        A.  I don't remember the -- the exact sequence.  I
16    know that when you first start for a period of time the
17    district manager will ride with you for a week or two
18    weeks.  I don't remember what it is.  And then they
19    have a trainer that rides with you for a week or two
20    weeks.  And, again, I don't remember which order those
21    two come in, so -- but that did occur.  And then Paul
22    would come out in the first like a once a month or
23    something like that and ride with me.
24        Q.  After the first six months or so how often did
25    your district manager ride with you?
```

```
1         A.  Paul was pretty regular.  But I think after I
2    was there for about a year and Matco fired Paul -- and
3    that's when Doug came in.
4         Q.  And how often did you ride with Doug?
5         A.  Doug was supposed to ride with me like I think
6    once a year, I think.  But oftentimes he would -- maybe
7    more often.  I don't know.  But he would tell me, you
8    know, Hey, I rode with you today, okay?
9            But he didn't.  And then he would do these
10   annual evaluations and so forth, and he would just hand
11   them to me at the meetings.
12        Q.  Was it helpful to ride along with Paul when he
13   was doing it?
14        A.  I guess.
15        Q.  Did you get any training from Matco before you
16   started?  You talked about the two-week course and you
17   talked about the time with Paul, which we will get to
18   the course in a minute.  But did you get any other kind
19   of training from Matco?
20        A.  This one occurs in the -- in the meetings.
21   They are not monthly meetings.  I think there is -- I
22   don't remember -- five or six -- I think there is ten
23   meetings a year.  I don't remember.  But during those
24   meetings they had what they called an under-the-hood
25   where they would train you a little bit about, Do you
```

1          THE VIDEOGRAPHER:  We are back on the record.

2    The time is 11:38.  There has been a change in court

3    reporters.  Audrey Kolterer has left and is being

4    replaced by Dana Freed.

5    BY MR. ROWLEY:

6          Q   So once you started driving on your

7    distributorship, was your home base your home?

8          A   Sorry.  I lost the last part.

9          Q   Sure.  Was your home base your home?

10   Basically, did you work out of your home unless you

11   were on the road driving your truck?

12         A   That's correct.

13         Q   You said you parked your truck.  Did you park

14   it every night in a secure location at your house?

15   Where did you park it?  You said you had some storage?

16         A   Well, I think for about a month or two I

17   drove it home every day, but it was just way too

18   expensive on fuel.  My home is probably 50 miles from

19   the route and so I -- at that point I got a storage

20   yard to keep the truck in.

21         Q   So you drive your personal vehicle out there

22   and then drive the truck and then drive your personal

23   vehicle home?

24         A   That's correct.

25         Q   And I noticed in some of the materials your

1    lawyers produced, there were receipts for hotels and

2    some nights you decided to stay in a hotel out there?

3        A    The only receipts for hotels would be during

4    expo.

5        Q    So there weren't any times where you, for

6    example, decided that you were going to stay in a

7    hotel out in that area for work where your route was?

8        A    No.

9        Q    At some point you signed what's called a 225

10   amendment to make your route a little bit smaller.  Do

11   you recall that?

12       A    Yes.

13       Q    Why did you decide to do that?

14       A    I didn't want to keep working 70, 80 hours a

15   week.  My main focus at that point in time was I was

16   trying to collect money.  I was not trying to make

17   sales.

18       Q    Don't they go hand in hand?  Aren't you there

19   to collect money and make an additional sale to

20   somebody; right?

21       A    The problem with it is if you sell something

22   to somebody, you have that cash back out there again.

23   The big thing with the Matco franchise is trying to

24   keep up on your tool bill and you're constantly trying

25   to collect money.  You don't want to increase that

1    tool bill, you want to pay it down.

2        Q   So you weren't trying to sell product after

3    your first year?

4        A   Not very often.  A lot of times somebody

5    would get on the truck, I'd say, I don't want to sell

6    it to you.  If it was somebody I knew that was going

7    to pay cash or that I could trust to pay me in a

8    right, you know, in a timely matter, that would be one

9    thing.  But a lot of people get on there and they'll

10   pay you two or three times and then they disappear.

11       Q   So you would make a decision if you were

12   going to sell to somebody, whether or not you wanted

13   to sell to that person based on your evaluation of how

14   trustworthy they were?

15       A   That's true.

16       Q   And in any given situation you could decide,

17   I'm not going to sell to Christian, for example, from

18   Shaw Becks because I think he's going to do a runner

19   on me and not pay for it; right?

20       A   Not quite that simple, but you may be in a

21   shop where the shop owner is a good customer, and

22   he'll say, Please sell it to this guy, you know, and

23   I don't want to lose that shop owner, but you have

24   some doubts about whether you want to sell it to that

25   particular individual.  A lot of times you can walk

1   into a shop and somebody's working there who you know

2   from another shop and you know can't be trusted and

3   you tell the shop owner, This guy cannot be trusted.

4   So and I'm not going to sell to him.

5       Q    So then in terms of -- let me ask you this.

6   You indicated that there is this form where you would

7   allegedly put your expenses in, then you'd get a

8   printout on your expenses.  Do you know if you were

9   required to use that or not?

10      A    I don't know how you could not use it because

11  the MDBS system, if you want to order your supplies

12  from Matco, or whatever tools you want to purchase,

13  that's all in the MDBS.  So if you sell a wrench

14  today, MDBS at the end of the day is going to ask you,

15  Do you want to order another wrench?  And then you do

16  a call back, so it transmits to Matco via a VPN, and

17  then Matco knows that you want to order another

18  wrench.

19      Q    Well, certainly for purchasing your wrenches

20  and stuff.  But talking about your expenses that

21  aren't, for example, your fuel or your lease or your

22  marketing expenses.  Do you know whether Matco

23  requires you to put those into the system?

24      A    I don't know that it was a requirement.

25  I know that it was part of the system.  And that when

1  I went there for training they told me, This is how

2  you track your expenses, so I did.

3      Q   Do you know whether other distributors don't

4  use that system?  In other words, setting aside the

5  purchase of tools to track other expenses like fuel

6  or, you know, insurance or things like that?

7      A   I have no idea how other distributors run

8  their businesses.

9      Q   Have you ever talked to any other

10  distributors about how they run their business?

11      A   Not with regards to that, no.

12      Q   But with regards to anything?  I mean, you

13  talked a little bit about how they told you to buy

14  beef jerky from a third party.  But outside of that,

15  have you ever talked to any distributors about how

16  they run their business, other distributors?

17          MS. BRENDER:  Objection; overbroad.  Vague

18  and ambiguous.

19          THE WITNESS:  I'm not even sure if I can

20  answer that question.  Obviously, you discuss things

21  with somebody, but I'm not a real social person with

22  the other distributors.  I don't go out and hang

23  around with them, go camping, go to the bars with them

24  and stuff like that.  But, you know, at the meetings

25  we discussed things like that, of that nature.  I've

1              And also, the tool carts, which were like

2    a smaller toolbox, they would ship them to my house

3    and I had to assemble those.  And so, you know, that

4    would take me a couple hours to assemble one of those

5    things, and which I -- those are one of the things I

6    tried not to sell because I didn't like assembling

7    them and didn't make any money off of the deal.

8              And then he would put them in my pickup

9    truck.  And then that's when I used my pickup for a

10   lot of personal use.  I would deliver it to -- instead

11   of try to transfer it to the big truck, which is too

12   heavy for me to do, I would go right to the shop and

13   deliver it to the shop with my pickup truck.

14      Q   How often did you use your personal pickup

15   truck to deliver things to shops?

16      A   You know, I used it quite often.  I also used

17   it sometimes to collect money because of the fact that

18   I didn't want to sell stuff, I was just trying to

19   collect money.  And it had a -- it's 110 volts, I

20   can't remember what the word is, receptacle in there.

21   I had a Honda Pilot.  And so I was able to run my

22   computer and my credit card machine and all that kind

23   of stuff through the Pilot, on the Pilot.  Actually, a

24   Honda, what do you call it, Ridgeline, Ridgeline.

25   I was able to run it through there.  And so a lot of

 1  <u>times I would intentionally take that pickup truck</u>

 2  <u>instead of the big truck because I didn't want to sell</u>

 3  <u>stuff that day.</u>

 4      Q   Would you do that once a week, once a month,

 5  couple times a year?

 6      A   Once -- at least once every two weeks.

 7      Q   So your whole route you would just go in your

 8  personal pickup truck?

 9      A   Yeah.

10      Q   Did anybody from Matco ever tell you you

11  couldn't do that?

12      A   They didn't tell me I couldn't do it.

13      Q   Anybody ever tell you you had to do that?

14      A   Nobody told me I had to do it.

15      Q   Did you ever tell anybody from Matco you were

16  doing that?

17      A   I don't think so.

18      Q   Did you keep any records of when you did

19  that?

20      A   No.

21      Q   So other than you said you occasionally would

22  call in to Matco, is that when you would call in your

23  order?

24      A   What happens is the computer connect, they

25  call it a call Matco, that's what the -- they train

1   switch it around.

2          I did have the ability to go into the

3   computer to switch times for shops, but I generally

4   did not do that.  I just kind of remembered, Okay,

5   they're not going to be there, so I'm going to go to

6   this other shop at this time and then go back and

7   catch that shop an hour later.

8      Q   After, say, the first six months of your

9   franchise, did you kind of, you know, decide that,

10  look, there are certain shops that are kind of a waste

11  of time for me to go to, they never buy very much, so

12  I'm going to visit them maybe once a week as opposed

13  to more frequently.  And there's other shops that,

14  you know, they're great and I like the people and I'm

15  going to go there more often?  Did you kind of -- as

16  you learned your customer base, kind of change your

17  visitation plan?

18      A   No.  I didn't skip a lot of shops.  To be

19  honest, I enjoyed the people, my customers liked for

20  me to be there.  And I didn't have very many shops

21  that were just -- didn't buy anything.

22      Q   But there were times where you decided you're

23  going to spend more time at this shop than that shop;

24  right?

25      A   Well, as time went by really, as I said

```
 1  before, my focus became more on collecting money.  So

 2  I would spend more time, you know, trying to catch the

 3  shops that I would collect money from.

 4          But as to skipping shops during the course of

 5  the week, I didn't do that unless the shop closed or

 6  something.

 7      Q   Well, I'm having a hard time understanding

 8  that.  If you basically quit selling to people, at

 9  some point you're not going to have anything to

10  collect, right, because nobody bought anything?

11      A   Well, Matco encouraged --

12          THE REPORTER:  I'm sorry.  You broke up.

13  BY MR. ROWLEY:

14      Q   I'm sorry.  What was the answer?

15      A   I said Matco encourages you to put a lot of

16  money out there.  And a lot of that money you have to

17  go spend a lot of time trying to catch, find the

18  person and get your money.

19      Q   Right.  But over time eventually you'd either

20  collect it or not.  Say, after six months somebody

21  hasn't paid you, you know, if you're not selling

22  anything else, there wouldn't be anything to collect;

23  right?

24      A   In your theory, maybe.  But you're never

25  going to collect 100 percent.  Believe me.
```

```
 1     Q   Right.  But you had to continue -- I mean,
 2  you continued to be one of the highest producing
 3  distributors in your area; correct?
 4     A   Just for the first two years.  After that,
 5  no.
 6     Q   So the first two years, at least, you were
 7  continuing to sell; right?
 8     A   That just makes sense.  After I sold that
 9  much, I needed to collect the money to be able to pay
10  the bills to Matco.
11     Q   How much longer after that first two years
12  did you have the franchise?
13     A   I think it was a total of six years, five and
14  a half.
15     Q   So the next three and a half years you didn't
16  sell anything, you just collected what you sold the
17  first two years?
18     A   I sold a little bit, but I tried to avoid
19  selling.
20     Q   You tried to avoid selling.  So you would
21  just go out and collect money and you would sell only
22  if somebody insisted they wanted to buy from you?
23         I understand you keep talking about how you
24  were just forced to do all this collection for four
25  years, but I don't understand what you're collecting
```

```
 1   on if you're not selling anything.  What are you
 2   collecting?  What you sold in the first two years?
 3        A    There was still another $80,000 out there
 4   that I hadn't received.
 5        Q    So you spent four years trying to collect
 6   $80,000?
 7        A    About 160,000 I had on the street, and I got
 8   it down to about 80.
 9        Q    And you didn't make any sales in that period
10   of time?
11        A    Of course, I made sales.
12        Q    So within that period of time you were buying
13   snacks and things to sell off the trucks; right?
14   Candy bars, beef jerky, all sorts of stuff; right?
15        A    Yeah.
16        Q    Did you use that as a way to entice people
17   to, kind of, come on the truck and look at your stuff?
18        A    Guys would come out to the truck.  The guys
19   that bought the jerky was the same guys all the time
20   that bought the jerky and they had to pay cash for the
21   jerky.  I paid $10 for the jerky, I sold it for $15.
22   It was worth getting them to come out to the truck if
23   I could make a $5 profit.  If there was five or six of
24   them, you know.  The candy bars I bought at Costco, I
25   sold them for -- I bought them for 60 cents and sold
```

 1  them for a dollar.

 2      Q   Because that was a good way to get people on

 3  the truck, and then you'd try to sell them something

 4  from the truck; right?

 5      A   I don't know what my motivation was.  I was

 6  trying -- jerky and a candy bar.

 7      Q   You don't know why you were doing that.

 8  Remember you're under oath.  You just wanted to make

 9  40 cents on a candy bar?

10      A   I can't think back about each individual

11  thought that went through my head at any given moment.

12      Q   I'm not asking each individual thought.  One

13  of the things they talked to you about and other

14  distributors may have talked to you about is,

15  you know, if you have these kinds of things on the

16  truck, it gets people on the truck and then you can

17  start talking to them about the tools; right?

18      A   You asked me what my motivation was for

19  having candy and jerky on the truck.  That was your

20  question, I think.

21      Q   Right.

22      A   And I don't know, you know.  Okay, so

23  I wanted people to come on the truck.  I wanted people

24  to come on the truck to pay me.  And if they were good

25  people and customers that I can trust that would buy

 1  something from me, I would sell it to them.

 2       Q   And fair to say you continued to make

 3  substantial sales in the last four years you were

 4  there; right?  At least many of those years.

 5       A   Not nearly.

 6       Q   No?

 7       A   The first two years.

 8            THE REPORTER:  I'm sorry.  You guys are on

 9  top of each other.  I can't get that.

10  BY MR. ROWLEY:

11       Q   Sorry.  Are you finished?

12       A   Yeah, go ahead.

13       Q   Did you make your sales goals in your third

14  year?

15       A   I never set sales goals.

16       Q   Did you have an idea of how much you wanted

17  to sell?

18       A   No.

19       Q   Did you fill out any sort of forms or

20  documents where you kind of put down what your goal

21  was?

22       A   I don't remember filling anything out.

23  I remember sitting down with Doug a couple of times

24  and discussing stuff.  As time went by, Doug would

25  tell me that he filled out these forms and had me sign

 1  that, I guess.

 2          Monday was at the auto dealership, Tuesday

 3  was over off Mission Street and all that area of town.

 4  I continued to service the same areas on any given day

 5  of the week that were in the initial route schedule.

 6  Because, for the most part, I was the only one in

 7  Salinas.  I was pretty much bound -- Salinas is a

 8  relatively small geographic area.  I was pretty much

 9  bound to stay in the areas that Matco had originally

10  scheduled me to be in.

11      Q   In terms of, let's talk about, say, the last,

12  the last year of your distributorship before you gave

13  up your, the one that you were running, route one we

14  will call it, how many days a week did you make visits

15  to shops?

16      A   I'm sorry.  I didn't understand your

17  question.

18      Q   In the last year or so of your franchise --

19      A   The last.

20      Q   -- how many days a week did you make visits

21  to shops?  Five days a week?

22      A   Four days a week.

23      Q   Did you ever tell anybody you were only doing

24  three days a week?  Was there ever a period of time

25  you did three days a week?

 1      A   There may have been a week or two where I did

 2  only three days.  But no, I didn't say I'm not going

 3  to go there, no.

 4      Q   And in terms of your schedule, did you kind

 5  of make your schedule?  In other words, I'm going to

 6  start at 9:00 this morning or 10:00 or 8:00 or 7:00

 7  or whatever, you know, you decided to start?  How did

 8  you decide when you were going to start?  Again,

 9  focusing on, let's say, the last year of your

10  franchise.

11      A   I was trying to slow down, I was getting

12  older.  And so I would usually start my day around

13  8:00 or something like that.  I'd actually leave my

14  house with everything, all the stuff, 7:30, 8:00.  And

15  by the time I got into the truck and got all the stuff

16  loaded onto the truck and ready to go, I'd probably

17  see my first shop about 9:00.

18      Q   And how long did it take you to get from your

19  house to your first shop typically?

20      A   Typically an hour.  Maybe 50 minutes and then

21  15 to 20 minutes to load the truck and get it ready to

22  go.

23      Q   But sometimes you went earlier, some days you

24  went later, you kind adjusted your schedule depending

25  on what you had to do that day or what you felt like?

```
 1              THE REPORTER:  Can we go off the record?  Is
 2   it okay to go off the record?
 3              MR. ROWLEY:  Yeah, of course.
 4              MS. BRENDER:  Let's go off the record.
 5              THE VIDEOGRAPHER:  Going off the record.  The
 6   time is 12:23.
 7              (A recess was taken for the noon hour.)
 8              THE VIDEOGRAPHER:  We're back on the record.
 9   The time is 12:55.
10   BY MR. ROWLEY:
11       Q   I'll load into the box another document.
12   This is control number 64076472.  It's called 3, with
13   that Bates number on it.  I believe this will be
14   Deposition Exhibit No. 3.
15              (Deposition Exhibit 3 was marked.)
16              THE WITNESS:  I don't have anything yet.
17              MS. BRENDER:  Me neither.
18   BY MR. ROWLEY:
19       Q   It's a big file.  It will take a second.
20   There you go.
21              I represent that this is the agreement that
22   you signed with regard to your second route that you
23   purchased for your son to operate.  Do you recognize
24   this set of documents?
25       A   It's still opening.  There we go.
```

```
 1              Looks like the franchise agreement, I guess.

 2         Q    Is that your signature that appears on page

 3    6431?  That number is in the bottom right-hand corner,

 4    about the 25th page.

 5         A    Taking me forever to scroll through this

 6    here.  Let's see here.  25th page you said?

 7         Q    Yeah.  Give or take.

 8         A    Yeah, that looks like my signature.

 9         Q    Is that your wife's signature there as well;

10    right?

11         A    I think so.

12         Q    Going to the next page, if you would scroll

13    down, you'll see there's a promissory note here.  Is

14    this your signature on the promissory note?

15         A    Yeah.  Yes.

16         Q    And did you -- does this refresh your

17    recollection that you financed the second route?

18         A    It's not for the route, it's for the tools.

19         Q    Okay.  And did you pay this promissory note

20    off?

21         A    Yes.

22         Q    Okay.  When did you pay it off?

23         A    I don't remember, but I know it was very

24    quickly.

25         Q    What funds did you use to pay it off?
```

```
 1        Q    In terms of your operation of your routes,
 2   did you ever do any kind of marketing?
 3        A    No.
 4        Q    Did you ever have any sort of, like, mailings
 5   that you created or emails or anything like that?
 6        A    No.
 7        Q    Do you know whether other people did that?
 8        A    I think some -- I don't know this, but I know
 9   that Matco charges you to have a website.  I don't
10   think it's very much.  And I think some people use it,
11   but I'm not very tech savvy.  I don't use social media
12   or any of that.
13        Q    Did your wife do anything to help you with
14   the business?
15        A    As I told you earlier, my wife would help me
16   check in the tools.  My wife would help me check in
17   the tools and she'd sometimes help me wash my truck,
18   that sort of thing.
19        Q    What did your wife do with regard to checking
20   in the tools?
21        A    We would kind of sit there together.  Because
22   I was tired at the end of the day and she would check
23   them off, there was a list, you know, when they come
24   in, whether it's for special order or whether it's for
25   the truck or whatever it is, and I knew the part
```

1   numbers and so forth, so she would -- I would just be

2   watching TV and eating dinner and I'd say, That's an

3   AR20-B or something and so she would check it off.  I

4   said, I remember that's for Jose Mendoza.  And she

5   would go down the list, check it off, and she'd put a

6   label on it that said this is for Jose Mendoza on

7   Wednesday.  We had color-coded labels.  And that's

8   about the extent of how she helped.

9       Q   All right.  And how long typically, say in

10  the -- well, strike that.

11          In the last two years of your

12  distributorship, how long typically in a week would

13  you spend doing that?  Hour, two hours?  Something

14  else?

15      A   No.  The two of us together, you know,

16  towards the end there, it was probably 45 minutes to

17  an hour for the two of us to do it.

18      Q   A week or a day or what?

19      A   A day.

20      Q   And then she'd occasionally help you wash

21  your truck?  I mean, how many times did she do that in

22  the last two years?

23      A   I'd take the truck home.  I think I lost that

24  full screen again.  I'd take the truck home, like I

25  said, at least once a month, usually every two weeks

John Fleming
November 13, 2020

```
 1    Hold on.
 2           MS. BRENDER:  Maybe Dan can pop in and --
 3           THE VIDEOGRAPHER:  Well --
 4           MR. ROWLEY:  That's how I get it.  Okay.
 5           MS. BRENDER:  Did you get it, John?
 6           MR. ROWLEY:  I haven't loaded it, so it's not
 7    there yet.  Just give me one second.
 8           THE WITNESS:  Okay.  It's like I have to shut
 9    down the computer, then it will ask me to leave the
10    meeting, I say no and it comes back up.
11    BY MR. ROWLEY:
12       Q   All right.  So this is going to be Exhibit 4.
13    It's floating 299 to 324.
14           (Deposition Exhibit 4 was marked.)
15           THE WITNESS:  I see two things in here.
16    299, 324, that's the one you want me to open.  Okay.
17    BY MR. ROWLEY:
18       Q   Yes, sir.
19       A   Okay.
20       Q   Do you recognize this as a -- the first page
21    is a waiver of notice and consent at a board of
22    directors meeting.
23       A   That's what it says, yeah.
24       Q   Take a moment to flip through it, and let me
25    know if you recognize this as being documents related
```

1  to the corporation that you created and served as CEO

2  and president of.

3      A   Yeah, it looks like it is.

4      Q   And did that business continue to operate

5  throughout the time that you owned the two franchises?

6      A   It actually shut down in 2018, yeah.

7      Q   So while you owned the franchises, you

8  operated them through this particular business; right?

9      A   That's correct.

10     Q   And you were the beneficial owner of that

11 business.  Did your son own any shares in that

12 business?

13     A   I don't think he owned any shares, no.

14     Q   And in 2018 you closed that business with the

15 secretary of state or wound it up?

16     A   It was never closed up.  My accountant told

17 me he had closed it up.  And I got a notice that he

18 hadn't, so I contacted somebody else to take care of

19 closing it.  But it is still open, the corporation,

20 with the secretary of state.

21     Q   Have you used it for any businesses since

22 your franchises with Matco ended?

23     A   No, I have not.

24     Q   All right.  I'll show you what will be marked

25 as Exhibit 5.

1     Q   So again, if I look in the system, there'll

2  be a transaction here for a toolbox around this period

3  of time?

4     A   I'm sure there will be something around that

5  period of time.

6     Q   Then if you go to the next page for me.

7  You'll see there's a payment to a Paul Moulder.  Who's

8  Paul Moulder?

9     A   Paul Moulder was the district manager when I

10 started.

11    Q   And you are paying him for independent

12 contract $1,553.46.  What was that for?

13    A   When my son left, Paul came out and said he

14 would collect money for my son's route, so he -- I

15 think -- I don't remember exactly.  I think he charged

16 me $200 a day to collect money, and plus I covered his

17 expenses for his hotel, so...  And he would just go

18 out and collect the money.  I was trying to get some

19 of the money off the street, so Paul was selling my

20 stuff to try to help me out.

21    Q   So you, through your business, hired an

22 independent contractor to help you do collections;

23 right?

24    A   I hired him to help collect money on my son's

25 business, not mine.

```
 1      Q   Well, you're the one that owned the business.

 2  It was in your name; right?

 3      A   Paul -- yes.  Paul asked me if he could help

 4  me out and I accepted his help.

 5      Q   And you paid him for it; right?

 6      A   Uh-huh.

 7      Q   And then there's another payment to Paul

 8  Moulder two things later where you paid to him

 9  $1,954.58; right?

10      A   Yeah.

11      Q   Is that for the same thing?

12      A   Yes.

13      Q   Is that the sum of all the payments you made

14  for this or are there others?

15      A   I don't know.  If you go through the MDBS

16  system of my son, you would find that collections were

17  being made after July.  It was during the months of

18  August, September, may have even stretched into

19  October of 2018.  I was working my other route.  I

20  couldn't go out and try and chase down the payments

21  for my son, so that's when Paul would go.

22      Q   Anybody from Matco tell you to hire Paul?

23      A   I didn't hire Paul.

24      Q   Well, you did.  You're paying him as a

25  contractor; right?
```

```
 1        A    As a contractor.  I don't think that's

 2   hiring.  You know labor law better than I.

 3        Q    Well, did you ever have contractors when you

 4   owned a -- when you owned a laundromat?

 5        A    I owned a dry cleaning business, not a

 6   laundromat.  No, I never had contractors.  I had

 7   employees.

 8        Q    Did you issue him a 1099?

 9        A    No, I did not.

10        Q    All right.  So then, if you go to a couple of

11   pages further, it looks like there's some more

12   payments to Paul Moulder.  We've got another, unless

13   I'm mistaken here, $1,669 then $1,787.  This is all

14   for that same thing then, huh?

15        A    That's correct.

16        Q    Was he collecting the money?

17        A    Yes.

18        Q    You paid him quite a bit.

19        A    Yeah, he was collecting about $1,000 a day.

20        Q    And then if we go to the last one.  There's

21   one that doesn't appear on the register, but the check

22   is here for $1,940.  That's the same thing; right?

23        A    I'm not sure if that's a duplicate, but you

24   can see the dates.  Yeah, it looks like the dates are

25   like 10 days apart.  That's what I said.  He was there
```

1  collecting money from August through probably

2  November.  Looks like the end of October.

3      Q   And you told me you're paying 200 a day plus

4  expenses; right?

5      A   I think that's what it was.  I know it was

6  expenses.  I think 200 a day.

7      Q   Then he's collecting $1,000 a day for you?

8      A   Uh-huh.

9      Q   Is that a yes?

10     A   That was a yes.

11     Q   So why didn't you hire him to help you with

12 collections on your route?  Sounds like you were

13 making about an $800 delta there.

14     A   I don't know what a "delta" means.

15     Q   Difference.  So you paid him 200 and got back

16 1,000.

17     A   Because how am I supposed to be in two places

18 at the same time?

19     Q   I'm wondering why you didn't have him help

20 you, since you said that you were spending a lot of

21 time doing collections, why didn't you have him help

22 you on your route?

23     A   Because I only have one computer to make

24 collections, only one person can work the route.

25     Q   You ever just consider hiring him to go out

1    on the route for you?

2        A    No, I never did.  It was a temporary thing

3    from a friend who offered to help me.

4            (Deposition Exhibit 7 was marked.)

5    BY MR. ROWLEY:

6        Q    If you could open up that one for me, please,

7    sir.

8        A    Bear with me.  I don't know why, but I have

9    to --

10       Q    Yeah.  No worries.

11       A    -- act like I'm shutting down my computer and

12   then get back there.

13           There we go.  So is this the one, 00917, you

14   want me to open?

15       Q    Yes, sir.

16       A    Okay.

17       Q    And do you recognize this document?

18       A    It looks like a receipt from ISN.

19       Q    Why would you have been buying a dent puller

20   and a SATAjet?

21       A    The SATAjet is -- obviously, this was for a

22   body shop.  They must have special ordered it because

23   the dent puller is too.  That dent puller, through

24   Matco, my cost is about a little over $1,000, 1,060 or

25   something.  To make any money, I'd have to sell it to

 1  the customer for an outrageous price.  I probably, if

 2  I remember, this went to Abbott Street Auto Body.

 3  And it was just because he was the kind of guy that

 4  paid me cash and I wanted to keep the prices down for

 5  him.

 6      Q   Do you remember how much you sold this for to

 7  him, these two items?

 8      A   Probably somewhere in the neighborhood of

 9  $1,500.

10      Q   So you made a decision that it would be more

11  profitable for you to buy -- in this case to buy the

12  items from a third party instead of Matco and to sell

13  it; right?

14      A   It would be a better price for my customer.

15      Q   But you made that decision yourself; right?

16      A   Oh, I made that decision because otherwise I

17  wouldn't be able to make the sale.

18      Q   All right.  And nobody from Matco ever

19  disciplined you or did anything to you because you

20  decided to do that; right?

21      A   I don't know that Matco ever knew about it.

22      Q   Well, you just told me you entered everything

23  in the system.  Did you enter this in the system too?

24      A   You can enter that in the system.

25      Q   What's that?

 1  district manager.

 2      Q   And did you suggest a district manager who,

 3  as I recall, was a friend of yours, that maybe it

 4  would be good to cut out the auto dealerships?

 5      A   I told him that I wanted to have, like, one

 6  day a week off.  And Monday was the day that I was all

 7  in one place, the auto dealerships, so it seemed like

 8  a logical place to cut it off.

 9      Q   Let's see, we're at 7.  No, 8.  Sorry.  It's

10  much easier if I can just hand them to you.

11          (Deposition Exhibit 8 was marked.)

12  BY MR. ROWLEY:

13      Q   Open Exhibit 8 for me, please, sir.

14      A   Okay.

15      Q   Take a minute to flip through it for me.  I'm

16  just going to ask you if you have seen it, then I'm

17  going to ask you a few questions about it.

18      A   Okay.

19      Q   All right.  Kind of go to the -- I guess, the

20  page that's the third page.  One, two, three.  It's

21  the third page of it.

22      A   Okay.

23      Q   All right.  You'll see that it says

24  John M.  TRK up in the upper left-hand corner.  This

25  exhibit.  Again, 3957.  I don't know why the pages

John Fleming
November 13, 2020

1  aren't individually numbered in it.  But up in the

2  upper left-hand corner it says John M. TRK and then it

3  says, Take a weekly draw from my business.  Are you on

4  the right page?

5       A   I'm on the right page.  Okay.  I see it.

6  Okay.

7       Q   Do you recall filling out this form online,

8  this evaluation form, in 2015?

9       A   No, I do not.  It wasn't unusual.  Doug

10 oftentimes would do this business review stuff and

11 just have me sign it and not even tell me about it.

12      Q   Well, did you review it when you signed it?

13      A   I don't even -- this one doesn't even look

14 like I signed it.

15      Q   Well, let me ask you this.  Did -- was he

16 your district manager in July of 2015?

17      A   Yes, he was.

18      Q   So you're saying that your district manager

19 just filled this out himself?

20      A   I don't know, but he -- if this particular

21 one he filled out, but he was in the habit of doing

22 that.  This one is not signed or dated or anything, so

23 I would think that he filled this one out.  It was not

24 unusual.

25          He would call me up.  Because he was supposed

1  to be riding with me, and he would call me up and just

2  say, Hey, I'm supposed to ride with you today, and he

3  wouldn't show up.  And then he would tell me

4  sometimes, Everything going okay?  I'll just do your

5  business review for you online, so that's what he did.

6      Q   So you never did any of them yourself?

7      A   Oh, I worked with him on some, but I don't

8  know if this one I did.  And it's not signed by me, so

9  my presumption is, is that this is one he just did.

10      Q   So let me ask you, is it true that you took a

11  weekly draw from your business with Sullys (ph)?

12      A   No, I -- after we incorporated, like I said,

13  we took $2,000 a month.  I know that, so...

14      Q   And it says your daily start time, start at

15  8:00, end at 5:00.  Are you saying that wasn't

16  accurate for that time?

17      A   I have no idea.  I'm sure that that was about

18  right.  7:30, 8:00.

19      Q   Then number -- I'm sorry.  Go ahead.

20      A   In fact, you see he said he was meeting me at

21  the truck at 7:30 a.m., so...  And that was usually

22  about the time, as I told you, I got to the truck.

23  I'd usually leave the house around 6:30, get to the

24  truck at 7:30.  As to this form itself, budget and all

25  that kind of stuff, he just never, never paid

1  attention to it.

2      Q   Well, let's go to the budget page then for a

3  minute.  You don't -- so as you sit here, you don't

4  know whether this is something you filled out or not?

5      A   I don't know.  He --

6      Q   Let me go to the next page of it after that

7  first -- let's go to the page that says, let's see,

8  Our business provides, and then B.

9      A   I'm not sure -- the objective?

10     Q   No.  It's two pages later.  It says

11 up in -- question number one, Our business provides,

12 and there's a number B in there.

13         MS. BRENDER:  That's -- it's above the

14 income.  The personal expenses and business expenses

15 portion.

16 BY MR. ROWLEY:

17     Q   Yeah, it's back close to where we were

18 before.

19     A   You're going to have to give me a page

20 number.  I'm --

21     Q   Well, it says the same as -- remember the

22 page we were looking at, it said, John M. TRK-1 at the

23 top.  This is two pages later from that.

24         MS. BRENDER:  It's PDF page 6.  Does that

25 help?

```
 1              THE WITNESS:  Two pages after that?
 2   BY MR. ROWLEY:
 3       Q   Yes, it's page -- thanks, Valerie.  It's page
 4   6 of the PDF.
 5       A   Oh, I see.  Okay.
 6       Q   You see it says, Our business provides B
 7   percent of required dollars to meet the household
 8   budget, and that's 90 to 99 percent.  Was that
 9   accurate?
10       A   No, not at all.
11       Q   So you think that he just made that up and
12   put it in there, your friend?
13       A   Nobody took that stuff seriously, and I
14   didn't take it serious.  And all Doug was concerned
15   about was am I able to pay my tool bills, which I did.
16              Like I said, I didn't sign this thing.  I
17   don't -- I can't say that I reviewed it.  I certainly
18   can't say that.  I did go over one of these or two of
19   these, during the time I worked for Matco.  But in
20   terms of actually seeing these budgets, I guarantee
21   you Doug never met up with me to do that.  And I think
22   this is one that I never saw.
23       Q   Okay.  Well, then do you know why he wouldn't
24   just put A on all of them if he was just filling it in
25   for you?  You don't have any idea; right?
```

1      A   I have no idea.

2      Q   Okay.  Do you know whether he can even

3  physically do in that the system, just put your

4  answers in for you?

5      A   Well, I've never put anything in that system

6  for this evaluation.  I wouldn't do it.  I didn't have

7  access.

8      Q   If you go to page 8.

9      A   Is that two more pages?

10     Q   Yes, sir.  See there's a whole list of

11  expenses listed, personal and business?

12     A   Uh-huh.

13     Q   It says down at the bottom, This budget is

14  completely based on information provided by the

15  distributor and is unaudited by Matco.  So is this

16  information that you provided to Doug?

17     A   He probably had that information from a prior

18  deal.  The budget, like I said, he knew, he knew what

19  my expenses were.

20     Q   How would he know what other loans you had or

21  automobile loans?

22     A   At some point in time I told him.  But

23  obviously, when I did the first application, my

24  mortgage payment, if you go look at it, was 3,416

25  at the time.  And that's what it was.  So -- and

John Fleming
November 13, 2020

 1  they've known that from the time I started.

 2       Q   Well, of course, they know your mortgage

 3  application, but how does he know how much you spend

 4  on groceries or your automobile expenses or your

 5  clothing?

 6       A   I'm trying to look at what is on here.  I

 7  didn't participate in any of that.  We spent a lot

 8  more than $800 on groceries.  I've never had an

 9  automobile loan for $450.  Business expenses he would

10  have a pretty good handle on.

11       Q   Why would he know your business expenses?

12       A   Because of MDBS.

13       Q   If I told you he didn't have access to that,

14  would that be accurate to your recollection?

15       A   I believe he had access to MDBS.

16       Q   To this part of the budgeting part of it?

17       A   Well, he knows -- he knew what my lease

18  payment was.  It was the same lease payment all along.

19  The rest of it is just rounded numbers.  Made up a

20  best guess.

21       Q   Well, is it accurate?

22       A   I don't think so.

23       Q   What's not accurate on it?

24       A   Well, loss on TP accounts, it says $200.

25  That's definitely not accurate.  Legal and

 1  professional fees.  I don't think I really -- I guess

 2  I had my accountant.  Obviously, they're not detailed,

 3  you know, bank charges.  I don't know if it's $100 or

 4  not.  So it's clear to me that he was just filling in

 5  numbers.

 6      Q   Just pulling it out of the air and putting

 7  them in there?

 8      A   Yeah.

 9      Q   So why would you go along with that?  Why

10  wouldn't you say, Doug, this isn't accurate.  Let's do

11  it right.

12      A   Because I really didn't care.  That was Doug.

13      Q   Why didn't you care?

14      A   I was just trying to keep my head above

15  water.  I was bored to sit there with Doug and wait

16  for a whole long period of time to do nothing and

17  these budgets don't mean a damn thing.

18      Q   So did you have some other budget you kept?

19  I mean, you're a man who's run a business for years.

20  You're telling me you had no other budget that you

21  kept?

22      A   No.

23      Q   You just, money went in the account, money

24  came out, you didn't really keep track of it and Doug

25  made it up and put it in here?

John Fleming
November 13, 2020

```
 1       Q    And it also lists the day that you had a

 2  transaction at that route; right?

 3       A    Yeah.

 4       Q    And then it shows how much is owed to you

 5  from people at that location, right?

 6       A    Yeah.

 7       Q    Did you get this routinely as part of your

 8  franchise?

 9       A    I don't remember ever seeing it in this

10  format, no.

11       Q    Did you get it in an Excel spreadsheet where

12  there's a tab for it at the bottom?

13       A    I hate to sound ignorant, but I don't even

14  know what an Excel spreadsheet is.

15            I mean, I saw a route list, but it was

16  usually organized in such a way that this is your list

17  on Tuesday or Monday, or whatever day it is.  But to

18  see it listed this way, I don't think I ever -- oops.

19  I don't know what I just did.  I don't think I've ever

20  seen it that way.

21            (Deposition Exhibit 10 was marked.)

22  BY MR. ROWLEY:

23       Q    There's a new document in there.  Exhibit 10.

24       A    Okay.

25       Q    Have you seen this document before today?
```

 1       A   I'm going to give you the same answer.  Like

 2  I said, I saw some of them, but I didn't see all of

 3  them.  There is no signature on this one either.

 4  Yeah, I don't think I've ever seen this.

 5       Q   So looking at this one where it says that

 6  under your normal schedule -- I'm looking at page 3 of

 7  it now.  Three of the PDF.

 8       A   Okay.

 9       Q   It says you're not working Monday.  That's

10  true; right?  You weren't working Monday?

11       A   That's true.

12       Q   And it says Friday, at this point, you're

13  working three hours a day; is that right?

14       A   That wasn't true.  As I said before,

15  sometimes, if I could really rush things, I tried to

16  get out of town on a Friday afternoon.  But usually I

17  always -- if I left early, I would come in early.

18  And, you know, maybe if I left, it was 3:00 or 4:00,

19  but I don't remember ever leaving at 12:00.

20       Q   Hmm.  So again, you think he just made this

21  up and put it in there?

22           MS. BRENDER:  Objection; calls for

23  speculation.

24  BY MR. ROWLEY:

25       Q   As far as you know?

```
 1        A    I have no idea what he did.

 2        Q    Well, he's a friend of yours.  Did you ask

 3   him?

 4        A    I didn't say he was my friend.  We're on a

 5   friendly basis.

 6        Q    He's been to your house, you've been to his

 7   house; right?

 8        A    He was at my house because the whole group of

 9   distributors wanted a Christmas party and we held it

10   at my house.  I was never at his house.  He lives in

11   San Luis Obispo.

12        Q    Did you ever do anything socially with him?

13        A    No.  Other than expo, that sort of thing.

14             THE REPORTER:  Other than what?

15             THE WITNESS:  Expo.  Tool Expo.

16   BY MR. ROWLEY:

17        Q    So if we go to page 5 of this one.  Same

18   answer.  You don't know anything about what's on this

19   page; right?

20        A    No.

21        Q    Go to page 7.  Did you fill this page out?

22        A    No.

23        Q    If you look over there at what's listed as

24   expenses, can you tell me, did you have any expenses

25   that weren't on there for business expenses?
```

1      A   I don't have my business expenses in front of

2   me.  Like maintenance repair, I don't know what that's

3   about.  Like storing the truck.  I don't see that on

4   there.  Maintenance repairs, fees and storage.

5   I don't know if that's with respect to the vehicle,

6   but certainly the vehicle maintenance is not on there.

7           Again, loss on TP payments.  I never told him

8   a $200 loss because that's not true.  And again,

9   they're all just round numbers.  I don't think there's

10  anything that's accurate.  Personal expenses, it looks

11  like it's just duplication.

12          Are you loading something else in there?

13     Q   I am.  Sorry.  It takes me a second.  I've

14  got to rename them and put them in there.

15     A   It's a weird procedure to get back to that

16  screen.  So if I know you're doing it, then I can make

17  myself be able to respond to you a little more

18  quickly.

19          Okay.  Here we go.

20          (Deposition Exhibit 11 was marked.)

21  BY MR. ROWLEY:

22     Q   This is control number Fleming 332 and you

23  produced it to us or your lawyers did.  Have you seen

24  this document before today?

25     A   Yes.

1  ever seeing it.

2      Q   Well, you did sign some of them; right?

3      A   I thought I did.  I think maybe I signed it

4  when Paul was there, maybe, in 2012.  I don't know.

5      Q   If we could go to -- give me one second to

6  pull another one up here.

7          (Deposition Exhibit 13 was marked.)

8  BY MR. ROWLEY:

9      Q   We're at 13.  Right.

10          If you could open that one up for me, please,

11  Mr. Fleming?

12      A   No. 13.  All right.

13      Q   Do you recognize this document?

14      A   Yes.

15      Q   This appears to be for 2015; is that correct?

16      A   That's correct.

17          MS. BRENDER:  I'm assuming we're on

18  page -- just talking about page 1; is that right?

19          MR. ROWLEY:  Well, is the document for more

20  than 2015 overall?  I think it is, right, it's got

21  other months on here.

22          MS. BRENDER:  Has other years on it is my

23  understanding.  You can see it was generated in

24  different years.

25  BY MR. ROWLEY:

```
 1        Q    Is this a document you generated?

 2        A    This is what I was talking to you about

 3   that's in MDBS.

 4        Q    Okay.  And would you have generated this each

 5   year?

 6        A    Yeah.  Again, sometimes, like, I didn't think

 7   to put the lease, see I wrote in $1,666 per month.

 8   That's the lease on the truck.  You know, if you have

 9   an expense during a given day, you know, you didn't

10   get it entered, you know, the truck lease, for

11   example, because it came right out of the checking

12   account automatically.

13             So this is -- I would print this document

14   out, but there's some things that were missing.  For

15   the purpose of my accountant, I would provide this

16   list, so that he would know and he could look at the

17   expenses, so...

18        Q    So your accountant would get -- I'm

19   looking -- I'm just looking at the first page now.

20   Your accountant.  I don't think these are tax records.

21   This is an expense account.  So when we get this

22   record, we're going to have something that looks

23   exactly like this, page 1, with the same writing on it

24   and everything?

25        A    That's my writing.
```

```
 1      Q   Okay.  And you did that at the time and you
 2   gave it to your accountant?
 3      A   That's correct.
 4      Q   All right.  And so you were trying, because
 5   you're an upstanding guy, and he was preparing your
 6   federal taxes which, of course, you wouldn't want to
 7   do anything unlawful or illegal on, you try to be as
 8   accurate as you could when you do that; right?
 9      A   That's correct.
10      Q   And occasionally you'd notice there were
11   things that weren't on here that you needed to fix.
12   And you would fix that at the time, and that's what
13   the various handwritten changes on here, if you look
14   at these different pages, are; right?
15      A   Correct.  It's stuff that I forgot to put
16   into MDBS.
17      Q   So if you look at storage here, it says -- is
18   that -- I don't understand, because you weren't paying
19   64,000 a year for storage; right?  So what is that
20   number supposed to be?  I hope you weren't paying
21   64,000 a year for storage in Salinas.  Because I'll
22   store your truck for less than that for you.  But what
23   is that supposed to be?
24      A   I don't know what that was.
25      Q   Is that $648?  I mean, how much were you
```

1   paying a month for storage?

2        A    I was paying $200 a month for storage.  Plus

3   I had a storage -- that was to store my truck.  Plus

4   I had a storage locker, which I think was another 300

5   or something.  So it was about $500 a month.

6        Q    Paying $300 for a storage locker.  For what?

7        A    That's what it cost in Salinas.

8        Q    No.  But what are you storing in a $300

9   storage locker?  That would be a room-size locker.

10  What were you storing in there?

11       A    Toolboxes.

12       Q    You're saying you had a large locker that was

13  costing you $300 a month to store toolboxes in.

14  I thought you said you had those at your house?

15       A    A lot of times if I took a toolbox in trade

16  I would put it into storage.

17       Q    All right.  So where was this other storage

18  place, so we can figure out exactly what the cost was?

19  What was the name of this other storage place?

20       A    That was when I was at the first place.

21  I can't remember.  I can drive to it.  It's on Rossi

22  Road.  I just can't remember the name of it.

23       Q    You keep going down here, you've got

24  something listed as ISN.  What's ISN?

25       A    That's what you saw before.  That's -- you

1   showed me the receipt, actually, for it.  ISN is, I

2   think, Integrated Supply Network.  It's a tool

3   supplier.

4        Q   So you spent -- you sold $15,000, to your

5   cost, $15,000 worth of tools from ISN in 2016?

6        A   That's correct.

7        Q   And just so we're clear, this is for 2015;

8   right?  It's printed in 2016, but as it says up here

9   at the top, these are your expenses for 2015; right?

10       A   I believe that's true.

11       Q   Yeah.  And that's all money that you took

12   care of directly yourself in a transaction if you're

13   selling through ISN; right?

14       A   No.

15       Q   The money doesn't go through Matco, you're

16   not buying it from Matco, you're paying it directly

17   and you're getting the money directly; right?

18       A   It does go through MDBS.  You can see that it

19   is, because that's what it printed out.  So Matco was

20   aware of the fact that people purchased stuff from

21   MDBS -- or from ISN rather.

22       Q   Well, I understand that.  What I'm trying to

23   figure out is, you know, assuming -- and we will get

24   to that in a minute, because I think they were pretty

25   clear with you that they didn't look at your expenses.

 1  It was for your use or not.  But setting that aside,

 2  this $14,913 was money that you directly collected and

 3  kept, whatever profit you made on that; right?

 4      A   No, that's not true.  That $14,913 is money

 5  I spent to buy tools.  The price is included in

 6  the -- I mean, when I sold it, it's reflected in MDBS

 7  as a sold item.

 8      Q   Okay.  So when I look back, there'll be ISN

 9  reflected in MDBS as sold items with a product cost of

10  almost $15,000?

11          MS. BRENDER:  Objection; misstates testimony.

12  Assumes facts.

13  BY MR. ROWLEY:

14      Q   I'm trying to figure out why, when you go to

15  a third party, buy a tool from a third party and sell

16  it yourself off the truck and keep the money yourself,

17  why that would be in MDBS, other than here you've

18  included it in your expenses.  Would it be anywhere

19  else in there?

20          MS. BRENDER:  Objection; asked and answered.

21          THE WITNESS:  The sale was included in MDBS,

22  if that's what you're asking.

23  BY MR. ROWLEY:

24      Q   Okay.  And so we'd be able to see what your

25  net markup was on the stuff you sold from ISN?

 1      A   I don't think you could.

 2      Q   So how much did you make on all these sales

 3  you made on the side with products that weren't Matco

 4  products?

 5      A   I can't tell you because some of that was

 6  financed, some of it I never got paid for.

 7      Q   You can't tell me on any of it what it was;

 8  right?

 9      A   There is no way anybody could tell you what

10  they made exactly on a tool on a tool truck because

11  it's one thing to sell it, it's another thing to get

12  paid for it.

13      Q   Well, you certainly were truthful in your tax

14  returns about whatever you made on it; right?

15      A   Yeah.  Sure.

16      Q   Okay.  So you could tell by looking at your

17  tax returns; right?

18      A   I don't -- the question you're asking doesn't

19  even make sense to me.

20      Q   I can tell how much profit you made on these

21  sales by looking at your tax returns and doing, kind

22  of, a forensic accounting on it; right?

23      A   I'm not a forensic accountant.

24      Q   I want to be clear because this is important.

25  It's your testimony, under the pains and penalties of

1  perjury, that when you sold an item that you purchased

2  from a third party off your truck, that you would,

3  outside of this expense account report that we're

4  looking at, that you would enter that sale in the

5  system as a sale that you'd made?

6       A   You previously produced a receipt from ISN

7  that said I had bought a dent puller and a spray gun.

8  Okay?  I answered this question before.  I sold it, it

9  may have gone negative inventory.  But the sale itself

10  is entered in MDBS, otherwise I have no way of

11  tracking.  And obviously it is because you can see

12  it's here in the expense account.

13      Q   Then we go down here, you spent almost $1,800

14  on jerky; is that right?

15      A   That's correct.

16      Q   And how much profit did you make on that?

17  I think you said you marked it up.  Was it a dollar

18  each, or what was your profit margin on the jerky?

19      A   Four to $5 each.

20      Q   I'm trying to understand.  So if it was

21  $1,800 base price, you're making 100 percent on it,

22  200 percent?

23      A   That's my purchase price, so...

24      Q   I understand that.

25      A   You can add, you know, I probably sold

1   it -- I bought it for 10, 9 to $10 a bag and I would

2   sell it for 13, 14 or $15, so I was making about 4 to

3   $5 per bag.

4       Q   So you're making about, and tell me if I'm

5   wrong, 30, 40 percent, something in there, markup?

6       A   And some of it, you wouldn't actually sell.

7   Some of it you'd just give it to guys because they're

8   buying something or, you know, that kind of thing.

9       Q   And then if I go down to travel, you've got

10  $2,000 listed here.  What was that for?

11      A   I don't see it.  Oh, that's probably for

12  expo.

13      Q   And that includes your wife's travel there?

14      A   Yes.  Probably the hotel room.

15      Q   Just the hotel room was $2,000.  How long

16  were you at expo for?

17      A   Four days, I think.

18      Q   Was that in San Diego or somewhere else?

19  Where was it?

20      A   I don't know.  There was one in San Diego,

21  one in New Orleans, one in Las Vegas.  I don't know

22  where it was in each individual year.  One in Orlando,

23  Florida.

24      Q   If we look at the very bottom of this page

25  you've got a category called, Outside Labor.  What is

 1  that?

 2       A    That's for accounting purposes.  That's the

 3  money that I gave my son.

 4       Q    That's $74,409?

 5       A    That's right.

 6       Q    And he wasn't working for you, you just gave

 7  him the money?

 8       A    Well, it was because we had to do something.

 9  The money was in my name in the account, so I put -- I

10  gave him the money -- it was his -- he freely had the

11  ability to do what he wanted to do with his route.

12  I just helped him handle money.

13       Q    But you took, as an expense against your

14  route, 75-, almost 75-, $74,409 that you gave to your

15  son; right?

16       A    I don't remember how we structured it for the

17  accountant.

18       Q    Well, you already told me you accurately

19  listed your expenses in the system and it was $74,409

20  you gave to your son; right?

21       A    I'm sure that it's accurate.

22       Q    Okay.  So then if I wanted to figure out how

23  much profit you made in 2016.  Let's set aside the

24  $74,000 for now.  I could take the total amount here

25  and add it to the cost of goods sold, in other words,

 1   what you paid to Matco, and deduct that from the

 2   revenue; right?

 3          MS. BRENDER:  Objection.

 4   BY MR. ROWLEY:

 5      Q   Why not?

 6          MS. BRENDER:  Vague and ambiguous.

 7   BY MR. ROWLEY:

 8      Q   These are your expenses, that's your revenue.

 9   We deduct one from the other, we get how much money

10   you paid; right?  Including the $75,000 that you gave

11   to your son; right?

12      A   I'm sorry.  I'm not an accountant.  I don't

13   understand what you're asking me.

14      Q   So for a guy that ran businesses for 20

15   years, you don't know how to look at a P&L sheet?

16   Profit and loss.

17          MS. BRENDER:  Objection; argumentative.

18   Badgering the witness.

19   BY MR. ROWLEY:

20      Q   Did you use profit and loss statements in

21   your dry cleaning business?

22      A   Yes, I did.

23      Q   All right.  So you understand what a profit

24   and loss statement is; right?

25      A   I understand what a profit and loss statement

1    is.

2         Q    Yeah.  And you understand the term "gross

3    revenue"; right?

4         A    Yes.

5         Q    And you understand the term "net revenue";

6    right?

7         A    Yes.

8         Q    And you understand the term "expenses";

9    right?

10        A    Yes.

11        Q    And you understand the term "cost of goods

12   sold"; right?

13        A    Yes.

14        Q    All right.  So if I wanted to determine your

15   net revenue, I could take your gross revenue and

16   deduct your expenses and your cost of goods sold;

17   right?

18             MS. BRENDER:  Objection; vague and ambiguous.

19   Christian, I'll just go ahead and tell you you're

20   leaving out the fact that just because he sold

21   something doesn't mean he collected it.

22             MR. ROWLEY:  Don't, don't, don't.  No.  I'm

23   asking.  Let him answer.

24   BY MR. ROWLEY:

25        Q    If we look at your revenue collected on that

 1  other sheet.

 2      A   Revenue.

 3      Q   Yeah.

 4      A   Okay.

 5      Q   If we look at revenue, revenue means you

 6  collected it.  And you deduct your expenses and your

 7  cost of the goods sold.  Cost of goods sold could be

 8  including expenses or not, but for our purposes we'll

 9  do it separately, that would be your net revenue for

10  the year; right?

11      A   That's not true.  And I'll tell you why.  As

12  you saw in, I think it was 2018 or something, I

13  collected $386,000 and I only owed $330,000.  As

14  you -- or only sold 330.  A lot of the money that I

15  was collecting in 2018 is money that was actually sold

16  in previous years, because I was going out there

17  knocking on doors trying get some of the money back so

18  I could pay my bills.

19          So in answer to your question, if you used my

20  completed sales, the money I collected as revenue, it

21  does not reflect the current cost, the actual cost of

22  the goods.

23      Q   You would agree that somebody could take the

24  whole period of time, right, and somebody who wasn't

25  an accountant, not like you or me, could figure out

 1  when the sale was made and they could take your self

 2  referred expenses here and make a determination as to

 3  any particular year, depending on which accounting

 4  method you used, as to what your net profit was;

 5  right?  This would be the best record of what your

 6  expenses were; right?

 7      A   I believe that would be the best record of my

 8  expenses.

 9      Q   Yeah.  And you made enough in 2015, before

10  you took any profit that year -- did you take any

11  profit that year?

12      A   I don't know.

13      Q   You paid your son $74,000; right?

14      A   The money that was paid to my son came out of

15  my son's truck.  There was two separate accounts.

16      Q   So on your taxes, did you list that as a

17  labor expense?  I'm sure your lawyer is going to tell

18  you not to answer that.

19          MS. BRENDER:  Objection.  Yeah.  Objection on

20  the basis of attorney-client privilege.

21          THE REPORTER:  I'm sorry.  Counsel.  You were

22  talking at the same time.  Can you start the question

23  over?

24  BY MR. ROWLEY:

25      Q   Sure.  I'll say the question and then wait,

John Fleming
November 13, 2020

```
 1   so your lawyer can tell you not to answer it.
 2          Did you make a deduction on your federal
 3   income taxes in 2000 -- for your tax year 2015 in
 4   which you listed outside labor for your son at
 5   $74,409?
 6          MS. BRENDER:  Objection on the grounds of the
 7   taxpayer privilege.  I'm instructing the witness not
 8   to answer.
 9   BY MR. ROWLEY:
10       Q   But you had prepared this document, like you
11   already said, to give to your accountant to do your
12   taxes; right?
13       A   Correct.
14       Q   If we go to the next page.  Same question.
15   You prepared this yourself throughout 2016; is that
16   correct?  This one appears to have been printed in
17   2017.
18       A   This is the stuff I entered in MDBS, yeah.
19       Q   Okay.  And then if we go through this one,
20   you've got internet access listed at $2,322.  What
21   internet access was costing you $2,322?
22       A   Obviously that's a mistake.  I don't know
23   where it came from.
24       Q   Okay.
25       A   Actually, that's not too far off.
```

1  Between -- I would say $200 a month is probably...

2      Q   That includes your cable bill; right?  Your

3  actual internet doesn't cost you $200 a month, does

4  it?

5      A   Well, you have to have both the internet and

6  a mobile hotspot on your truck to process the credit

7  cards.  I don't remember.

8      Q   What about your telephone you've got listed

9  at $2,000 a year.  Is that just for you or somebody

10  else as well?

11      A   Myself and my wife.

12      Q   You've got a Matco note listed at $45,000.

13  Is that a note you paid off for your second route?

14      A   I would assume.

15      Q   You have professional listed at

16  2,540 -- excuse me, $2,543 for professional.  What's

17  that for?

18      A   My accountant would be about $1,000 worth.

19      Q   What's the other $1,543?

20      A   I don't know.  I would have to look into MDBS

21  to find that out.

22      Q   Well, let me ask you.  These categories are

23  ones that you wrote; right?  These aren't ones that

24  automatically pull up?  You personally type in these

25  categories; right?

November 13, 2020

```
 1       A   Oh, I didn't type them in.  I entered it in

 2   the computer, the computer generates this report.

 3       Q   Right.  But you typed in, for example, where

 4   it says jerky.  There's not a category for jerky on

 5   the computer or IS 10.  You typed that in; right?

 6       A   No, that's not true.  There is a category in

 7   the computer for jerky and for IS 10.  As I said, the

 8   MDBS system will allow you to enter other vendors that

 9   you purchase from.  It allows you to do that.  And I

10   had a category in there for Kelly Supply,

11   for example, for jerky, for IS 10.  And I would enter

12   it.

13       Q   Sorry.  Maybe I'm not being clear enough.

14   What I'm saying is the Matco system doesn't come

15   preloaded with these categories, you put these

16   categories in there and then you used them to put

17   expenses under; right?

18       A   That's correct.

19       Q   Okay.  BOM Tools.  What's that?

20       A   BOM Tools was a company that specializes in

21   German things.  That's a situation where -- they're

22   out of Florida.  Matco has access to them, but,

23   for example, I think probably what this was was one of

24   my customers was working on an Audi.  Audi is German

25   and it has a special tool that's necessary for holding
```

 1 | the camshafts.  I can get that tool through Matco, but
 2 | Matco would charge me around 7- to $800 for that tool.
 3 | They would be buying it from BOM Tools for the $280
 4 | and expect me to sell it to my customer for $1,200.
 5 | And it would take them 10 days to get it.  Whereas, if
 6 | I just made a phone call to BOM, they could get it to
 7 | me in a day or two, my customer would not have their
 8 | customer's car broken down for weeks on end while
 9 | they're waiting for Matco to get the tool and I can
10 | sell it to my customer at a reasonable price.
11 |     Q   If you turn to -- and again, sorry to keep
12 | asking this.  For all these documents, you gave all of
13 | these to your accountant; correct?
14 |     A   Yeah.
15 |     Q   Was that a yes?  I'm sorry.
16 |     A   I believe I did.
17 |     Q   If you look at the 2000 -- the next page,
18 | which is dated February 12th of 2018.
19 |     A   Okay.
20 |     Q   I'm trying to figure out, this one has some
21 | handwritten stuff at the bottom.  I believe it
22 | says -- and I'm going to try to read your handwriting,
23 | so correct me if I'm wrong.  But I believe it says,
24 | had two franchise.  One for son who quit, got into
25 | drugs, ended up, what is that word next?

```
 1        A   Ended up owing money, I guess, to Matco.

 2        Q   To Matco for tool for son truck to loan at

 3   8 percent.  Did you write that?

 4        A   That's probably my accountant writing, making

 5   notes.  I don't remember writing that.  And that's not

 6   my handwriting.

 7        Q   All right.  And then there's some handwritten

 8   stuff over on the side here.  Is that your

 9   handwriting?

10        A   No.

11        Q   So do you know what that first thing says 30,

12   it looks like 31,106 something.  Do you know what that

13   is?

14        A   It looks like cost of goods, but I don't know

15   what it is.  I --

16        Q   And then it says, 55,551 operating expenses.

17        A   What year is this?

18        Q   2017.  It was printed in 2018.

19        A   I can't remember when my son left.  But it

20   could be what happened was we were just trying to

21   combine the two trucks together, so that I could file

22   a tax return.

23        Q   And then it says 22,000 wages.  What's that

24   for?

25        A   That would probably make sense because my son
```

1  was there for four -- five months, four, five months

2  that I paid him, so maybe that was for him.

3      Q   You were paying him 5,000 a month?

4      A   He was drawing out of his account, so

5  I -- but it was a set amount he was supposed to take

6  and I don't remember exactly the amount.  But the

7  $74,000 a year seems about right.

8      Q   Okay.  And when you say he was drawing out of

9  his account, just so we're clear in the deposition, it

10  wasn't -- it was the account that you had set up in

11  your business for truck two?

12     A   That's correct.

13     Q   All right.  And so the money received from

14  customers went into that account and the money to pay

15  expenses came out of that account; right?

16     A   That's correct.

17     Q   And so if I'm looking at the expenses on

18  this, the printed part of the expenses, not the

19  handwritten stuff at the bottom, the amounts are for

20  truck one; is that right?

21     A   I believe it is.  That doesn't say it, but I

22  believe it is.

23     Q   And let me ask you.  You just said that, you

24  know, 75,000 or so was about what your son was

25  expected to take out of the account.  How did you guys

1    come up with that number?

2        A    I don't remember.  It was supposed to be

3    based on what his collections were.  I know that.  But

4    I don't remember exactly how it was worked out.

5        Q    Did he take more than that out of the

6    account?

7        A    No.

8        Q    When he just kind of disappeared I

9    think -- again, I'm very sorry to ask you about this.

10   But when he just kind of disappeared, he didn't take

11   any additional money out of the account?

12       A    Not out of the account.  I found out over the

13   period of time that he was selling a lot of stuff for

14   cash.  He also had a separate -- when he moved out of

15   a house that he was renting from me and we cleaned it,

16   I found a separate register as to where he was keeping

17   notes of who owed him what amount of money.  That sort

18   of thing.  So he did steal quite a bit from me and

19   left me with a lot of debt.

20       Q    Do you still have that separate accounting he

21   was doing?

22       A    No, I threw it away pretty quickly because --

23            THE REPORTER:  You dropped off.

24            THE WITNESS:  I threw it away.

25   BY MR. ROWLEY:

```
 1      Q   And I don't want to go through each one of
 2  these line items here on this page.  But these line
 3  items, again, are, to the best of your knowledge,
 4  accurate as of the time you created this?
 5      A   I do the best I can.  But when you're real
 6  busy, maybe I missed a few things.  Looks like I
 7  reentered something wrong there, at one point in time,
 8  that was a large amount.  I forgot what it was.
 9      Q   I'm sorry.  I don't know what you're looking
10  at.  I'm looking at the 2018 printout.
11      A   Yeah, I know.  I thought you were just
12  talking in general.  On this one.
13      Q   So if I look down here, the word "cogs" or
14  "logs," I'm not sure which one it's supposed to be,
15  appears down the side.  Do you know what that's about?
16      A   I'm sure those are -- oh, you know what, I
17  know what it is.  My accountant, who had always done
18  my stuff, previously he sold his business to Block
19  Advisors or something.  This lady named Shirley was
20  working for my accountant.  And this was the first
21  year, 12/'18 was the first year that Shirley did my
22  tax returns.  And so that writing on there is from
23  Shirley, because she didn't understand it and I was
24  explaining things to her.
25      Q   And the checkmarks, are those hers or your
```

1   notes?

2        A   I don't know.  You see where it says "lease"?

3   That's my writing, but the other stuff is not.

4        Q   Okay.  And so she's basically -- the X there,

5   she's telling you you can't -- well, do you know, the

6   X she's got by the lease, do you know what that's

7   about?

8        A   I have no idea.

9        Q   All right.  Then we go to the last page.

10       A   Okay.

11       Q   Same question.  This was prepared for and

12   given to your accountant; is that correct?

13       A   I don't see a year on this one.

14       Q   It's in the right-hand corner.  It says

15   3/30/2019.

16       A   Okay.

17       Q   This is your 2018 expenses; right?

18       A   Right.

19       Q   All right.  And here I'm kind of curious

20   because you've got $33,513 listed for BOM Tools.

21   That's a pretty large amount.  What did you buy from

22   BOM that was that much?

23       A   You see up to the right it was actually -- it

24   was 3,513.  I put a line through the three.  Probably

25   I discovered the error of my entry.  And I think I

1   went and looked, What the heck is that?  And so

2   I probably entered it wrong.

3       Q   So that line there is you crossing out the

4   first three?

5       A   Yes.

6       Q   Okay.  And you've got a computer listed at

7   4,524.  What's that for?

8       A   If you look over to the right, it is also

9   handwritten at the bottom, it says 4,524 to ISN and

10  3,513 to BOM.

11      Q   Oh, so that was in the wrong category.  That

12  was supposed to be ISN?  Because it looks to me like

13  it's in computer, unless I'm misreading it?

14      A   Yeah, it is in computer.  If you look over,

15  see where it says computer, it says 600 and then below

16  it it says 700?

17      Q   Yeah.

18      A   That's the code that you enter it to in the

19  computer with respect to MDBS.  So if I was in a hurry

20  and looked down and I clicked on it, I could have

21  easily clicked on computers and ISN because they're

22  right next to each other.

23      Q   All right.  And then there's some accounting

24  stuff here in the lower left-hand corner; is that your

25  handwriting?

     1        A    The stuff with the line through it?

     2        Q    Yes, sir.

     3        A    It looks like that might be my handwriting.

     4        Q    What were you doing there?

     5        A    Just making notes for the accountant.

     6        Q    And then there's some stuff here crossed out,

     7   Matco purchases and total stuff; is that your

     8   handwriting?

     9        A    I think so.

    10        Q    Then it says, at the very top there, 225,643.

    11   What's that?

    12        A    The total -- I don't know.  I'd have to look

    13   back and see if that's total sales or something.

    14        Q    So you were kind of doing some rough math on

    15   what you made that year?

    16        A    Yeah.  And I had an accountant that wasn't

    17   familiar with this and hadn't done it before.  And I

    18   was trying to explain things to her, but I do from

    19   time to time, or I did make mistakes on admissions, so

    20   I would just add it at the bottom so that the

    21   accountant would be aware of it.

    22        Q    And so the -- where it says, though, you

    23   got 225, you think is the revenue and then you

    24   have -- it's crossed out now, but total 163,639.

    25   What's that?

```
 1       Q    And this was the final year that -- this will
 2   reflect the final period of time that you were a
 3   franchisor; right?
 4       A    That's correct.
 5       Q    I need to take a quick break and then we can
 6   come back.
 7            THE VIDEOGRAPHER:  All righty.  Stand by.
 8   Going off the record.  The time is 2:46.
 9            (Discussion held off the record.)
10            THE VIDEOGRAPHER:  We're back on the record.
11   The time is 3:03.
12   BY MR. ROWLEY:
13       Q    So when you were on your route visiting your
14   stores, did you take breaks in the morning typically,
15   get a cup of coffee?
16       A    Generally not.  I'd sometimes stop and go to
17   the bathroom, obviously.  But generally I worked all
18   day.
19       Q    Did you stop for lunch somewhere?
20       A    Rarely.
21       Q    So you would just go the whole day without
22   any breaks and without any lunch?
23       A    That's the way I work.
24       Q    What's that?
25       A    That's the way I work.  That's normal for me.
```

```
 1      Q   Anybody tell you you couldn't stop and take a

 2  break for lunch?

 3      A   No, nobody told me I couldn't do it.

 4      Q   So if you wanted to, if you felt like having

 5  lunch somewhere, you could stop and have lunch, right?

 6      A   The problem is, again, you're trying to

 7  collect that money, so I would adjust my time to make

 8  sure that I could get in every single person.  And to

 9  do that, you didn't have lunch.

10      Q   Well, you could have stopped and had lunch

11  anyway, right, and just stayed a little later?

12          MS. BRENDER:  Objection; asked and answered.

13  BY MR. ROWLEY:

14      Q   Right?

15      A   I just answered that.  It was more time

16  efficient for me to go without lunch, so I could

17  collect it, to make enough amount of money.  You can't

18  just stay later because shops close and people are

19  gone.

20      Q   You're starting an hour later, so you could

21  have started an hour earlier and had lunch?

22      A   I could have started an hour later and had

23  lunch?

24      Q   No.  You told me towards the last year or two

25  of your franchise you were starting a little later in
```

1  the day.

2       A   That's true.

3       Q   Yeah.  And you could have started an hour

4  early and stopped and had lunch; right?

5       A   Well, still wanted to get things done.  You

6  asked me if I took lunch.  I didn't take a lunch.

7       Q   And no one told you that you couldn't take

8  lunch; right?

9       A   No one told me, You can't take lunch.

10      Q   There was nothing physical preventing you

11  from taking lunch or a break when you wanted to take

12  it; right?

13      A   The issue of not taking lunch was that

14  I needed to get the money collected, so I could pay

15  Matco.

16      Q   Not to pay Matco, you gave $75,000 to your

17  son; right?  You were trying -- you wanted to make

18  more money and it was more important to you to try to

19  make the money than it was to stop for lunch; right?

20          MS. BRENDER:  Objection; misstates testimony.

21  BY MR. ROWLEY:

22      Q   You can answer.

23      A   It's not true.

24      Q   So then why didn't you come in an hour

25  earlier towards the end of the last two years of your

 1  working and spend a half-hour lunch and take a couple

 2  breaks?

 3      A   Because I didn't want to.

 4      Q   You made a decision that it was more

 5  worthwhile for you to come in an hour later and not

 6  take a lunch or rest breaks; right?  That was your

 7  decision.  Right?

 8      A   I made my schedule, yes.

 9      Q   Okay.  And you made the decision that it was

10  more important to you to have an extra hour in the

11  morning and to start an hour later than it was to stop

12  and take a meal or rest break; right?

13          MS. BRENDER:  I'm going to object to the

14  extent this is overbroad.  And I think we're talking

15  about the last year right now.

16          MR. ROWLEY:  No speaking objections.  I've

17  got your objection.

18      Q   You can go ahead.  Right?

19      A   What are you asking me to say right to?

20      Q   I'm asking you to say that you made a

21  decision that you would start your day an hour later

22  rather than start an hour earlier and take a meal and

23  rest break?

24          MS. BRENDER:  Objection; vague and ambiguous

25  as to time.

BY MR. ROWLEY:

 Q   You can answer.

 A   The truth is in order to collect money, you have to go when people are there.  I knew which shops took lunch at 12:00, which shops took lunch at 1:00, which shops would be there.  So I continued to work throughout the day, so I would be there when the employees of the shops were there.

 Q   You started working an hour later in the last couple of years after you switched to the shorter route; right?

 A   I don't dictate what hours the shops are open.

 Q   Well, the shops, you told me the shops are open late?

 A   They are.

 Q   You used to stay until 6:30 or so; right?

 A   Some shops are open late, yes.

 Q   Okay.  So you could have adjusted your schedule and visited shops at other times and taken a lunch or break?

        The bottom line is, are you really sitting here saying to me you didn't have time to take a meal period because you were so desperate to collect money that you couldn't stop and take a meal period?  Is

 1   that your testimony under the pains and penalties of

 2   perjury as you sit here today?

 3           MS. BRENDER:  Objection.

 4           THE WITNESS:  Absolutely, sir.

 5   BY MR. ROWLEY:

 6       Q   Okay.  And did you take a meal or rest period

 7   when you worked at your dry cleaning business?

 8       A   No, I did not.

 9       Q   All right.  So your practice has always been,

10   throughout your career, you're a hardworking guy and

11   besides the time you were a law enforcement officer,

12   when you were working for yourself, you chose to work

13   instead of take a meal or rest period; right?

14       A   That's correct.

15       Q   You never read anything at Matco that said

16   you can't stop and take a meal or rest period; right?

17       A   I never read anything, no.

18       Q   Did you ever tell your district manager, Oh,

19   I'm so busy, I can't ever take a meal or rest break?

20       A   He got upset the few times that he did ride

21   with me because I don't stop and he wanted to stop.

22       Q   So did you stop?

23       A   No.

24       Q   So you don't know whether other Matco

25   distributors stop for meal or rest periods.

John Fleming
November 13, 2020

```
 1      Q    I'll load in No. 18.
 2           (Deposition Exhibit 18 was marked.)
 3           THE WITNESS:  Okay.
 4  BY MR. ROWLEY:
 5      Q    Do you recognize this document as the
 6  separation for your first truck -- or excuse me, your
 7  second truck?
 8      A    Yeah, I guess so.
 9      Q    Do you recall getting this?
10      A    I don't recall, but it looks like that's what
11  it is.
12      Q    Is that your signature at the bottom?
13      A    I haven't got to the bottom yet, but...
14           Yeah, it looks like my signature.
15      Q    This is Exhibit 19.  Bates number starting at
16  751 Fleming.
17           (Deposition Exhibit 19 was marked.)
18  BY MR. ROWLEY:
19      Q    It looks like a bunch of receipts for a hotel
20  in Salinas.  I'm trying to figure out what this is
21  for.
22      A    I'd have to go through this thing, but...
23           That would be during the time -- let me look
24  at the receipts here.
25      Q    Is that where you held the meetings with
```

1    There's got to be another one for 2017, I think.

2         Q    Is there any way to tell, when you look at

3    it, which truck it was?

4         A    I don't know.  It wouldn't say anywhere on

5    that.  I thought that earlier you showed me one from

6    2017 also.

7         Q    It's your recollection this is low for you,

8    and so it is probably, as far as you know, maybe for

9    your son's truck?

10        A    Well, because of the fact that he only worked

11   five months the numbers make sense, but I don't know

12   for a fact.

13            MR. ROWLEY:  Putting in Exhibit 23.

14            (Deposition Exhibit 23 was marked.)

15   BY MR. ROWLEY:

16        Q    This is the same thing as before, I think.

17   Here you're getting charged a fee for quarterly

18   payroll tax reporting.  So your accountant is making

19   payroll tax payments for you; correct?

20        A    That's correct.

21        Q    And what Rasmussen would do for the 70 bucks

22   is figure out what your FICA withholding was and

23   everything and then submit it quarterly?

24        A    Yes.  That's correct.

25            (Deposition Exhibit 24 was marked.)

 1      Q    If she wasn't doing it, she would write void

 2  on it; right?  Like we saw earlier.

 3      A    She did it on one, but I don't know she would

 4  do it on every one.  I don't know what she did.  I

 5  would have to be looking at my banking account to know

 6  exactly what money went in there.

 7      Q    Do you still have that bank account?

 8      A    I already answered you that I do not.

 9      Q    The one you were depositing the money into.

10      A    Oh, our personal account?  Yeah, we should

11  still have that same account.

12      Q    And then, I mean, I can pull it up if we need

13  to.  But there's some receipt from Block Advisors

14  where you're being charged for business services

15  payroll $115.  Was that for the same thing, to process

16  the payment that you were taking out?

17      A    Yeah, Matt Rasmussen retired in --

18           THE REPORTER:  You're breaking up on my end

19  all of a sudden.

20           THE WITNESS:  I'm sorry.  Matt Rasmussen

21  retired and sold his business to Block.

22  BY MR. ROWLEY:

23      Q    Right.  And so I'm just trying to make sure

24  that during that period of time you were paying Block

25  the 115 a month for the same service that you had been

```
 1  paying Rasmussen 70, to process the check to you each

 2  month and submit the payroll taxes.

 3      A   I believe that that's the case.  I don't

 4  remember for sure.

 5      Q   And did you change the $2,000 you paid

 6  yourself a month at any point during the time you

 7  owned the franchise?

 8      A   I don't think so.

 9      Q   And do you know, did the corporation issue

10  you a W-2 for the money that was paid to you?

11      A   Yes.

12      Q   And was there any W-2s issued to anybody else

13  during the period of time that you owned the

14  franchise?

15      A   No.

16      Q   One more thing, then I think we're done.

17          (Deposition Exhibit 26 was marked.)

18  BY MR. ROWLEY:

19      Q   Would you take a look at that for me?

20      A   Okay.

21      Q   If you go to the fourth page of that.  I just

22  want to see if that's your electronic signature that

23  appears there?

24      A   Where it says distributor number?

25      Q   Yes.
```

```
 1        A   I guess it is.  I think I signed this.

 2   I don't remember.  I don't know whether that would be

 3   my electronic signature or not.

 4        Q   You recall signing this document at the time

 5   that you gave up that second truck; correct?

 6        A   This wasn't the second truck, this was trying

 7   to reduce the size of my route.

 8        Q   Okay.  I'm sorry.  You recall signing this

 9   at the time you reduced the size of your route?

10        A   Yes.

11        Q   And you had a chance to review it before you

12   signed it; right?

13        A   Yes.

14        Q   And you understood that you were signing a

15   legally binding document; correct?

16        A   Correct.

17        Q   And it was your voluntary choice to want to,

18   kind of, reduce your route at that point, as opposed

19   to surrender it or hire somebody to work on it or

20   something else; right?

21        A   Yes.

22        Q   And at the time you reduced your route, if

23   you look at page, I guess, it's one, two, three, four,

24   page 5 of this, it looks like there's a starter

25   inventory of 45,692.  You already had in that
```

```
 1                     REPORTER'S CERTIFICATE

 2

 3          I, AUDREY KLETTKE, CSR No. 11875, Certified

 4    Shorthand Reporter, certify:

 5          That the foregoing proceedings were taken

 6    before me at the time and place therein set forth, at

 7    which time the witness was put under oath by me;

 8          That the testimony of the witness, the

 9    questions propounded, and all objections and statements

10    made at the time of the examination were recorded

11    stenographically by me and were thereafter transcribed;

12          That a review of the transcript by the deponent

13    was requested;

14          That the foregoing is a true and correct

15    transcript of my shorthand notes so taken.

16          I further certify that I am not a relative or

17    employee of any attorney of the parties, nor

18    financially interested in the action.

19          I declare under penalty of perjury under the

20    laws of California that the foregoing is true and

21    correct.

22       Dated this 20th day of November, 2020.

23

24

25                     AUDREY KLETTKE, CSR No. 11875
```

# EXHIBIT 2

**DECLARATION OF COREY BANK**

I, Corey Bank, declare as follows:

1.     The following facts are based on my own personal knowledge and, if called as a witness, I could and would testify to them.  I am providing this declaration freely and voluntarily.  I was advised before meeting with Matco Tools Corporation's ("Matco") attorney that I could choose whether to participate in the interview, and voluntarily chose to participate. Matco's attorney has told me that I do not have to provide this declaration and that whether I choose to do so or not, the decision will not affect my distributorship status with Matco in any way.  I have had the opportunity to review the contents of this declaration and to make any changes I believe necessary so that it is accurate.  I understand that Matco has the right to and may use or file this declaration in the case of *John Fleming, et al. v. Matco Tools Corporation, et al.*, Case No. 5:19-cv-00463-WHO (U.S. District Court for the Northern District of California) or in any other lawsuit alleging that distributors have been misclassified as independent contractors. The allegations in this case have already been described to me.

2.     I understand that because I own a Matco distributorship, I may be a class member in the *Fleming* case, and that this declaration could be used by Matco to argue that a class should not be certified or in a manner that could be against the interests of potential class members. Before talking to Matco's attorney and providing this declaration, I read and voluntarily signed a Notice of Acknowledgment, attached hereto as Exhibit A.

3.     I signed a Matco Distributorship Agreement (the "Agreement") about six years ago, in approximately November or December 2014.  In connection with opening my business, I borrowed about $67,000-$68,000 from Matco to cover my start up tool inventory, and, I believe, a franchise fee.  The Agreement lasts for 10 years and can be renewed.  I knew when I signed the Agreement that I would be running my own business as a Matco distributor.

4.     My business is called Corey Bank Tools, and it is a sole proprietorship. I believe previously registered a fictitious business name for my business.

5.      I worked in the mechanic industry before I started my distributorship business. I decided to start a distributorship because I wanted to do something different, and, something for myself. I had worked at a couple of dealerships previously and was over the politics at the dealerships. I looked into tool distributorships with both Matco and Snap-On, which is a competitor of Matco. I talked to a few people from Matco and Snap-On, and did ride-alongs with them as well. I decided to open a Matco distributorship because I felt like Matco was more family-oriented than Snap-On. I also felt Matco wasn't going to tell me what to do, and since I don't want to be told what to do when I'm working up my own business, that fact made a difference in my mind.

6.      When I first started my distributorship, I leased an Isuzu truck to use as my mobile store. I had that truck for about three years, and I hated it. I decided, kind of on the spur of the moment while attending a Matco Expo, to lease a different truck, about three years ago. I am leasing the truck from a company called Translease. No one at Matco told me that I had to lease the new truck.

7.      Matco sent me about 3-4 weeks of starter inventory, but beyond that, it was completely up to me to decide which products to carry on my truck. I base my inventory decisions on what sells, and try to carry those products.

8.      Before I began operating my distributorship, I attended training for about a week and a half in Stow, Ohio. During the training, I learned about "showing and selling," as well as how to use Matco's MDBS software that I use for sales. I found the training in Stow to be helpful. After the training in Stow, I participated in field training, which consisted of ride-alongs with a Matco District Manager and a Matco trainer over the course of a few weeks. I did not find the ride-alongs with the trainer useful, because his sales methods were different than mine. At some point, I asked him to stay in the truck while I made my stops. The ride-alongs with the District Manager, Jeff Baerg, were useful, however.

9.      Before I started my business, I was given the choice of running a distributorship in either the Pomona, CA or Tustin, CA areas. I chose Tustin because I'm from the Pomona

area and wanted to do something new a little further away from where I'm from.  Matco provided me with a list of potential customers when I started my business.  That list was meant to support the opening and continued success of my business, but ultimately I had to make the sales.  I also have some customers who are not in my area, but they buy from me because they like me.  I understand that no Matco distributor serves the same geographic territory that I do.

10.     My customers include dealerships, independent mechanic shops, bus yards and waste management companies.  The techs at these sites have different needs since they are working in different types of businesses, and I have to plan my inventory purchases according to what they all need.  Matco gave me suggestions on the order in which to visit my customers when I started my business, but I changed it up to fit my needs and my customers' needs.  For instance, my bus yard and waste management customers have techs who work on day and night shifts, and since I found that the night shift techs tend to buy more product, I crafted my schedule to ensure that I go to their sites during the later shifts.  I also sometimes arrange to visit some customers at the beginning or the end of the day so that I can spend more time with them.

11.     I make most of my sales in person, though sometimes customers will text or call me with an order.  I always use the times when I meet with customers in person, for whatever reason, to try to sell product to them.

12.     I buy inventory from Matco at cost, and then price products for resale to my customers.  Matco has a suggested retail price for products, which I usually use, but I can sell products to my customer for more or less than the retail price if I choose.  My profit is the difference between the price I pay for the inventory and the price my customers pay for the products they purchase.

13.     When customers purchase tools from me, they generally pay me directly.  Customers pay in one of three ways: cash/credit card, "time payment," or a Preferred Spending Account (PSA).  With time payment sales, customers pay me directly, I decide how long the customers have to pay off the full cost of a product and I do not charge interest.  I want

customers to come out to my truck so that they can buy more products, so I'm flexible about scheduling payments and use those touchpoints to try to sell to my customers.  Most of my sales are time payment.  A PSA is usually for larger purchases, and customers apply for financing through Matco for these purchases.  Matco pays me for the entire amount of the purchase, minus a certain amount, and then takes on the risk of loss if the customer skips out on paying.  I generally collect the money on PSA sales.

14.     I developed my sales strategy on my own; I couldn't tell you how.  I just do my own thing.  I've always been good at selling.  I know how to talk to people, and I was always the salesperson in my family.

15.     I keep my truck in storage and do not report to any Matco location when I'm working.  When I am on the road and meeting customers/selling, I am always looking to sell them additional tools. I also choose how long to spend with each of my customers, as some need or want more attention that others.

16.     I set my own schedule and hours.  Matco does not require that I spend a specific number of hours per week working.  Before COVID, I would typically be on the road between 8:00 a.m. until 4:30 or 5:00 p.m. on Mondays; between 6:30 a.m. and 6 p.m. on Tuesdays; between 7:00 a.m. until 8:30 or 9:00 p.m. on Wednesdays; between 7:30 a.m. until 6:30 or 7:00 p.m. on Thursdays; and between 8:00 a.m. until 3:30 or 4:00 p.m. on Fridays.  I spend the vast majority of this time meeting with customers or driving to their shops.  I don't spend excess time on stocking my truck or accounting.  I don't come in early or work late on those things.  Instead, I tend to stock my truck during my first two stops of the day while I have customers in the truck looking around.  Doing this allows me to talk to them, and to try to sell them products, while I'm stocking the truck.  I probably spend between an hour and an hour and a half per week on inventory.  I also do accounting tasks in my truck when I have a second, sometimes with customers inside who I'm hoping to sell to.  I estimate that I spend about 2 hours per week on accounting.  At the end of the day, I spend about 15 minutes doing closeout of my daily orders.  Then, I drop my truck off at storage, shut the door, and I'm done

working for the day.  I can adjust my schedule if needed if any personal matters come up.  I've adjusted my schedule since COVID hit, and I've only been working three days a week since then.

17.    Jeff Baerg, the Matco District Manager in my territory, holds sales meetings for distributors in the area every six weeks.  I'm not required to attend, but I generally find the meetings helpful because Jeff goes over promotions and sales strategies and tactics.  However, the meetings are generally held on my late days, so I only attend a portion of them if I make it.

18.    I have a good relationship with Jeff.  We probably talk on the phone once a week on average, but usually have to play phone tag before we connect.  We don't have a scheduled call.  Instead, I will call him to see how he is doing or to ask for ideas on how to take care of a customer.  Jeff generally calls me to see how I am doing or to see if there is anything he can help me out with.

19.     I do not have a website for my business and as far as I know, Matco does not require that I have one.

20.    I sometimes sell non-Matco products to my customers, such as beef jerky, energy drinks and candy.  This was my idea, and I did not run it by Matco.  I thought of doing this because I've always seen these types of items for sale in tool trucks.

21.    When I visit customers, I generally wear a Matco polo shirt and a Matco hat.  I don't know if this is required, but I don't see why anyone wouldn't want to wear something that promotes their business.

22.    My distributorship agreement requires me to maintain a certain level of auto insurance to cover my Mobile Store. Even if Matco did not require me to maintain insurance, I would have purchased it anyway.

23.    If I am sick, I decide whether I want to work or take time off.  I do not have to tell anyone at Matco if I take time off when I am sick.  I am also free to take vacations when I want.  I typically take about 2-3 weeks off per year, usually spread out over a number of long

weekends.  I don't tell Matco that I am taking time off for vacation unless the District Manager calls me, in which case, I tell him I'm not working that day.

24.    I am free to take breaks when I choose, and I do from time to time.  Matco has never told me I can't take breaks.  Sometimes a customer will want to grab lunch and I'll take an hour for lunch to meet with him.  Other times, I'll eat on the go.  It's my choice.

25.    Every business has customer complaints, and I occasionally have to deal with them.  If a customer has a complaint about a Matco product, they will usually raise it directly with me.  I'm not required to tell Matco about these complaints, but I'll sometimes discuss them with Jeff Baerg to figure out how to take care of the customer.

26.    If someone asked who my employer is, I would tell them I am self-employed.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

8/25/2020

Executed on _____, 2020, at Westminster, California.

_____
Corey Bank

65433166v.1

# EXHIBIT A

## <u>NOTICE OF RIGHTS RERGARDING INTERVIEW</u>

A class-action lawsuit has been filed against Matco Tools Corporation, NMTC, Inc. d/b/a Matco Tools and Fortive Corporation (collectively, "Matco") by a former distributor, John Fleming ("Plaintiff"). Plaintiff claims that he and other Distributors in California should have been treated as employees of Matco as opposed to franchisees, and therefore, among other things, should have been reimbursed by Matco for all necessary business expenses, should receive payment for overtime, and should receive meal and rest breaks.

Plaintiff seeks to represent the following class of individuals: All persons who signed Distributorship Agreements, and personally operated a Mobile Store in California at any time between January 25, 2015 and the present.

Matco believes Plaintiff's allegations are untrue and is vigorously defending the lawsuit. At this stage, the court has not certified any class. Counsel for Matco is interviewing a number of current and former Distributors to investigate facts that may be relevant to the case. If you agree to be interviewed as part of this case, please read the following and sign below.

**By signing this document below, you are acknowledging that you have read and understand the following:**

(a)      You are a potential member of the class that Plaintiff seeks to certify in this case and your interests may ultimately be adverse to Matco's.

(b)      You are free to consult with your own attorney about this case and may opt to have your own attorney present during any interview.

(c)      Your participation in the interview is entirely voluntary.  You may choose to participate or not participate, and if you choose to participate, you may terminate the interview at any time. If you choose to participate, your only obligation is to tell the truth in response to the questions asked.

(d)      After the interview, the attorneys may ask you to sign a declaration stating under the law of perjury that the information you provided was true.  This declaration may be used to oppose class certification and/or liability in the lawsuit.  Your decision to sign the declaration is also voluntary.

(e)      The information you share during the interview may compromise your ability to make a wage or other claims against Matco and Matco may use the declaration in defense of any claim brought by you or the Plaintiffs.

(f)      It is possible that the parties to the lawsuit may seek to take a deposition from you during the course of the litigation to ask about your duties and responsibilities and the declaration.

(g)      **Matco cannot and will not retaliate against you, or take any action against you, based upon my decision to participate or not to participate in the interview, or on my decision to sign or not sign a declaration, or on the information I provide.**

I also acknowledge that I have not been threatened, coerced or in any way intimidated to participate in the interview or sign a declaration.

Corey Bank Print Name _____   Signature _____

8/24/2020   Date _____   Time _____

# EXHIBIT 3

**DECLARATION OF HAIG BOYADJIAN**

I, Haig Boyadjian, declare as follows:

1.      The following facts are based on my own personal knowledge and, if called as a witness, I could and would testify to them.  I am providing this declaration freely and voluntarily.  I was advised before meeting with Matco Tools Corporation ("Matco")'s attorney that I could choose whether to participate in the interview, and voluntarily chose to participate. Matco's attorney has told me that I do not have to provide this declaration and that whether I choose to do so or not, the decision will not affect my distributorship status with Matco in any way.  I have had the opportunity to review the contents of this declaration and to make any changes I believe necessary so that it is accurate.  I understand that Matco has the right to and will likely use and file this declaration in the case of *John Fleming, et al. v. Matco Tools Corporation, et al.*, Case No. 5:19-cv-00463-WHO (U.S. District Court for the Northern District of California) or in any other lawsuit alleging that distributors have been misclassified as independent contractors. The allegations in this case have already been described to me.

2.      I understand that by virtue of my distributorship with Matco, I am a potential class member in this case, and that this declaration could be used by Matco to argue that a class should not be certified or in a manner that could be against the interests of potential class members. Before talking to Matco's attorney and providing this declaration, I read and voluntarily signed the Notice of Acknowledgment, attached hereto as Exhibit A.

3.      I first entered into a Distributorship Agreement (the "Agreement") with Matco in October 2003.  When I signed this Agreement I understood I would be operating an independent business as a Matco distributor. Shortly after opening my business, I financed approximately $35-40,000 for the purchase on an initial tool inventory of $60-70,000 and an initial line of credit of approximately $35-40,00. This is so I could offer credit to my customers when I was starting up. I used some of my savings in order to cover my initial expenses. All in, I used $35,000 out of my own pocket, and financed the rest.  I made weekly payments to Matco of about $200-250, and paid off the note in about two-and-a-half years. I

could have gone through any bank I chose, I could have gotten a small business loan, or refinanced my house. Matco allows you to use these options. But in the end, it was easier to go through Matco and I was confident that I could pay off my loan early. I also leased my tool truck, referred to as a Mobile Store, through a company called Translease that Matco recommended. I had an option to pick a new truck or one that was one year old. The older truck was a shorter term lease but was the same payment, so I went with a new truck. After one year, I upgraded to a step van, leased through Translease. I was able to buy that lease out after 6-7 years. I recently sold that truck and bought a Peterbilt. I needed to get a new truck anyway in order to pass California's new emission standards in January 2020. I financed this truck on my own, not through Matco. I wanted to purchase a truck, and Matco only arranges leases. Once I purchased the truck, the truck is built out by either Summit or ACVD. Matco does want the trucks to have a similar look and to have the Matco Brand. One of the things I understood I obtained in entering into a distributorship with Matco was the right to use Matco's trademark and to leverage off their reputation in the tool industry.

4.     The term of the Distributorship Agreement was 10 years. After 10 years, there is a renewal process. Matco wants to make sure that your Mobile Store is updated. By then I had purchased a new truck, so mine was fine, and I decided to renew my Agreement.

5.     The name of my business is just a d/b/a - Haig Boyadjian, authorized Matco Distributor. I registered the fictitious business name in Los Angeles County in order to get a reseller's permit and with the City of Los Angeles to obtain a business permit.

6.     As an independent business owner, I understand that I may employ another person to run the distributorship business for me. Matco would probably like to know about that, but I do not need Matco's approval. If I hired someone else to drive my truck, I would just need to make sure they were added on to my insurance. I know some distributors that have their wives or family members help them in their business, but I'm single, and so I've chosen to run my business on my own.

7.      Prior to being a Matco distributor, I was an auto technician for Ford. I knew the Matco and Snap-On distributors that came to our shop, and I thought that selling tools would be an opportunity to be my own boss. Being a mechanic, I really only considered being a tool distributor. I looked at both Matco and Snap-On distributorships.  I consulted with the father of a friend of mine who was a CPA. He ran the numbers for both and told me he thought Matco was a better deal. I was 26 years old at the time, so this advice was helpful to me, and I decided to go with Matco. I love not having a boss. I can start my day when I want to and work my own schedule. I am not a morning person, so I usually choose to start my day around 10:00 a.m. I also prefer to work late. I put in 50-60 hours per week, but set my own schedule. For example, I try to never do any work on Saturdays.

8.      Before I began operating my Matco franchise, I attended 10 days of training in Stow, Ohio.  During this training, I learned about Matco's products, product display ideas, inventory management, sales techniques, and strategies to help my business be successful. I big part of this training was how to use Matco's business software, called MDBS.  The training was mostly helpful. While I had to pay to attend this training out of my own pocket, my CPA deducted these costs as business expenses on my tax returns. Before this training and before signing the Distributorship Agreement, I had done some ride-alongs with another Matco distributor who showed me my route and introduced me to the customers. After I signed the paperwork, I chose to take two months off before attending the training in Stow. After the training in Stow, I worked with a trainer for two weeks who rode with me all day. After that, I was on my own. I also received  Matco's Confidential Operating Manual and an MDBS Manual before the training in Stow. I do not remember if I had to sign any type of acknowledgment for those.

9.      When I started my business, Matco offered two routes near where I lived, either in Hollywood or North Hollywood. There was also a route available in Ventura, but that would have involved a lot of extra driving. I chose the Hollywood route, as that actually contained the Ford dealership where I used to work. There were approximately 325

technicians who were customers on that route. The route included some small auto shops, about 6-7 large auto dealerships - approximately 50 different shops total. I have far less now as Hollywood has changed a lot over the years. I don't have as many small shops, but I have some large bus transit yards, and fire and police stations. The list of customers Matco provided was meant to help me hit the ground immediately in starting my business. I am glad that Matco has a built in customer list so that I do not need to start from scratch in developing my own customer list when I started my own business.  I was promised that no other Matco distributor would serve the same geographic territory as I do, that's a big no-no. There are no overlaps in the territories Matco offers, so I am guaranteed that I do not compete with another Matco distributor in my area.

10.     Over time, I have lost customers as certain shops close, but I have added some as well. When I renewed by Agreement after 10 years, Matco resurveyed my route and I ended up with some different shops. I lost a big auto dealership, but I went out and found new shops on my own. My District Manager also found some new shops for me. Right now, I have two large auto dealerships, some independent dealers, some bus and truck yards, the Los Angeles Unified School District, and some fire and police departments.

11.     I do not operate a website for my business. Matco has a page that may direct customers my way, but I don't get very many sales from that. I pay a fee for that that I keep meaning to cancel, but I keep forgetting to do that. Almost all of my sales are made by me by meeting my customers in person. I do have a Facebook page that is dedicated solely to my business. It is private, and only my customers have access to it. I will use that to post instructional tool videos, and as an alternative way to keep in touch with my customers.  I also do a Super Bowl contest each year,. Each person who fills out a credit application gets a few squares. I've offered a few giveaway items and have done some raffles. But now that I've been doing this for over 16 years, my business is pretty steady and I do not need to rely on promotions very often.

12.     I pay Matco wholesale prices for tools, which is my inventory.  The price set by Matco is a wholesale price and enables me to price the tools that I sell to my customers at a higher price. While Matco has a manufacturer's suggested retail price at which I can sell products to my customers, I have the freedom to raise these prices. I can either raise the price on certain specific tools or do a global markup. I choose to do a global markup of 5%, which I determined was fair to my customers but also took into account the high cost of living in California. I chose the amount of this markup, and I understand some distributors markup as high as 15%. I started using this markup when gas prices went up. I understand my customers may be able to get a cheaper price if they purchased online, but I tell them if they purchase from me they don't have to pay for shipping, they get personal service, and they get offered credit for free. Occasionally I will offer discounts to customers who pay all at once and do not use credit. I choose whether and how much to mark up the retail price of the tools I sell, and whether to offer discounts.  I sell the tools to my retail customers and collect money from customers.  Whatever is left over after expenses is my profit, so over time I have learned how to price my tools to maximize my profits while keeping my customers happy.

13.     When customers purchase tools from me, they pay me directly. I am responsible for invoicing and collecting money from my customers. I keep 100% of the purchase price from the customer. How much profit I make depends on where I set the retail sales, customer payments (whether they pay on time, no default, etc.) and expenses. Customers pay me in one of three ways: in cash, with a line of credit (referred to as a truck account), or a Preferred Spending Account (PSA). With truck accounts, I decide the payment terms, and usually offer weekly payments over ten weeks. This is an interest-free offer of credit. Most of my customers pay in 6-7 weeks. While some customers pay in cash or with their own debit card, truck accounts probably make up at least 60-70% of my sales. PSAs make up less than 10% of my total sales. With a PSA, Matco offers credit based on the customer's credit score. The interest rate can range from 6.99% to 23.99%. With PSAs, Matco used to keep 9% of the purchase price, but now they keep 8%, because they are assuming responsibility for the bad debt. For

everything but PSA sales, if a customer does not pay for a product, then I am left with a bad debt. I have tried using collection agencies a few times, but they didn't get much. Overall, my skip rate is less than 1% which is not a big deal. I just factor that as the cost of doing business and write off the loss on my taxes. I have learned over time that you have to be flexible, I am basically doing business on a handshake, which is extremely rare these days. If a customer is in a hard spot, I will offer him more time to pay me.

14.     From time to time, Matco offers large discounts to the distributors, at sales meetings or at Matco's annual Expo. Sometimes my District Manager will offer special discounts on certain items. I try to buy as many tools as I can when they are discounted. To decide on which products I need to buy, I have to rely on my own understanding of my customers' likely needs. For example, I no longer have any body shops on my route, so I know I do not need to buy sanders. But I do have large truck yards, so I need a lot of heavy-duty tools that other distributors don't. My inventory level generally depends on how much money I have, how much space I have to store the tools, and my customers' needs. I don't worry too much about my inventory levels, and neither does Matco. If I have the money, I buy more tools. In my experience, the more I carry and show in my Mobile Store, the more I sell.

15.     One thing I do to increase sales is to always keep my truck looking good. I clean it myself and take time to polish the wheels. My customers notice this. I think of it like a gas station: if you saw one that had a only a little walk-up window and was all dirty, and one that had a full convenience store that was nice and clean, which one would you go to? My sales strategy depends on people skills. I have learned and gotten to know my customers over time. Making relationships drives sales, but this takes time and experience.

16.     The time I spend operating my business varies from day to day depending on what I might choose to focus on at any particular time. As I stated above, I am not a morning person, so I choose to start my route at about 10 a.m. each day. I place my tool order every night, this takes about 5 minutes. I do my weekly closeout on Thursday. My accountant handles sales tax issues with the State Board of Equalization.

17.     When I am on the road meeting with my customers, I check to see if they are satisfied and always ask if they need any additional tools. I choose how long to spend with each of my customers, as some need or want more attention than others. It takes more time to sell a large item like a tool box that it does a set of wrenches. Some customers may ask me to research a specific item, and so I may take more time with that customer on a given day. Some customers like to chat more than others. It can be easy to get caught up in personal conversations with customers. Over time, however, I have learned to walk a fine line between being friendly with my customers and spending too much time in personal conversations, which cuts into my selling time. Overall, about 90-95% of my total time is driving my route and meeting with my customers to make sales. Of that time, I would estimate my drive time is about 15-20%.

18.     I set my own schedule and hours.  I tend to leave late and work late. This is not only my personal preference, but I have some big yards on my route that have second and third shifts that start at 2 or 2 p.m., or at 8 p.m. I might see these customers once every two weeks, but this definitely varies from time to time. Matco does not require that I spend a specific number of hours per week marketing or selling, and as long as I am doing well, no one bothers me. Having my own business allows me to take time off or to adjust my schedule when I need to, for example I leave my mornings open for things like doctor's appointments or meeting with my CPA. Having flexible hours is a big help.

19.     The Matco District Manager in my territory holds sales meetings every 5 or 6 weeks. These were normally in-person meetings, but post-COVID they are held remotely. I don't know if there is a minimum number of meetings I am supposed to attend, but I'm pretty good about attending them. There are usually good discounts on tools offered, and the comradery with the other distributors is nice. I know some District Managers that may be more strict than mine about attendance at these meetings, but I know some distributors who never go.

20.     Aside from the sales meetings,  I see my District Manager, Gary Armstrong, about once per month. We will meet for lunch or he will drop off some sales flyers. I talk with him on the phone at least once per week, just to chat about how things are going. I am friends with him outside of work as well, so when we meet or talk on the phone it's not always about business.

21.     I decide what tools and equipment I need to run my business. For example, I need to use a cell phone and a laptop. While Matco offers the opportunity to purchase a laptop that comes preloaded with their MDBS software system that I use in my business, I am free to buy a laptop from somewhere else. But I chose to go with the Matco laptop because they offer a good deal and a good warranty. If I purchase a laptop from elsewhere, Matco would load the MDBS software onto it for me. After 16 years running my own Matco distributorship, I am now on my fourth laptop. I use a point of sale program through my laptop so I do not need a separate credit card reader. I believe I paid approximately $1,500 for the most recent laptop. In addition, I use a cell phone and a mobile hotspot for work. While at first I tried to keep a business phone and a personal phone, after a while I realized it was much easier just to have one phone. For any equipment I purchase for my business, I write off on my taxes as a business expense

22.     While it is not exactly encouraged by Matco, I do occasionally sell non-Matco tools to my customers. I believe Matco is generally aware this happens on occasion. For example, if one of my customers wants a tool that Matco does not carry, I'd rather the customer get that tool from me than from somewhere else. My District Manager, Gary, is aware of this and understands that if I get whatever a customer wants, they will continue to buy from me. Obviously I know to keep this to a minimum. Gary used to be a distributor himself, so he knows that as long as you keep it to a minimum, in the long run it will help your business.

23.     When I visit customers, I do not have to wear any specific uniform.  I wear shorts close to 365 days a year. I do want my customers to know I run a Matco franchise, so I

always wear a collared shirt with a Matco logo on it. This is my choice. I have police stations on my route, so I don't want people wondering what I'm doing there. I buy these shirts from Matco, and deduct them as a business expense.

24.    My District Manager Gary provides me with sales flyers that I can give to current and prospective customers. Matco also gives us signs that we can place in a metal holder on the side of my truck that will advertise new products. After I had a couple people approach me at gas stations and the like and ask if they could buy tools from me, I've stopped using those.

25.    Pursuant to my Distributorship Agreement, I am required to maintain a certain level of auto insurance to cover my Mobile Store. I have a $2 million liability insurance policy plus standard vehicle insurance for my Mobile Store. Matco offers a deal through Allstate, but I chose to go with Mercury because I have a friend who works there. I am free to choose any insurer I want. I am personally responsible for those expenses, but I deduct the cost of insurance, gas, and maintenance on my Mobile Store as business expenses.

26.    I am responsible for providing my own health and dental insurance. Having no benefits is one of the few downsides to running your own business. Matco does offer a group policy, but it is no cheaper than the insurance I get on my own. I deduct insurance costs as business expenses as well.

27.    As mentioned above, I decide the days and hours I work.  If I am sick I decide whether I want to work or take time off. I am also free to take vacation whenever I please. I try to take a total of one month off per year. I usually take a week off between Christmas and New Year's, and a week off during Matco's annual Expo. I also take long weekends.

28.    I am also free to take meal and rest breaks when I choose.  Pre-COVID, I liked to stop somewhere and get lunch. Sometimes I feel like I need to take an hour off and take a break. Other times I feel like working through the day so I can get home as quickly as possible. It's my choice. Matco is not involved in whether I take breaks or don't.

Declaration of Haig Boyadjian

29.     I do not have a sales quota. The only thing Matco looks at when you start and then generally once per year is your breakeven point. That is all your household expenses added up so that you know how much profit you need to make each month to at least cover your expenses. Gary and I review this each year to see if my expenses have gone up so I can determine whether I need to make any changes in my business to increase sales.

30.     I am generally expected to visit each of my customers once per week, but that is more my customers' expectations than Matco's. For some customers that work night shifts, I may only visit them once every two weeks. I offer to run their credit card each payday to pay their tool bill. If a customer wants to buy something, it is my choice to stay late and help the customer.

31.     I am not required to follow any particular script when I meet with customers or potential customers. We did some role playing during the initial training in Stow, but I've developed my own style over time.

32.     Occasionally I have to deal with customer complaints. Usually a customer complains directly to me, and I handle it on my own. I am not required to report it to anyone. Very occasionally, a customer might complain about me to Gary. This has happened probably only once every 5 years. I recall one was from a guy who bought a tool 20 years ago, not even from me, and he wanted a discount on something. I told him no. I do not apologize to anyone for something I didn't do wrong. I don't need to sugarcoat anything to please a boss, because I am my own boss.

///

///

///

///

///

///

///

10

Declaration of Haig Boyadjian

33.     If someone asked who my employer is, I would tell them I am self-employed. If someone asked who my boss was, I would say "me."

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on _____9/3/2020_____, in Whittier, California.

*HAIG BOYADJIAN*
_____
Haig Boyadjian

65467438v.1

11

Declaration of Haig Boyadjian

**EXHIBIT A**

## <u>NOTICE OF RIGHTS RERGARDING INTERVIEW</u>

A class-action lawsuit has been filed against Matco Tools Corporation, NMTC, Inc. d/b/a Matco Tools and Fortive Corporation (collectively, "Matco") by a former distributor, John Fleming ("Plaintiff"). Plaintiff claims that he and other Distributors in California should have been treated as employees of Matco as opposed to franchisees, and therefore, among other things, should have been reimbursed by Matco for all necessary business expenses, should receive payment for overtime, and should receive meal and rest breaks.

Plaintiff seeks to represent the following class of individuals: All persons who signed Distributorship Agreements, and personally operated a Mobile Store in California at any time between January 25, 2015 and the present.

Matco believes Plaintiff's allegations are untrue and is vigorously defending the lawsuit. At this stage, the court has not certified any class. Counsel for Matco is interviewing a number of current and former Distributors to investigate facts that may be relevant to the case. If you agree to be interviewed as part of this case, please read the following and sign below.

**By signing this document below, you are acknowledging that you have read and understand the following:**

(a)     You are a potential member of the class that Plaintiff seeks to certify in this case and your interests may ultimately be adverse to Matco's.

(b)     You are free to consult with your own attorney about this case and may opt to have your own attorney present during any interview.

(c)     Your participation in the interview is entirely voluntary.  You may choose to participate or not participate, and if you choose to participate, you may terminate the interview at any time. If you choose to participate, your only obligation is to tell the truth in response to the questions asked.

(d)     After the interview, the attorneys may ask you to sign a declaration stating under the law of perjury that the information you provided was true.  This declaration may be used to oppose class certification and/or liability in the lawsuit.  Your decision to sign the declaration is also voluntary.

(e)     The information you share during the interview may compromise your ability to make a wage or other claims against Matco and Matco may use the declaration in defense of any claim brought by you or the Plaintiffs.

(f)     It is possible that the parties to the lawsuit may seek to take a deposition from you during the course of the litigation to ask about your duties and responsibilities and the declaration.

(g)     **Matco cannot and will not retaliate against you, or take any action against you, based upon my decision to participate or not to participate in the interview, or on my decision to sign or not sign a declaration, or on the information I provide.**

I also acknowledge that I have not been threatened, coerced or in any way intimidated to participate in the interview or sign a declaration.

Print Name   HAIG BOYADJIAN            Signature   HAIG BOYADJIAN

Date   8/21/2020

# EXHIBIT 4

## DECLARATION OF MATTHEW CORSON

I, Matthew Corson, declare as follows:

1.     The following facts are based on my own personal knowledge and, if called as a witness, I could and would testify to them.  I am providing this declaration freely and voluntarily. I was advised before meeting with Matco Tools Corporation ("Matco")'s attorney that I could choose whether to participate in the interview, and voluntarily chose to participate. Matco's attorney has told me that I do not have to provide this declaration and that whether I choose to do so or not, the decision will not affect my distributorship status with Matco in any way. I have had the opportunity to review the contents of this declaration and to make any changes I believe necessary so that it is accurate. I understand and consent that Matco has the right to and may use or file this declaration in the case of *John Fleming, et al. v. Matco Tools Corporation, et al.*, Case No. 5:19-cv-00463-WHO (U.S. District Court for the Northern District of California) or in any other lawsuit alleging that distributors have been misclassified as independent contractors. The allegations in this case have already been described to me.

2.     I understand that by virtue of my distributorship with Matco, I am a putative class member in this case, and that this declaration could be used by Matco to argue that a class should not be certified or in a manner that could be against the interests of putative class members. Before talking to Matco's attorney and providing this declaration, I read and voluntarily signed the Notice of Acknowledgment, attached hereto as Exhibit A.

3.     I entered into a Distributorship Agreement (the "Agreement") with Matco in March 2016. Before I started my Matco franchise, I worked for a transit company in a management role. As my contract with the transit company was coming to an end in approximately 2015, I decided to look for another opportunity because I wanted to reduce the number of hours I was working. Before working for the transit company, I was a mechanic and owned my own repair shop. From my experience as a mechanic and a small business owner, I decided I want to start a franchise business because I understood the convenience, security, and benefit of having the support of a franchise business platform. For example, independent

business owners who do not own a franchise generally cannot offer the same level of discounts or deals as a franchise because the overhead costs and expenses are generally higher. I considered different franchises and ultimately decided to go with a tool-selling franchise because of my knowledge and familiarity with tools. I did my due diligence and researched the four biggest tool-selling companies (Matco, Snap-On, Cornwell, and Mac Tools). I spoke to at least a dozen Matco distributors to ask about their experience. After receiving generally positive feedback, I decided to start a Matco franchise.

       4.     When I started my business, I borrowed from Matco to cover my initial purchase of inventory. I had to purchase a minimum level of inventory, but I had the choice of how many tools to buy beyond that. I incurred other expenses during my start-up, such as the licensing fee associated with opening a Matco distributorship, but I paid those out of pocket. I signed the loan myself, but my wife did co-sign on the franchise Agreement, which is a 10-year term. I am about four years into my Agreement, but I understand that I have the choice to renew the Agreement at the end of the 10-year term if I wished if I qualified based on a number of factors, such as how well I have maintained my business. I also took a lease out to finance the truck I purchased that serve as my mobile store. I know many distributors purchased new trucks, but I had no interest in buying a new truck for my business because they are so expensive. Instead, I decided to take over a lease from another distributor, which allowed me to save almost $60,000 on a truck that was only one-year old. I obtained financing through a lender called Translease. I am almost done paying off the truck, and understand that once I do, I own the truck.

       5.     When I signed the Agreement, I understood I would be operating an independent business as a Matco distributor. I love running my own business because I am my own boss. The name of my business is Tools 2 You. I operate my business as a sole proprietor. My wife and I are in the process of discussing whether to change the business structure to a limited liability company. I understand that I can make the decision to change my business structure and do not need Matco's approval to do so.

6.       I operate my business with my wife. My wife handles the accounting, and also helps me with things like checking in the inventory and cleaning the truck. I focus on keeping my customers happy and selling them tools. As an independent business, I understand that I may employ another person to run the distributorship business and do not need Matco's approval to hire employees. I have thought about hiring employees to assist me in my business, but decided not to because about 20% of my business is cash sales and I would prefer to handle the sales myself.

7.       Because of my prior experience as a small business owner and in management with the transit company, I already had a lot of experience running a business and knew exactly what I was getting into when I decided to start a franchise business. While I worked 24/7 at my prior job, I am able to control my own work schedule with my Matco franchise. Since 2016, I typically only work on Monday through Friday. Many of my customers start their first shift early, between 4:00 a.m. and 7:00 a.m., so on Monday to Thursdays I typically try to leave my house by 7:00 a.m. On Fridays, I like to sleep in a little bit and leave my house around 8:00 a.m. Typically, I get home between 5:30 p.m. and 6:00 p.m., except on Wednesday when I get home around 7:00 p.m. because one of my stops is UPS and I try to catch the customers on the swing shift (which ends at 4:30 p.m.) as well as the night shift. After I am done selling each day, I like to drive to a Starbucks, get a cup of coffee, and then do my closeout, paperwork, and order inventory before I go home for the day. My wife prefers that when I am home, I do not do any work, so I get my work done before heading home. Sometimes, I may work on a Saturday, although this is rare.

8.       I decide my own schedule. I report to myself and do not need to keep track of the hours I work, which I like. Matco never told me what hours to work or how many hours to work. Long ago, when I was employed as a technician at a Ford dealership, I had to punch the clock and keep track of the start and end time of my shift and for my meal periods. I found that very regimented and appreciate that I, as my own boss, do not need to do that now.

9.     Before I began operating my Matco franchise, I attended 10 days of training in Stow, Ohio. The training was a good refresher, although I was already familiar with much of what was covered because of my prior experience. However, I still found the training helpful because I gained my product and tool knowledge, and learned how to better navigate the software system, sales techniques, and strategies to help my business be successful. I deducted the travel and other costs of attending this training as a business expense on my tax returns. I also completed Field Training, which consisted of alternating ride-alongs with a District Manager and Field Trainer. Even though I was experienced in sales, I did pick up helpful pointers during these ride-alongs. I also received different paperwork from Matco, although I do not recall what the documents were about.

10.     When I started my business, there were two unassigned geographic territory near my home, one in the Vallejo/Benicia/small part of Contra Costa County and the other in the San Rafael area. Because I lived almost in the middle of the Vallejo/Benicia route, I chose that territory since it was very convenient for me. Matco provided me a list of 335 potential customers when I started. I found the list very helpful to kick off my business. Indeed, the call list is a good example of the reason why I decided to start a franchise business because it offers support such as providing me with customer prospects and I do not need to start from ground zero. I was not prohibited from selling my products to other customers within my territory. In the last several years, I have gained some customers not on the call list and lost some customers who were, but I currently have approximately 135 actual customers to whom I sell tools. I understand that no other Matco distributor serves the same geographic territory as I do.

11.     Over the years, the sales technique I have developed and adopted is to learn the customers' personality and try to mirror it. The types of customers I have work in places that vary from auto shops, distribution centers, mom and pop shops, so there is a wide range of personalities and preferences. I am not the pushy salesman-type, and to avoid seeming like I am trying to peddle tools to them, I try to get to know my customers on a personal level and

build those relationships. I observe my customers' styles. Some are more direct and know exactly what tools they need before entering my truck. Others like to browse around to find what they want. I switch the layout of my truck often to keep my customers on their toes. I have adopted a laid-back sales approach, in which I make sales by sharing my tools knowledge and functionality with my customers and work with them to understand their needs and how to better perform their job, instead of pressuring them to buy tools. I learn by customers' needs and anticipate what they want, which I think makes me effective at making sales.

12.     I would estimate that I spend about 70% of the time visiting customers, checking up on them, and selling them the tools they need using my sales technique. I make about 99% of my sales in person. I have a webpage, but I do not maintain it and have not made any sales from it. I am not required to visit specific customers on a weekly or monthly basis. Matco recommends that I visit customers weekly, but this is not a required. However, I try to visit my customers weekly or as often as possible since I make most of my sales in person. When I am with a customer, I choose how long to spend with each of them, as some need or want more attention than others. I am not required to follow any particular script when I meet with customers or potential customers. I am free to develop my own sales pitch in the way I see fit.

13.     I pay Matco for wholesale tools and inventory. Matco sets the price at which I purchase tools from them for resale. There is a pricing guide in the software system that I can go by, but I am free to alter the pricing at any time and in any way I want. The price set by Matco is a wholesale price and enables me to price the tools that I sell to my at a higher price. While Matco has a manufacturer's suggested retail price at which I can sell products to my customers, I have the freedom to raise these prices or to offer discounts. I choose whether and how much to mark up the retail price of the tools I sell, and whether to offer discounts and the value of those discounts. I believe that the Matco recommended pricing margins are too low, especially by California standards. I usually run about a 7% mark-up. I came up with 7% after talking with other distributors and taking my expenses into account, such as insurance and

fuel, and think the 7% mark-up allows me to have a healthy profit margin while covering some of these expenses.

14.     I also decide what type of discounts I want to offer my customers. I try to have different incentives each week. I have made flyers that I laminate and put up on my truck for different tools promotions. The prices I charge for tools depend upon supply, demand, and the prices the market will bear. I sell these tools to my customers and collect money from customers. Whatever is left over after expenses is my profit. On average, I take about $650 per week, which goes into my personal bank account. The rest of the profits go back into growing my business.

15.     I can also decide to offer financing to my customers. I will negotiate the specific terms with each of my customers based on what my customers can pay and what I can finance. It is on me to make sure my customers stick to the terms. My customers can also obtain financing through Matco if they qualify.

16.     When customers purchase tools from me, they pay me directly. I am responsible for invoicing my customers. I keep 100% of the purchase price from the customer, and the difference between what I paid for the tools from Matco and the price I sell to the customer is profit to my business. How much profit I make depends on where I set the retail sales, customer payments (whether they pay on time, no default, etc.) and expenses. Customers pay me in one of three ways: cash (credit card or check), a line of credit, or a Preferred Spending Account (PSA). With lines of credit, I decide how long the customer has to pay and I do not charge interest.

17.     From time to time, Matco offers large discounts to the distributors so I try to stock up on some tools that I know my customers typically need. Buying tools at a deeper discounted price also allows me to increase my profit margin.

18.     Matco does not require that I spend a specific number of hours per week marketing or selling. I do not have a sales quota. Having my own business allows me to take

time off or to adjust my schedule when I need to, such as when I need to go to a doctor's appointment or am sick. Usually, I take a one-week vacation each year.

19.     I am my own boss, so when I am on the road, I am free to take meal or rest breaks whenever I choose. Matco does not require me to record my meal and rest breaks. No one from Matco has never told me that I can or cannot take meal or rest breaks throughout the day. I work for myself and I get to decide when and if I want to take meal or rest breaks. I do take rest breaks when I need them. For lunch, I usually grab something to eat or eat something I bring from home.

20.     The Matco District Manager in my territory offers nine sales meetings per year. While I am encouraged to attend, they are not mandatory. But the meetings are helpful and I try to attend as many as possible because I enjoy talking with the other distributors and learning tips and techniques that can help my business succeed. For example, some distributors who used to work my territory may have information about my current customers that can shape my sales approach with those customers. For example, a distributor may tell me that a certain customer is always late on payment, so I would be more careful when offering financing to that customer.

21.     The Distributorship Agreement sets a baseline inventory of tools I am expected to maintain. Beyond that minimum, I can choose how much, and more importantly, what inventory to keep in stock at any given time. I deduct the costs of tools I purchase from Matco as a business expense on my taxes. I also deduct all my business expenses on my taxes.

22.     I decide what tools and equipment I need to run my business. For example, I need to use a cell phone, laptop, wireless internet, and miscellaneous office supplies. For any equipment I purchase for my business, I write off on my taxes as a business expense  Running my own business gives me the flexibility to decide what equipment I need and how much to spend in order to maximize my profits. I have an accountant who does my business' taxes.

23.     When I visit customers, I do not have to wear any specific clothing. Typically, I will wear a shirt with a Matco logo, but this is not required and there are days when I wear clothing that do not have any Matco insignia.

24.     Matco provides us with advertising brochures and inventory lists that we can give to current and prospective customers. As I mentioned, I like to run my own promotions and I have developed my own flyers for these promotions, which I did not have to run by Matco.

25.     Pursuant to my distributorship agreement, I am required to maintain a certain level of auto insurance to cover my truck. Even if Matco did not require me to maintain insurance, I would have purchased it anyway because it is good business practice. I am also expected to maintain my truck and I am personally responsible for those expenses. In addition, I also generally pay approximately $500-600 per month for gas. I deduct the cost of insurance, gas, and maintenance on my Mobile Store as business expenses.

26.      I am responsible for providing my own health and dental insurance. I deduct insurance costs as business expenses as well.

27.     Occasionally I have to deal with customer complaints, but there have not been many. The customers came to me directly with their concerns, and I addressed them. If a customer complains directly to me, I am not required to inform anyone at Matco. I am not aware that any customers complained about me to Matco.

28.     If someone asked who my employer is, I would tell them I am my own employer. I also understand I am free to have another job if I want, the only limitation is that it can't be one that competes with Matco.

29.     As I mentioned, my wife assists with my business by doing the accounting, checking in the inventory, and cleaning the truck. I did not need Matco's approval to have her assist me in these areas. Matco does not control what tasks my wife performs to assist me in my business. My wife and I make those decisions together. I estimate my wife spends probably between 8 to 10 hours per week working with me in the business, but that varies.

Matco does not control how many hours she spends; again, those hours are determined by my wife and me together.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on August ___9/1/2020___, 2020 at ___Vallejo___, California.

*Matthew Corson*

_____
Matthew Corson

65379625v.1

9

Declaration of Matthew Corson

# EXHIBIT A

## NOTICE OF RIGHTS RERGARDING INTERVIEW

A class-action lawsuit has been filed against Matco Tools Corporation, NMTC, Inc. d/b/a Matco Tools and Fortive Corporation (collectively, "Matco") by a former distributor, John Fleming ("Plaintiff"). Plaintiff claims that he and other Distributors in California should have been treated as employees of Matco as opposed to franchisees, and therefore, among other things, should have been reimbursed by Matco for all necessary business expenses, should receive payment for overtime, and should receive meal and rest breaks.

Plaintiff seeks to represent the following class of individuals: All persons who signed Distributorship Agreements, and personally operated a Mobile Store in California at any time between January 25, 2015 and the present.

Matco believes Plaintiff's allegations are untrue and is vigorously defending the lawsuit. At this stage, the court has not certified any class. Counsel for Matco is interviewing a number of current and former Distributors to investigate facts that may be relevant to the case. If you agree to be interviewed as part of this case, please read the following and sign below.

**By signing this document below, you are acknowledging that you have read and understand the following:**

(a)     You are a potential member of the class that Plaintiff seeks to certify in this case and your interests may ultimately be adverse to Matco's.

(b)     You are free to consult with your own attorney about this case and may opt to have your own attorney present during any interview.

(c)     Your participation in the interview is entirely voluntary. You may choose to participate or not participate, and if you choose to participate, you may terminate the interview at any time. If you choose to participate, your only obligation is to tell the truth in response to the questions asked.

(d)     After the interview, the attorneys may ask you to sign a declaration stating under the law of perjury that the information you provided was true. This declaration may be used to oppose class certification and/or liability in the lawsuit. Your decision to sign the declaration is also voluntary.

(e)     The information you share during the interview may compromise your ability to make a wage or other claims against Matco and Matco may use the declaration in defense of any claim brought by you or the Plaintiffs.

(f)     It is possible that the parties to the lawsuit may seek to take a deposition from you during the course of the litigation to ask about your duties and responsibilities and the declaration.

(g)     **Matco cannot and will not retaliate against you, or take any action against you, based upon my decision to participate or not to participate in the interview, or on my decision to sign or not sign a declaration, or on the information I provide.**

I also acknowledge that I have not been threatened, coerced or in any way intimidated to participate in the interview or sign a declaration.

Print Name _Matthew  Consov_                Signature _____

Date _7- 21. 2020_                Time _6:30 A.m._

# EXHIBIT 5

### DECLARATION OF ABEL DOMINGUEZ

I, Abel Dominguez, declare as follows:

1. The following facts are based on my own personal knowledge and, if called as a witness, I could and would testify to them. I am providing this declaration freely and voluntarily. Matco Tools Corporation ("Matco")'s attorney has told me that I do not have to provide this declaration and that whether I choose to do so or not, the decision will not affect my distributorship status with Matco in any way. I have had the opportunity to review the contents of this declaration and to make any changes I believe necessary so that it is accurate. I understand that Matco has the right to and may use this declaration in the case of *Emanuel Aguilera, et al. v. Matco Tools Corporation*, Case No. 4:19-cv-00321-YGR (U.S. District Court for the Northern District of California), filed by two former Matco distributors and the spouse of one of the distributors, and *John Fleming, et al. v. Matco Tools Corporation, et al.*, Case No. 5:19-cv-00463-WHO (U.S. District Court for the Northern District of California). The allegations in these cases have already been described to me.

2. I understand that by virtue of my distributorship with Matco, I am a potential class member in this case, and that this declaration could be used by Matco in a manner that could be against the interests of putative class members. Before talking to Matco's attorney and providing this declaration, I read and voluntarily signed the Notice of Acknowledgment, attached hereto as Exhibit A.

3. I entered into a Distributorship Agreement (the "Agreement") with Matco in September 2016. I obtained financing from Matco when I entered into the Agreement. I financed approximately $80,000, which covered the purchase of initial tool and product inventory. I financed approximately $19-21,000 for a line of credit to offer to customers, and $6-7,000 for a franchise fee. My spouse co-signed on this financing agreement with me. The term of the Agreement is 10 years, and I am free to renew at the end of the term if I would like to. I understood that one of the significant rights I obtained through the distributorship agreement was the right to use Matco's trademark.

4.      When I signed the Matco franchise agreement, I understood that I would be operating as a Matco distributor.

5.      Prior to operating a Matco distributorship, I had worked in a body shop. I wanted to retire from doing body work, and I asked the Matco distributor who came to our shop if there were any routes available. He said there were. I decided to look into the Matco program. I considered a Snap-On franchise as well, but I heard from several people that they were not successful in their business and were forced to purchase tools from Snap-On that they did not want to buy. What I like about being a Matco distributor is that I run my own business but get support from Matco.

6.      I operate my business on my own as a sole proprietorship. My wife assists me in the business by offering financial support, and she helps with the taxes and bookkeeping. I do not need Matco's approval to have my wife assist me in the business, and they have no knowledge or control over what she does. I believe that I can hire employees to work for me if I want to but I have not explored that. I know at least one distributor who has his son working for him. I also know that I could purchase a second franchise if I wanted to. I do follow Matco's brand standards and policies, including those relating to the use and display of the Matco trademark and the conditions of any applicable Matco warranties. Matco also supports my business by advertising and promoting the Matco brand. But in the end, the financial performance of my business falls on me and my ability to run it successfully.

7.      I leased the Matco Mobile Store from a company called Translease, a company recommended to me by Matco. I pay $420-470 per week on this lease, and I believe the term of the lease is 6 or 10 years, I am not sure. I believe the Mobile Store would cost approximately $120,000 if I wanted to purchase it outright. While the Mobile store features Matco branding, I was offered different options and features to choose from by Matco.

8.      Before I decided whether to entire into a franchise agreement with Matco, I went on one ride-along with a Matco distributor where I rode with him and visited customers with him to see what the business was like. Before I began operating my Matco franchise, I

attended training for two weeks in Stow, Ohio. This was very helpful to me as being a Matco distributor is very different from being a mechanic. The training helped show me how to run my business. There was sales training, and training how to use the Matco software system which tracks sales and does bookkeeping.

9.     Once I completed the training in Ohio, I had field training, where a District Manager would ride with you as you drove your route and visited customers. My District Manager was not available, so one from southern California came and rode with me for one week. Then a manger from Oregon came and rode with me for one week. I then I did one week on my own, and then the manager from southern California came back and rode with me for one final week. This was also very helpful as these manager showed me how to set up my truck an helped me learn how to sell to customers.

10.     When I started my business, Matco provided me with a weekly call list, which consisted of a list of approximately 320 customers or potential customers. These customers are located in Campbell, Los Gatos, and Saratoga. The customer list was actually a little lower than that, because, for example, some locations would list 9 mechanics as potential customers bout would have only 1 or 2. Other shops have closed. I have talked to my District Manager about this and he told me they are working to get me some additional potential customers. I understand I am free to also try to find new customers, but they have to be within my area. The initial goal was that I should try to visit each customer on a weekly basis. Over time, however, I learned that certain customers did not need to be visited that often, so I adjusted my schedule accordingly. I did not need Matco's approval to do this. I also make my own decisions as to how much time I spend with each customer, and when I visit each customer.

11.     My customers consist of mechanic shops, body shops, and car dealerships. I make the decisions and choose the best strategy to focus on certain types of customers.

12.     I spend the vast majority of my time visiting customers. On Mondays and Tuesdays, my days are a little short, like 9 a.m. to 4 p.m., because I visit less customers. On Wednesdays through Fridays, I am out visiting with customers from 8:30 to about 6 to 7 p.m. I

3

Declaration of Abel Dominguez

try to focus on one area each day to minimize my driving time. I can switch my schedule around if I want to. For example, if I know one of my customers is going to get visited by Snap-On on a particular day, I will adjust my schedule and visit that customer on a different day.  Also, some of my customers, usually smaller ones, will just call me when they need tools so I only visit them to deliver tools. At the end of each day, I do expenses and paperwork. The software provided by Matco helps a lot with this and makes the process much easier.

13.     I choose my work hours myself and I like the freedom I have to choose my own schedule. I can take time off any time I want. If I am sick, I may call my customers to let them know I'm not coming that day, but I do not need to inform anyone at Matco. But I am used to working for commissions, so I understand that if I'm not working, I'm not getting paid. So, while I know I am free to take vacations when I choose, I choose not to take many vacations. Matco does not require that I work a specific number of hours per week. I don't report my hours to anyone.

14.     Matco has meetings for their distributors every six weeks. So far I have only missed one. I just told my District Manager that I couldn't make it, it was no big deal. I don't think I am required to go to a certain number of meetings per year. But I find the meetings very helpful. We learn about things happening in the industry, and different experiences or situations with customers. I learn a lot from the distributors who have been distributors for Matco for a long time. So I try not to miss the meetings. In fact, if I'm feeling a little stressed out or tired, seeing the other distributors pumps me up again.

15.     My District Managers talks with me or rides along with me just about once a week. I believe he does that with all his distributors. My District manager is a resource for me whenever I or a customer have questions, for example, about a broken tool or a tool out of warranty. My District Manager always tries to help me either get a repair of a product or get a credit for a tool I have given to a customer to replace one that broke while out of warranty. In addition, if I have a hard time with a customer, I can always call my District Manager and ask him how I should handle the situation.

4

16.     Matco suggested I purchase an initial tool inventory of $70,000, but after that they do not require I have any specific level of inventory. I usually carry more inventory now, and I tailor my inventory to meet my customers' needs.

17.     I generally decide what tools and equipment I need to run my business. I need to use a laptop, and I had the option to buy my own computer and have Matco's software installed on it, or buy a laptop from Matco with preloaded software. Any supplies I buy for my business I deduct as business expenses on my taxes. My wife assists me with preparing the taxes for my business. I use my own cell phone and internet service which I use for business and personal purposes, and deduct a portion of this cost as a business expense. I am able to choose my own cell phone and internet provider. Matco does not require that I use any specific ones. Running my own business gives me the flexibility to decide what equipment I need and how much to spend in order to maximize my profits.

18.     I do not maintain a website for my business, and as far as I know, Matco does not require that I do so.

19.     When I visit customers, I generally wear whatever I want. Matco simply suggest that I look professional when I visit customers and that I should wear a shirt with the Matco logo, so I try to do that. I usually wear a t-shirt or collared shirt with the Matco logo on it. I am not required to have a specific number of shirts, but I probably have about 20 Matco shirts. I don't currently deduct these as business expenses but I know I should start doing that.

20.     Matco provides us with sales flyers every week for free. They also provide magazines with a list of tools on sale. I have a Facebook page that I try to use to promote my business. I also do various promotions, such as a raffle where I will give the winner a Playstation or an Xbox as a prize. I learned of this idea from other distributors. Matco says it is a good idea, but I am not required to do any specific promotions by Matco. I decide on my own how best to promote my business.

21.     I need to have my own personal truck to run my business because I have tools shipped to my house and then I need to bring those tools from my house to where I keep my

Declaration of Abel Dominguez

Mobile Store in storage when I am not driving it. I deduct the mileage and repairs to my person truck as business expenses. I also purchase various office supplies from Staples and deduct those as business expenses as well.

22.     Matco gets a discount on insurance through Allstate. While I am free to choose others if I want, I shoes to go with Allstate. I carry insurance of $1.5 million for my Mobile store, and approximately $100,000 for my inventory. I deduct the insurance premiums as a business expense. I know that there was another insurance carrier who set up a booth at our convention in Las Vegas in February, and I do plan on calling them to check on their rates.

23.     For lunch, depending on how busy I am, I stop and get something quick, like Subway. Sometimes I drive while I eat, I don't like to take too much time out of my day for breaks. This is my choice.

24.     While the initial training in Stow, they cover sales strategies and how to meet with customers, over time I have found my own as to what works best with my customers and what works best for me. I adapt my sales techniques depending on my customers. For example, some of my customers like to joke around and others are more business-like. I am not required to follow any particular script when I meet with customers or potential customers. I am free to develop my own sales strategies in the way I see fit.

25.     I have the authority to set the prices at which I sell products to my customers. I generally charge a 6% global markup on all my products above Matco's suggested retail price, and I have the freedom to do that. Most distributors use some type of markup. I also have freedom to offer discounts, and often will do so in order to close a deal.

26.     Occasionally I have to deal with customer complaints. Generally, customers complain directly to me and I determine how to resolve the issue on my own. If I cannot resolve it on my own, I may call my District Manager for assistance. For example, a customer way want to return a product even though the warranty has expired, I offer to give them a discount or a credit on a future purchase. If I can't resolve the issue on my own, I call me District Manager for advice. Sometimes, if a tool is far out of warranty, there is just nothing

we can do. Sometimes customers might complain to me directly to Matco, but I don't know what happens in these situations.

27.    Within the first 6 months, I knew I was free to terminate my Matco distributorship at any time for any reason with no penalty. After that time, there may be some type of a penalty but I am not sure. There may be reasons that Matco can terminate my distributorship, but I do not know what they are. I do not know any distributors who have had their distributorships terminate by Matco.

28.    Customers can pay by cash, lines of credit, or through a Preferred Spending Account (PSA). With a line of credit, I set the term of how long they have to pay, and there is no interest. I am responsible for invoicing my customers. For larger purchases, Matco suggest I offer my customer a PSA. This is an account that the customer pays over time but with interest. Matco then pays me a commission from this sale which I put in my account as a credit against future tool purchases.

29.    If someone asked who my employer is, I would tell work for myself, I am my own boss.

30.    While my wife does assist me with my business, I do not pay her for her time. Matco has no knowledge that she assist me or what she does. They certainly have no control over any of her work.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on February 13, 2019 at _3:00 p.m._ a.m. at Las Vegas, Nevada.

_____
Abel Domínguez

# *Exhibit A*

# *Exhibit A*

## NOTICE AND ACKNOWLEDGEMENT

1.      I am a lawyer in a private law firm representing Matco Tools Corporation, NMTC, Inc. and Fortive Corporation (collectively, "Matco") in connection with two lawsuits called *Emanuel Aguilera, et al. v. Matco Tools Corporation*, Case No. 4:19-cv-00321-YGR (U.S. District Court for the Northern District of California), filed by two former Matco distributors and the spouse of one of the distributors ("*Aguilera*"), and, *John Fleming, et al. v. Matco Tools Corporation, et al.*, Case No. 5:19-cv-00463-WHO (U.S. District Court for the Northern District of California) filed by a former Matco distributor ("*Fleming*") (the *Aguilera* and *Fleming* plaintiffs are referenced collectively as the "Plaintiffs"). The lawsuits claim, among other things, that Matco misclassified distributors as independent contractors instead of as employees, and, made unlawful deductions from Plaintiffs' wages, failed to reimburse Plaintiffs for business expenses, failed to pay Plaintiffs overtime wages, failed to provide Plaintiffs with meal periods and rest breaks, failed to pay Plaintiffs for all hours of work, collected interest in excess of the permissible rate under the law and failed to provide accurate itemized wage statements. The Plaintiffs seek, among other things, back pay, damages, interest, and penalties.

In addition to themselves, Plaintiffs seek to represent all individuals who worked as distributors for Matco, and, in the *Aguilera* lawsuit, all individuals who co-signed a Matco Distributor Agreement or similar document as a spouse and who performed work for the distributorship in California.

2.      At this stage, the courts have not certified any class. Matco disputes the claims being made by the Plaintiffs and is vigorously defending the lawsuits. Counsel for Matco are interviewing Matco distributors to investigate facts that may be relevant to the lawsuits, to defend against the claims brought in the lawsuits and to defend against the Plaintiffs' attempts to have the lawsuits certified as class actions. Please tell us if you are currently represented by an attorney in any way related to your distributorship with Matco or the pending lawsuits. If you are, the rules of professional ethics do not permit us to interview you today.

3.      We represent Matco and thus the information that you provide may be shared with Matco. We do not represent any Matco distributors. We are not your personal attorneys, we do not represent your interests, and thus we cannot provide you with any advice concerning your relationship with Matco. This interview is completely voluntary, and you have no obligation to talk to us. If you choose to participate, you may stop the interview at any time or choose not to answer any question(s). If you do not wish to proceed, please tell me and we will stop. After the interview, a Matco attorney may ask you to sign a written statement known as a declaration stating under penalty of perjury that the information you provided was true. Your decision to sign a declaration, if requested, will also be voluntary.

4.      Your distributorship will not be affected in any way whether you talk to us, do not talk to us, or choose to sign or not sign a declaration. Also, your distributorship will not be affected in any way by what you tell us or don't tell us. Regardless of your decisions or what you do, you will not be penalized or retaliated against in any way. You also will not receive any benefit from Matco based on your decisions or what you do.

5.      If you choose to speak to us, and/or sign a declaration, Matco may use the information and any declaration to defend against the claims in the lawsuits or any future lawsuit, argue to the court that the classes in these lawsuits should not be certified, and/or seek to limit the recovery to the proposed classes.

6.     We want to hear your honest, candid responses.  Please do not give us information or an answer because you think that I or Matco would like the answer.  Please provide only truthful information and answers in response to our questions.

By signing this document below, you are acknowledging that you have read this document carefully and understand the following:

(a)     You are a potential member of the classes that the named Plaintiffs are seeking to represent in their respective lawsuits.  You could in theory recover money as part of the class action if the classes were to be certified and the Plaintiffs prevailed in court or Matco settled the matters.  Matco's interests in the lawsuits will be adverse to you in the event that a class is certified that includes you as a class member.

(b)     You are not currently asserting any claims against Matco and you are not represented by an attorney concerning any disputes you may have with Matco.

(c)     Your participation in the interview is entirely voluntary.  You may choose to participate or not participate, and if you choose to participate, you may terminate the interview at any time.

(d)     If you choose to participate, your only obligation is to tell the truth in response to the questions asked.

(e)     After the interview, the attorney may ask you to sign a declaration stating under the law of perjury that the information you provided was true.  You will have a chance to review the declaration and make changes.  Your decision to sign the declaration is also voluntary. This declaration may be used to present evidence to the court regarding the claims that are being made by the Plaintiffs.

(f)     No reprisals of any kind can or will be taken against you based on your decision to participate or not to participate in the interview, on your decision to sign or not sign a declaration if so requested, or on the substance of the information you provide; it is entirely your decision.

By signing below you are acknowledging that this information has been read to you before you were interviewed about your experiences as a potential class member, or, that you have read the information yourself; that you understand the information; that you are voluntarily agreeing to proceed with the interview; and that you have not been threatened, coerced, or in any way intimidated about participating in the interview.

Printed Name: _Abel Dominguez_____

Signature: _____

Date: __2/13/19_____

# EXHIBIT A

## NOTICE AND ACKNOWLEDGEMENT

1.     I am a lawyer in a private law firm representing Matco Tools Corporation, NMTC, Inc. and Fortive Corporation (collectively, "Matco") in connection with two lawsuits called *Emanuel Aguilera, et al. v. Matco Tools Corporation*, Case No. 4:19-cv-00321-YGR (U.S. District Court for the Northern District of California), filed by two former Matco distributors and the spouse of one of the distributors ("*Aguilera*"), and, *John Fleming, et al. v. Matco Tools Corporation, et al.*, Case No. 5:19-cv-00463-WHO (U.S. District Court for the Northern District of California) filed by a former Matco distributor ("*Fleming*") (the *Aguilera* and *Fleming* plaintiffs are referenced collectively as the "Plaintiffs"). The lawsuits claim, among other things, that Matco misclassified distributors as independent contractors instead of as employees, and, made unlawful deductions from Plaintiffs' wages, failed to reimburse Plaintiffs for business expenses, failed to pay Plaintiffs overtime wages, failed to provide Plaintiffs with meal periods and rest breaks, failed to pay Plaintiffs for all hours of work, collected interest in excess of the permissible rate under the law and failed to provide accurate itemized wage statements. The Plaintiffs seek, among other things, back pay, damages, interest, and penalties.

In addition to themselves, Plaintiffs seek to represent all individuals who worked as distributors for Matco, and, in the *Aguilera* lawsuit, all individuals who co-signed a Matco Distributor Agreement or similar document as a spouse and who performed work for the distributorship in California.

2.     At this stage, the courts have not certified any class. Matco disputes the claims being made by the Plaintiffs and is vigorously defending the lawsuits. Counsel for Matco are interviewing Matco distributors to investigate facts that may be relevant to the lawsuits, to defend against the claims brought in the lawsuits and to defend against the Plaintiffs' attempts to have the lawsuits certified as class actions. Please tell us if you are currently represented by an attorney in any way related to your distributorship with Matco or the pending lawsuits. If you are, the rules of professional ethics do not permit us to interview you today.

3.     We represent Matco and thus the information that you provide may be shared with Matco. We do not represent any Matco distributors. We are not your personal attorneys, we do not represent your interests, and thus we cannot provide you with any advice concerning your relationship with Matco. This interview is completely voluntary, and you have no obligation to talk to us. If you choose to participate, you may stop the interview at any time or choose not to answer any question(s). If you do not wish to proceed, please tell me and we will stop. After the interview, a Matco attorney may ask you to sign a written statement known as a declaration stating under penalty of perjury that the information you provided was true. Your decision to sign a declaration, if requested, will also be voluntary.

4.     Your distributorship will not be affected in any way whether you talk to us, do not talk to us, or choose to sign or not sign a declaration. Also, your distributorship will not be affected in any way by what you tell us or don't tell us. Regardless of your decisions or what you do, you will not be penalized or retaliated against in any way. You also will not receive any benefit from Matco based on your decisions or what you do.

5.     If you choose to speak to us, and/or sign a declaration, Matco may use the information and any declaration to defend against the claims in the lawsuits or any future lawsuit, argue to the court that the classes in these lawsuits should not be certified, and/or seek to limit the recovery to the proposed classes.

6.    We want to hear your honest, candid responses.  Please do not give us information or an answer because you think that I or Matco would like the answer.  Please provide only truthful information and answers in response to our questions.

By signing this document below, you are acknowledging that you have read this document carefully and understand the following:

(a)    You are a potential member of the classes that the named Plaintiffs are seeking to represent in their respective lawsuits.  You could in theory recover money as part of the class action if the classes were to be certified and the Plaintiffs prevailed in court or Matco settled the matters.  Matco's interests in the lawsuits will be adverse to you in the event that a class is certified that includes you as a class member.

(b)    You are not currently asserting any claims against Matco and you are not represented by an attorney concerning any disputes you may have with Matco.

(c)    Your participation in the interview is entirely voluntary.  You may choose to participate or not participate, and if you choose to participate, you may terminate the interview at any time.

(d)    If you choose to participate, your only obligation is to tell the truth in response to the questions asked.

(e)    After the interview, the attorney may ask you to sign a declaration stating under the law of perjury that the information you provided was true.  You will have a chance to review the declaration and make changes.  Your decision to sign the declaration is also voluntary. This declaration may be used to present evidence to the court regarding the claims that are being made by the Plaintiffs.

(f)    No reprisals of any kind can or will be taken against you based on your decision to participate or not to participate in the interview, on your decision to sign or not sign a declaration if so requested, or on the substance of the information you provide; it is entirely your decision.

By signing below you are acknowledging that this information has been read to you before you were interviewed about your experiences as a potential class member, or, that you have read the information yourself; that you understand the information; that you are voluntarily agreeing to proceed with the interview; and that you have not been threatened, coerced, or in any way intimidated about participating in the interview.

Printed Name: _Abel Dominguez_____

Signature: _____

Date: _2/13/19_____

# EXHIBIT 6

## DECLARATION OF THOMAS FITZGIBBON

I, Thomas Fitzgibbon, declare as follows:

1.      The following facts are based on my own personal knowledge and, if called as a witness, I could and would testify to them.  I am providing this declaration freely and voluntarily.  I was advised before meeting with Matco Tools Corporation ("Matco")'s attorney that I could choose whether to participate in the interview, and voluntarily chose to participate. Matco's attorney has told me that I do not have to provide this declaration and that whether I choose to do so or not, the decision will not affect my distributorship status with Matco in any way.  I have had the opportunity to review the contents of this declaration and to make any changes I believe necessary so that it is accurate.  I understand that Matco will use this declaration in the case of *John Fleming, et al. v. Matco Tools Corporation, et al.*, Case No. 5:19-cv-00463-WHO (U.S. District Court for the Northern District of California) or in any other lawsuit alleging that distributors have been misclassified as independent contractors. The allegations in this case have already been described to me.

2.      I understand that by virtue of my distributorship with Matco, I am a putative class member in this case, and that this declaration could be used by Matco to argue that a class should not be certified or in a manner that could be against the interests of putative class members. Before talking to Matco's attorney and providing this declaration, I read and voluntarily signed the Notice of Acknowledgment, attached hereto as Exhibit A.

3.      I entered into a Distributorship Agreement (the "Agreement") with Matco in August 2017.  The term of the Agreement is 10 years.  After that period is over, I understand I have the choice to renew. When I signed this Agreement I understood I would be operating an independent business as a Matco distributor. Shortly after opening my business, I borrowed $68,000 from Matco for my initial tool inventory through the Matco's Standard Initial Financing Program My spouse co-signed on this loan. I also obtained a secondary loan of $20,000 for a line of credit as an initial startup-up way that I could then extend credit to my customers.

4. I operate my business largely on my own. However, my wife assists me occasionally with certain administrative tasks. My kids also assist me with assembling service carts, unpacking tools that I purchase from Matco, checking inventory, and cleaning my truck. The name of my business is I Got the Fix Tools and Tool Storage. I run the business as a sole proprietorship and have registered the fictitious business name with Los Angeles County. I also applied for and obtained a California Reseller's Permit. I plan on incorporating my business next year to reduce liability concerns and to save on taxes.

5. I know other Matco distributors who have hired people to drive their trucks for them. I do not know if they obtained Matco's approval to do this. I know I did not ask or need Matco's permission to have my wife and kids assist me in running my business.

6. Prior to working for Matco, I was an auto technician. At that time we had two distributors visit our shop, one of whom worked for Matco. I has always liked their products, and the Matco distributor that served our shop always seemed very happy doing his job. I eventually got carpal tunnel syndrome and could no longer perform the auto technician job. So when I was looking for a new career, I called Ken, the Matco distributor who had serviced our auto shop, and asked him about becoming a Matco distributor. I also looked at Snap-On Tools and Mac Tools. Overall, Matco had the lowest total buy-in costs to start my business. I did think about going into business with a friend and buying an auto shop, but we had different views as to how to run the business so I ultimately decided not to do that, and became a Matco distributor instead.

7. The Standard Initial Financing of $68,000 was to obtain an initial inventory of tools. I also had to take out a loan to purchase a tool truck, or Mobile Store. Matco provides several options - an Isuzu or a Freightliner, new or used, purchase or lease. Matco partners with a company called Translease, and they get good rates. I chose to lease a used Isuzu. I could have gone to any bank of my choosing, but it was easier to do it through Translease. If you do an average expected amount of business, you should be able to replace your Mobile Store every 7-10 years. I have done well enough so far that I expect to be able to buy a new

truck within the next year or so.  The truck weighs 18,000 pounds. Once I pay off the financing, my understanding is that I then own the Mobile Store outright. I make weekly payments on the financing, and if I am late, Translease, not Matco, calls me about the late payment. I deduct these lease payments as business expenses on my tax returns.

8.     Before I began operating my Matco franchise, I attended 10 days of training in Stow, Ohio.  During this training, I learned about Matco's products, product display ideas, inventory management, sales techniques, collections, and strategies to help my business be successful.  The training was great; very helpful. While I paid the expenses to attend this training in Ohio, I deducted them as business expenses on my tax returns. After the training in Ohio, I had ride-alongs with a Corporate Trainer for two weeks, and then for one week with my District Manager, Gary Armstrong.

9.     When I started my business, there were several open territories for me to choose from. I chose a territory along the Pacific Coast Highway which contained beach cities close to where I live.   Matco provided me a list of approximately 325 customers - a customer is defined as one auto technician, so there are generally multiple customers inside one shop. I am always on the lookout for new customers. Shops change owners frequently, and perhaps a prior owner did not want to use Matco, but a new owner might. If I want to add an entire new shop to my list of customers, I need to get approval from by District Manager, but I do not need approval to add individual customers. I am grateful that Matco has a built-in customer list so that I did not need to start from scratch in developing my own customer list when I started my own business, but I have definitely added many customers since I started.  I understand that no other Matco distributor serves the same geographic territory as I do. Matco guaranteed that I would not compete with any other Matco Distributor.

10.     My customers generally consist of auto repair shops and car dealers. Over time, I have come to understand the needs of my clients and have developed  my sales technique accordingly. For example, I know that at specific car dealers, they have their own diagnostic equipment and will not allow their technicians to use outside equipment. But other auto repair

shops that may work on the same cars do not have the same restrictions. I look for a time when certain manufacturers may require specific new tools that need to be used, so I know which customers I can target for sales of such tools. I know that when a shop hires a new mechanic that mechanic will often need a lot of new tools. Most of my customers like meeting in person and shopping directly from my Mobile Store. But I have a few customers who will call me and place orders over the phone. I have one walk-in customer who has an aircraft at a local airport and he needs tools for his plane, and he just comes to my home.

11.     I generally make all my sales in person by visiting the shops on my route. I also use Instagram. I will post photos of new tools or tool-demonstration videos. I also hold raffles for my customers. For example, I will offer a Yeti Cooler as a prize, and give raffle tickets for every $50 a customer spends toward his tool bill. The customer isn't paying me anything extra, but this gives them an incentive to pay off their tool balance more quickly. I post winners of the raffles on Instagram so all my customers know who wins. When a technician moves to a different shop, I might post a photo of him at his old shop prior to leaving as a way of congratulating him and announcing the move.

12.     I pay Matco for wholesale tools/inventory, and write this off as a business expense on my taxes.  Matco sets the price at which I purchase tools from them for resale. The price set by Matco is a wholesale price and enables me to price the tools that I sell to my customers at a higher price. The difference in that price is my profit. While Matco has a manufacturer's suggested retail price at which I can sell products to my customers, I have the freedom to raise these prices or to offer discounts. I can set a global markup across the board for all tools I sell. I know some distributors that do a markup of 15%. Personally I think this is too high, and I strive to be fair to my customers. I choose to do a global markup of 3%, which in my determination is fair given the high cost of living in California. I also have the freedom to offer discounts. For example, if a technician spends $7,000 on a new tool box, I will offer him a $500 set of wrenches for free. Whether and how much to mark up the retail price of the tools I sell, and whether to offer discounts is totally my choice.

13.     I can also decide to offer financing to my customers. Customers typically pay me in three different ways. First, they can pay in full with cash or their own personal credit card, which probably accounts for about 5% of my sales. The second is what is called a "truck account." This is a short-term installment plan with no interest, typically spread out over a 2-3 months. When I stop to visit customers, I collect the installment payments. This type of sale is by far  the most common and is probably about 90% of the sales I make. For this type of sale, I set the payments terms on my own. The third type is a Preferred Spending Account (PSA), which accounts for another 5% of my sales. This is credit offered through Matco. The interest rate offered depends on the customer's credit score and can range from 6.99% to 23.99%. Customers still pay me directly, but each Wednesday, I remit these payments to Matco. Matco pays me up front for these PSA purchases less 8% which Matco keeps as a finance fee. There are actually three types of PSAs. The first, where a customer has good credit, Matco assumes 100% responsibility for the debt. If the customer does not qualify for this option, I have the choice of offering the customer a Tech Start, where Matco assumes 50% of the responsibility for the debt, or Tech Gold, where I assume 100% of the debt responsibility.

14.     If a customer does not pay for a product, then I am left with a bad debt, which is a risk I assume being in business for myself. I always try to be reasonable and assume best intentions. If a customer falls behind on a payment, I usually first just send him a text reminding him. If I see the customer when I am visiting a shop, I will talk to them and see if everything is okay. Sometimes people just fall into a temporary hard time, and I can just offer them a little more time to pay. I would much rather be flexible and work with the customer. If I think someone is truly trying to avoid paying me, I might visit their house in person. I have had a couple guys move or otherwise evade me, and in those circumstances I write the debt off as a business loss on my taxes.  I have turned a couple matters over to collections agencies but never ended up getting paid. Again, in those situations, I write it off as a business loss.

15.     While Matco provides training in sales techniques, they do not control what I say or how I sell to my customers. I have total freedom to come up with my own sales pitch or

ideas to increase sales. In addition to the raffle described above, I will sometimes offer a "buy one, get one free" promotion, or a specific percentage off a certain set of tools as a promotion. I have also offered discounts on a certain holiday, like 10% off on St. Patrick's Day. Another thing I do is near Christmas, I stock my truck with toys I think kids will like so my customers can shop for their kids' Christmas presents without having to go to the mall. I know guys hate shopping, so this way they can get a lot of shopping done in one stop. I offer a truck account for what they buy so they can also spread the payments out. I don't make any extra money doing this, but I feel it brings customer loyalty.

16.    Another strategy I have developed on my own is to embrace my competition. There is nothing I can do to stop Snap-On or Mac distributors from trying to sell to my customers. My strategy is to never bad mouth a competitor's distributor or a competitor's products. In fact, I get along well with the Mac Tools distributor, and we're often in the same shops at the same time. I think the customers like to see that we get along. They have enough drama going on in the shops that they don't need any more from the distributors. I like to think the best thing I can offer my customers is my personal service. I don't try to pressure or force sales.

17.    I have about 68 shops on my route, and approximately 300 individual customers in those shops. I try to visit all 68 shops each week. In the beginning I was working 5 days a week, and probably about 10 hours per day. Bur after about 6-7 months, I learned which stores open when, which of my customers are on their break when, and where best to park my truck. After a certain time, I was able to do my entire route in 3-and-a-half days, so I take Mondays off. On Tuesday, I have 3 shops in the same parking lot. I visit 23 shops on Tuesday, but they are all close by. On Friday, I may only visit 7 shops, but 5 are huge dealerships where I might spend an hour at leach one. Another is Jim & Jack's, which is the largest auto repair shop on the West Coast. I hit my first shop when they open, which is usually 8:00 a.m. I am usually home by 3:00 pm. to 5:00 p.m. Most of my shops are only 5 minutes away from each other.

Overall, I spend 80% of my time meeting with customers and selling. The other time is spent driving and on back-office stuff, like inventory or rearranging my Mobile Store.

18.     As long as I retain above a specific level of tool inventory and pay my bill to Matco on time, Matco does not care how I spend my time. Being my own boss, I have complete freedom to set my own schedule. This has allowed me to be an instructor in my kids' Sea Cadet program. If I want, I can go surfing in the morning. In fact, I just got back from a week-long vacation, which is easy for me since I just ask my customers if they can make a double payment before I leave or after I get back.

19.     The Matco District Manager in my territory, Gary Armstrong, offers sales meetings once every six weeks. While I am encouraged to attend, they are not mandatory. Some guys hardly ever go. But for me, there's no reason not to go, since there are almost always good deals on tools. It is also a good opportunity to learn about new products.

20.     I talk with my District Manager Gary about once per week. He usually just calls to see how I'm doing or if I need any help. Another reason I might call him is to ask for a field credit. This occurs when, for example, a customer's tool breaks only a short time after the warranty expires. I feel it is better to try to keep the customer, so I will offer the customer a new tool and eat the cost, but I will ask Gary for a field credit in the same amount, which I can then use towards new tool purchases.  Gary has the discretion to offer such a credit to me, but he agrees it's better to keep customers happy, so he usually will offer it to  me. There's no specific requirement I need to meet to get such a credit, but Gary will usually ask for a receipt so he can verify the amount of the credit.

21.     The Distributorship Agreement sets a baseline inventory of tools I am expected to maintain. Beyond that minimum, I can choose how much, and more importantly, what inventory to keep in stock at any given time. I usually keep between $80-100,000 in inventory at any given time. This level can vary depending on what discounts are being offered by Matco. It can also vary by season. For example, I overstock during tax season because a lot of

my customers get tax refunds and want to spend some of the money on tools. As stated above, I deduct the costs of tools I purchase from Matco as a business expense on my taxes.

22.     I decide what tools and equipment I need to run my business. For example, I need to use a cell phone and a laptop. Matco offers the opportunity to purchase a laptop that comes preloaded with their MDBS software system. While I could have bought a laptop somewhere else, it was just much easier to go through Matco. For any equipment I purchase for my business, I write off on my taxes as a business expense

23.     I do not maintain a website for my business and as far as I know, Matco does not require that I do so.

24.     While it is not exactly encouraged by Matco, I do occasionally sell non-Matco tools to my customers. For example, if one of my customers wants a tool that Matco does not carry, or occasionally I believe Matco's price for a particular tool is just too high for my customers, I believe the customer will buy more Matco tools in the future, so in these limited situations, I will buy the tool  from a wholesaler and sell it to my customer.

25.     I know Matco prefers that we wear a certain shirt that Matco buys in bulk. I believe they are from Dickies. But no one checks to see what I am wearing, and no one has ever given me a hard time about what to wear. I know distributors that do their job in board shorts and flip flops. Personally, I like to look professional, so I buy my own shirts and have a place that embroiders a Matco label on the shirt for me. I spend about $50-60 per shirt. Again, I deduct the cost of these shirts as a business expense.

26.     Matco provides us with 10-15 page sales flyers every two weeks. Beyond this, however, I am free to come up with my own sales material if I want to. Usually I just make signs that I put in my truck to direct customers to specific items.

27.     Pursuant to my distributorship agreement, I am required to maintain a certain level of auto insurance to cover my Mobile Store. Even if Matco did not require me to maintain insurance, I would have purchased it anyway to protect my investment. I believe Matco partners with Allstate, and I chose to go with them because they understand the

business and the insurance covers part of my inventory as well. In addition, I also generally pay approximately $45 per week for gas. I deduct the cost of insurance, gas, and maintenance on my Mobile Store as business expenses.

28.     I am responsible for providing my own health and dental insurance. Luckily, I am able to get health insurance through my wife's job.

29.     I am free to take meal and rest breaks when I choose. But to me, this is not a physically demanding job, so it's not like I really need a rest break. Usually I bring my own lunch and eat at a shop while customers are visiting the Mobile Store. I look at it as the sooner I am done for the day, the sooner I can get home. Personally, I am glad Matco does not require me to record me meal and rest breaks. However, no one from Matco has ever told me that I can or cannot take meal or rest breaks throughout the day.

30.     I do not have a sales quota and I am not require to visit specific customers on a specific timetable. Over time, I have figured out the best way to structure my days so that I spend time as needed with my customers.

31.     Occasionally I have to deal with customer complaints. Usually it is for a warranty issue or a broken tool. I always try to give my customers the benefit of a doubt, and try to use field credits to deal with these issues as discussed above. I've only had one customer complaint about my customer service, and that was because I didn't give him a free screwdriver. He still owed me $400 on his account, so I set up automatic payments from him so he didn't have to see me again.

///
///
///
///
///
///
///

9

Declaration of Thomas Fitzgibbon

32.     If someone asked who my employer is, I would tell them I am self-employed. I have never received an IRS Form 1099 or W-2 from Matco. My accountant deals with all the tax issues.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on _____9/23/2020_____, in Torrance, California.


_Thomas F Fitzgibbon Jr._
_____
Tommy Fitzgibbon

65158761v.1

**EXHIBIT A**

## NOTICE OF RIGHTS RERGARDING INTERVIEW

A class-action lawsuit has been filed against Matco Tools Corporation, NMTC, Inc. d/b/a Matco Tools and Fortive Corporation (collectively, "Matco") by a former distributor, John Fleming ("Plaintiff"). Plaintiff claims that he and other Distributors in California should have been treated as employees of Matco as opposed to franchisees, and therefore, among other things, should have been reimbursed by Matco for all necessary business expenses, should receive payment for overtime, and should receive meal and rest breaks.

Plaintiff seeks to represent the following class of individuals: All persons who signed Distributorship Agreements, and personally operated a Mobile Store in California at any time between January 25, 2015 and the present.

Matco believes Plaintiff's allegations are untrue and is vigorously defending the lawsuit. At this stage, the court has not certified any class. Counsel for Matco is interviewing a number of current and former Distributors to investigate facts that may be relevant to the case. If you agree to be interviewed as part of this case, please read the following and sign below.

**By signing this document below, you are acknowledging that you have read and understand the following:**

(a)     You are a potential member of the class that Plaintiff seeks to certify in this case and your interests may ultimately be adverse to Matco's.

(b)     You are free to consult with your own attorney about this case and may opt to have your own attorney present during any interview.

(c)     Your participation in the interview is entirely voluntary.  You may choose to participate or not participate, and if you choose to participate, you may terminate the interview at any time. If you choose to participate, your only obligation is to tell the truth in response to the questions asked.

(d)     After the interview, the attorneys may ask you to sign a declaration stating under the law of perjury that the information you provided was true.  This declaration may be used to oppose class certification and/or liability in the lawsuit.  Your decision to sign the declaration is also voluntary.

(e)     The information you share during the interview may compromise your ability to make a wage or other claims against Matco and Matco may use the declaration in defense of any claim brought by you or the Plaintiffs.

(f)     It is possible that the parties to the lawsuit may seek to take a deposition from you during the course of the litigation to ask about your duties and responsibilities and the declaration.

(g)     **Matco cannot and will not retaliate against you, or take any action against you, based upon my decision to participate or not to participate in the interview, or on my decision to sign or not sign a declaration, or on the information I provide.**

I also acknowledge that I have not been threatened, coerced or in any way intimidated to participate in the interview or sign a declaration.

Print Name  Thomas Fitzgibbon          Signature  _____

Date  2020 July 13th                   Time  22:32

# EXHIBIT 7

## DECLARATION OF GILBERT GUTIERREZ

I, Gilbert Gutierrez, declare as follows:

1.      The following facts are based on my own personal knowledge and, if called as a witness, I could and would testify to them.  I am providing this declaration freely and voluntarily.  Matco Tools Corporation ("Matco")'s attorney has told me that I do not have to provide this declaration and that whether I choose to do so or not, the decision will not affect my distributorship status with Matco in any way.  I have had the opportunity to review the contents of this declaration and to make any changes I believe necessary so that it is accurate.  I understand that Matco has the right to and may use this declaration in the case of *Emanuel Aguilera, et al. v. Matco Tools Corporation*, Case No. 4:19-cv-00321-YGR (U.S. District Court for the Northern District of California), filed by two former Matco distributors and the spouse of one of the distributors, and *John Fleming, et al. v. Matco Tools Corporation, et al.*, Case No. 5:19-cv-00463-WHO (U.S. District Court for the Northern District of California). The allegations in these cases have already been described to me.

2.      I understand that by virtue of my distributorship with Matco, I am a putative class member in this case, and that this declaration could be used by Matco in a manner that could be against the interests of putative class members. Before talking to Matco's attorney and providing this declaration, I read and voluntarily signed the Notice of Acknowledgment, attached hereto as Exhibit A.

3.      I entered into a Distributorship Agreement (the "Agreement") with Matco in May 2016.  At that time, I obtained financing from Matco in the form of a note for approximately $69,000, covering my inventory and franchise fee, and a line of credit of approximately $18,000.

4.      I learned about Matco through another distributor who told me that I would be a good fit for Matco.  I am a people person, I enjoy interacting with customers, and I also love tools.  I looked into other franchises, including Snap-on Tools, but Matco appealed to me the most.

54992720v.1

5.      My wife signed the Agreement as well.  She helps me with paperwork, taxes, ordering and stocking supplies and some deliveries.  She helps me because she wants to see my distributorship grow and succeed.  We both benefit when my business succeeds.

6.      I named my business Gilbert Gutierrez Authorized Matco Tools Distributor and I run it as a sole proprietorship.  Matco had no say in how I named and set up my business.

7.      Prior to starting my distributorship, I attended a Matco training in Stow, Ohio for about 10 days.  During this training, I learned about customer service, pitching sales, and using Matco's computer system, among other things.  I felt the training helped me launch my distributorship.  It gave me some skills I used to formulate my own business plan.

8.      I also participated in 2 Ride Alongs before starting my distributorship.  During these Ride Alongs, I saw first-hand what distributors do, how they interact with customers, and I also had the chance to discuss with them their advice on business strategy and development.

9.      My distributorship covers a customer base in the cities of Patterson, Modesto, Los Banos and Hilmar, California.  I have a total of about 270 active customers.  I visit them every week.  My customers are mostly mechanics, body shops, repair shops, agricultural shops, and some car dealerships.  It is important that I visit my customers each week because I do all my sales in person.  I have a Facebook page to communicate information about products to my customers, but I do not sell online.

10.     My schedule varies each week.  I enjoy having flexibility in my schedule so that I can take my daughter to school and spend time with her.  On Monday, Wednesday and Friday, I take my daughter to school so I start work around 8:30 a.m. and get home around 5:30 p.m.  Tuesdays and Thursdays tend to be my longer days.  On those days, I start around 6:30 a.m. and work until 6:30 p.m.  I try to get out earlier on Friday if I can.  I do not keep track of my hours.

11.     I also typically take a 20 to 40 minute lunch every day.  If I have any errands to run errands, I do so while I am out on my route.  Some days I run errands on my route, and some days I just stick to my route.  It depends on my day and what I need to get done.  I do not check with anyone if I need to take a break from my route to run errands or take a lunch.

54992720v.1

12.     There are about 11 distributor meetings per year.  I decide myself whether to attend any of these meetings.  I have personally never missed a meeting because these meetings provide good opportunities to purchase inventory at a discount.  If I purchase tools at a discount, and can sell them at my typical markup, I make more money.  In other words, better deals on tools from Matco mean greater profits for me.

13.     I decide what tools I stock.  Typically this decision is based on my customers' needs.  For example, some distributors have rural markets and some have urban markets, so they may or may not sell agricultural tools.  I have a mix of both types of customers, so my inventory contains tools for agricultural customers and city customers.

14.     When I visit my customers, I typically wear a black polo shirt or a Matco-branded shirt with slacks, or shorts in the summer.  I wear the Matco shirt because it is comfortable.  I also think it makes me look more professional.  I choose when to wear a Matco-branded shirt.  I am proud of the Matco brand.  I am not aware of any repercussions from not wearing a Matco-branded shirt will I'm on my route.

15.     I have a Certified Professional Accountant who assists me with my taxes every year.  Because I run my own business, my taxes are more complicated.  I try to deduct most, if not all, of my business expenses.

16.     I take 2 to 3 weeks of vacation per year.  If and when I take vacation is entirely up to me.  The same is true of my sick days; if I need to stay home sick or take care of a sick child, I am free to do so.

17.     I am not required to meet with specific customers on a weekly or monthly basis, but I choose to meet with all of my customers weekly.  By meeting with my customers weekly, I ensure that I can be there when they have a need and can provide them with the tools they want.  That is my strategy to making my distributorship successful.

18.     I feel that Matco supports my business, but ultimately I run it myself.  I decide how to talk to my customers, how to price my products, my sales pitch, and my schedule.  For example, I can discount products if I think I need to finalize a sale.  I am free to negotiate prices

1   with my customers and do not need to check with Matco before doing so.  Also, I provide

2   invoices directly to my customers and they pay me directly.

3       19.   Sometimes I have to deal with customer complaints.  I address any complaints to

4   the best of my ability.  I do what I can to ensure that my customers are satisfied.  I only reach out

5   to my District Manager if there is some major issue I cannot fix on my own.  For example, if a

6   customer complains about a defective tool box, which can cost thousands of dollars, I reach out

7   to Matco.  Even then, however, I remain involved in resolving the issue for my customer.

8       20.   I meet with my District Manager every few months.  During these meetings, we

9   discuss my sales and my District Manager offers guidance on how to improve my business.

10  Again, I see this as Matco being supportive of my business; not as Matco controlling how I run

11  my business.

12      I declare under penalty of perjury under the laws of the State of California and the United

13  States of America that the foregoing is true and correct.

14      Executed on February 26 , 2019 at 9:00 a.m./p.m. at Turlock, California.

15

16                                  _____

                                Gilbert Gutierrez

17  54867117v.1

18

19

20

21

22

23

24

25

26

27

28

Declaration of Gilbert Gutierrez

54992720v.1

# EXHIBIT A

## NOTICE AND ACKNOWLEDGEMENT

1.      I am a lawyer in a private law firm representing Matco Tools Corporation, NMTC, Inc. and Fortive Corporation (collectively, "Matco") in connection with two lawsuits called *Emanuel Aguilera, et al. v. Matco Tools Corporation*, Case No. 4:19-cv-00321-YGR (U.S. District Court for the Northern District of California), filed by two former Matco distributors and the spouse of one of the distributors ("*Aguilera*"), and, *John Fleming, et al. v. Matco Tools Corporation, et al.*, Case No. 5:19-cv-00463-WHO (U.S. District Court for the Northern District of California) filed by a former Matco distributor ("*Fleming*") (the *Aguilera* and *Fleming* plaintiffs are referenced collectively as the "Plaintiffs"). The lawsuits claim, among other things, that Matco misclassified distributors as independent contractors instead of as employees, and, made unlawful deductions from Plaintiffs' wages, failed to reimburse Plaintiffs for business expenses, failed to pay Plaintiffs overtime wages, failed to provide Plaintiffs with meal periods and rest breaks, failed to pay Plaintiffs for all hours of work, collected interest in excess of the permissible rate under the law and failed to provide accurate itemized wage statements. The Plaintiffs seek, among other things, back pay, damages, interest, and penalties.

In addition to themselves, Plaintiffs seek to represent all individuals who worked as distributors for Matco, and, in the *Aguilera* lawsuit, all individuals who co-signed a Matco Distributor Agreement or similar document as a spouse and who performed work for the distributorship in California.

2.      At this stage, the courts have not certified any class. Matco disputes the claims being made by the Plaintiffs and is vigorously defending the lawsuits. Counsel for Matco are interviewing Matco distributors to investigate facts that may be relevant to the lawsuits, to defend against the claims brought in the lawsuits and to defend against the Plaintiffs' attempts to have the lawsuits certified as class actions. Please tell us if you are currently represented by an attorney in any way related to your distributorship with Matco or the pending lawsuits. If you are, the rules of professional ethics do not permit us to interview you today.

3.      We represent Matco and thus the information that you provide may be shared with Matco. We do not represent any Matco distributors. We are not your personal attorneys, we do not represent your interests, and thus we cannot provide you with any advice concerning your relationship with Matco. This interview is completely voluntary, and you have no obligation to talk to us. If you choose to participate, you may stop the interview at any time or choose not to answer any question(s). If you do not wish to proceed, please tell me and we will stop. After the interview, a Matco attorney may ask you to sign a written statement known as a declaration stating under penalty of perjury that the information you provided was true. Your decision to sign a declaration, if requested, will also be voluntary.

4.      Your distributorship will not be affected in any way whether you talk to us, do not talk to us, or choose to sign or not sign a declaration. Also, your distributorship will not be affected in any way by what you tell us or don't tell us. Regardless of your decisions or what you do, you will not be penalized or retaliated against in any way. You also will not receive any benefit from Matco based on your decisions or what you do.

5.      If you choose to speak to us, and/or sign a declaration, Matco may use the information and any declaration to defend against the claims in the lawsuits or any future lawsuit, argue to the court that the classes in these lawsuits should not be certified, and/or seek to limit the recovery to the proposed classes.

6.      We want to hear your honest, candid responses.  Please do not give us information or an answer because you think that I or Matco would like the answer.  Please provide only truthful information and answers in response to our questions.

By signing this document below, you are acknowledging that you have read this document carefully and understand the following:

(a)      You are a potential member of the classes that the named Plaintiffs are seeking to represent in their respective lawsuits.  You could in theory recover money as part of the class action if the classes were to be certified and the Plaintiffs prevailed in court or Matco settled the matters.  Matco's interests in the lawsuits will be adverse to you in the event that a class is certified that includes you as a class member.

(b)      You are not currently asserting any claims against Matco and you are not represented by an attorney concerning any disputes you may have with Matco.

(c)      Your participation in the interview is entirely voluntary.  You may choose to participate or not participate, and if you choose to participate, you may terminate the interview at any time.

(d)      If you choose to participate, your only obligation is to tell the truth in response to the questions asked.

(e)      After the interview, the attorney may ask you to sign a declaration stating under the law of perjury that the information you provided was true.  You will have a chance to review the declaration and make changes.  Your decision to sign the declaration is also voluntary. This declaration may be used to present evidence to the court regarding the claims that are being made by the Plaintiffs.

(f)      No reprisals of any kind can or will be taken against you based on your decision to participate or not to participate in the interview, on your decision to sign or not sign a declaration if so requested, or on the substance of the information you provide; it is entirely your decision.

By signing below you are acknowledging that this information has been read to you before you were interviewed about your experiences as a potential class member, or, that you have read the information yourself; that you understand the information; that you are voluntarily agreeing to proceed with the interview; and that you have not been threatened, coerced, or in any way intimidated about participating in the interview.

Printed Name: _Gilbert  Gutierrez_____

Signature: _____

Date: _2 / 12 / 19_____

# EXHIBIT 8

**DECLARATION OF MARK JACOBSON**

I, Mark Jacobson, declare as follows:

1.      The following facts are based on my own personal knowledge and, if called as a witness, I could and would testify to them.  I am providing this declaration freely and voluntarily.  Matco Tools Corporation ("Matco")'s attorney has told me that I do not have to provide this declaration and that whether I choose to do so or not, the decision will not affect my distributorship status with Matco in any way.  I have had the opportunity to review the contents of this declaration and to make any changes I believe necessary so that it is accurate.  I understand that Matco has the right to and may use this declaration in the case of *Emanuel Aguilera, et al. v. Matco Tools Corporation*, Case No. 4:19-cv-00321-YGR (U.S. District Court for the Northern District of California), filed by two former Matco distributors and the spouse of one of the distributors, and *John Fleming, et al. v. Matco Tools Corporation, et al.*, Case No. 5:19-cv-00463-WHO (U.S. District Court for the Northern District of California). The allegations in these cases have already been described to me.

2.      I understand that by virtue of my distributorship with Matco, I am a putative class member in this case, and that this declaration could be used by Matco in a manner that could be against the interests of putative class members. Before talking to Matco's attorney and providing this declaration, I read and voluntarily signed the Notice of Acknowledgment, attached hereto as Exhibit A.

3.      I entered into a Distributorship Agreement (the "Agreement") with Matco in May of 2002. The agreement was for a 10-year term, and I renewed after it expired.  When I entered into the Distributorship Agreement, I obtained financing from Matco of approximately $40,000, which I paid off within four or five years.

4.      Before I signed the Matco Distributorship Agreement, Matco provided me with franchise disclosure documents.  It was a many years ago, however, and I don't recall the specific contents of these documents.

5.     I operate my business as an individual.  I have not set up a corporation, LLC, or other formal business entity.  I operate as a d/b/a, under the name "Mark Jacobson d/b/a authorized Matco Tools Distributor."

6.     Prior to becoming a Matco distributor, I worked as a technician.  I decided to start a Matco distributorship because I wanted to transition away from manual labor and work for myself as an independent contractor.  I found previous commission-based jobs stressful, and wanted to run my own business.

7.     It can be hard working for myself sometimes.  Any problem I encounter is mine to solve.  For example, sometimes I have customers that don't want to pay me, but it is my responsibility to collect.  Matco maintains a "skip tracing list" that helps alert distributors to customers who have failed to pay in the past, but Matco does not directly assist me in collecting what is owed by my customers.

8.     Before becoming a Matco distributor, I considered other franchises.  I decided on Matco after speaking to different people who had worked with Matco and had positive things to say.  I feel like Matco has a good reputation in the industry and this helps my business.  One particular individual--Jeff Baerg--got me interested in Matco.  Jeff is a District Manager and someone who I have been working with for a long time now.

9.     As a District Manager, Jeff is available if I need help with anything.  I talk with him at least once per week, typically.  These conversation might regard products that I do not feel are working the way they should be, promotions that are going on, or generally how to improve my business.

10.    I don't recall Matco setting forth specific standards or specifications for the use of their trademark.

11.    When I became a distributor for Matco, I obtained financing from Matco in order to purchase the initial inventory for my business.  I was not required to obtain this financing through Matco, but chose to do so.  I also leased my mobile store from, I believe,

Trans Lease.  Trans Lease is a company Matco recommends going through to lease a mobile store.  But I was not required to lease through Trans Lease.

12.    Before I began operating my Matco franchise, I attended one week of training at Matco's headquarters in Stow, Ohio.  Then I had two more weeks of training after that.

13.    The territory in which I operate my business includes San Clemente, Laguna Beach, Dana Point, and San Juan Capistrano.  I picked this territory because it was close to the beach, the weather is cool, and I thought it would be a good area to do business.

14.    When I started my distributorship, Matco helped me identify over 100 prospective customers within my territory, but it was up to me to solicit the business.  My customer list changes over time because businesses close up and new ones open.  If I notice a new repair shop near my route, I can ask Matco to add them to my customer list.

15.    Nobody at Matco tells me how many days per week or hours per day I should work.  This is because Matco distributors work for themselves.  I probably work 12-hour days, 5 days per week.  Running your own business takes a lot of time.  Sometimes I work on weekends, for example, doing cleaning and maintenance on the truck.  This might take 2-3 hours on a weekend, about once per month.

16.    My customers' needs determine the inventory I maintain.  Customer needs are different in different areas, and as a distributor, it is my business to understand my customer needs and purchase the products they need.

17.    I visit each of my customers every week and drive about 140 miles per week to do this.  Earlier in my career as a Matco distributor, my DM helped me design my route, but after being in business for years, I visit customers depending on my own schedule, and in a way that accommodates my particular customers.  If I don't manage my time well, I would not be able to visit all my customers.  For example, some of my customers open early, so I will visit them early.

18.     As mentioned above, I set my own work hours.  I am not required to keep records of the number of hours I work.  My DM might ask about once per year how many hours I am working, but I don't believe Matco keeps any records of this.

19.     Typically, I will begin my work day at 7:00 a.m..  When I get to the truck, I will stock up deliveries that arrived the day before.  This might take about 30 minutes.  Then I will head to visit my first customer.  I try to visit my customers when they open up and most of my customers' shops open around 8:00 a.m.  My goal is to speak to as many people as possible.  I will visit customers until about 12:00.  Around 12:00 or 1:00, I will usually take lunch.  I usually pack my own lunch and I eat it in my truck.  This usually takes about an hour.  I am usually home by around 6:00 p.m., sometimes 5:00 p.m., then take about 30 more minutes to complete various closing tasks.

20.     The above schedule is typical for me, but it will vary depending on my needs.  For example, a couple weeks ago, my arthritis was really hurting, so I went home at 1:00 p.m. that day.  When something like this happens, I don't have to report this to anyone at Matco.  If I was going on vacation for a week, I would probably tell the District Manager, but I know I don't have to ask his permission to take vacation.

21.     I need a cell phone and a computer for my business.  I write these off as business expenses on my taxes.  I also write off gas, payments on my truck, storage of the truck, and other business expenses.

22.     I am not required to follow any particular script when I meet with customers or potential customers.  Matco might provide sales guidance to help you present well to your customers, but it does not dictate how you make your sales.

23.     I have the authority to set the prices at which I sell products to my customers.  Matco does not tell me how much to mark up or discount the tools I sell.

//

//

4

Declaration of Mark Jacobson

1    I declare under penalty of perjury under the laws of the State of California and the

2    United States of America that the foregoing is true and correct.

3    Executed on March **2** , 2019 at _8.00 AM_.m./p.m. at _DANA POINT_, California.

4

5    _____

     Mark Jacobson

6    54867117v.1

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                      5
                          Declaration of Mark Jacobson

# EXHIBIT A

## NOTICE AND ACKNOWLEDGEMENT

1.      I am a lawyer in a private law firm representing Matco Tools Corporation, NMTC, Inc. and Fortive Corporation (collectively, "Matco") in connection with two lawsuits called *Emanuel Aguilera, et al. v. Matco Tools Corporation*, Case No. 4:19-cv-00321-YGR (U.S. District Court for the Northern District of California), filed by two former Matco distributors and the spouse of one of the distributors ("*Aguilera*"), and, *John Fleming, et al. v. Matco Tools Corporation, et al.*, Case No. 5:19-cv-00463-WHO (U.S. District Court for the Northern District of California) filed by a former Matco distributor ("*Fleming*") (the *Aguilera* and *Fleming* plaintiffs are referenced collectively as the "Plaintiffs"). The lawsuits claim, among other things, that Matco misclassified distributors as independent contractors instead of as employees, and, made unlawful deductions from Plaintiffs' wages, failed to reimburse Plaintiffs for business expenses, failed to pay Plaintiffs overtime wages, failed to provide Plaintiffs with meal periods and rest breaks, failed to pay Plaintiffs for all hours of work, collected interest in excess of the permissible rate under the law and failed to provide accurate itemized wage statements. The Plaintiffs seek, among other things, back pay, damages, interest, and penalties.

In addition to themselves, Plaintiffs seek to represent all individuals who worked as distributors for Matco, and, in the *Aguilera* lawsuit, all individuals who co-signed a Matco Distributor Agreement or similar document as a spouse and who performed work for the distributorship in California.

2.      At this stage, the courts have not certified any class. Matco disputes the claims being made by the Plaintiffs and is vigorously defending the lawsuits. Counsel for Matco are interviewing Matco distributors to investigate facts that may be relevant to the lawsuits, to defend against the claims brought in the lawsuits and to defend against the Plaintiffs' attempts to have the lawsuits certified as class actions. Please tell us if you are currently represented by an attorney in any way related to your distributorship with Matco or the pending lawsuits. If you are, the rules of professional ethics do not permit us to interview you today.

3.      We represent Matco and thus the information that you provide may be shared with Matco. We do not represent any Matco distributors. We are not your personal attorneys, we do not represent your interests, and thus we cannot provide you with any advice concerning your relationship with Matco. This interview is completely voluntary, and you have no obligation to talk to us. If you choose to participate, you may stop the interview at any time or choose not to answer any question(s). If you do not wish to proceed, please tell me and we will stop. After the interview, a Matco attorney may ask you to sign a written statement known as a declaration stating under penalty of perjury that the information you provided was true. Your decision to sign a declaration, if requested, will also be voluntary.

4.      Your distributorship will not be affected in any way whether you talk to us, do not talk to us, or choose to sign or not sign a declaration. Also, your distributorship will not be affected in any way by what you tell us or don't tell us. Regardless of your decisions or what you do, you will not be penalized or retaliated against in any way. You also will not receive any benefit from Matco based on your decisions or what you do.

5.      If you choose to speak to us, and/or sign a declaration, Matco may use the information and any declaration to defend against the claims in the lawsuits or any future lawsuit, argue to the court that the classes in these lawsuits should not be certified, and/or seek to limit the recovery to the proposed classes.

6.      We want to hear your honest, candid responses.  Please do not give us information or an answer because you think that I or Matco would like the answer.  Please provide only truthful information and answers in response to our questions.

By signing this document below, you are acknowledging that you have read this document carefully and understand the following:

(a)      You are a potential member of the classes that the named Plaintiffs are seeking to represent in their respective lawsuits.  You could in theory recover money as part of the class action if the classes were to be certified and the Plaintiffs prevailed in court or Matco settled the matters.  Matco's interests in the lawsuits will be adverse to you in the event that a class is certified that includes you as a class member.

(b)      You are not currently asserting any claims against Matco and you are not represented by an attorney concerning any disputes you may have with Matco.

(c)      Your participation in the interview is entirely voluntary.  You may choose to participate or not participate, and if you choose to participate, you may terminate the interview at any time.

(d)      If you choose to participate, your only obligation is to tell the truth in response to the questions asked.

(e)      After the interview, the attorney may ask you to sign a declaration stating under the law of perjury that the information you provided was true.  You will have a chance to review the declaration and make changes.  Your decision to sign the declaration is also voluntary. This declaration may be used to present evidence to the court regarding the claims that are being made by the Plaintiffs.

(f)      No reprisals of any kind can or will be taken against you based on your decision to participate or not to participate in the interview, on your decision to sign or not sign a declaration if so requested, or on the substance of the information you provide; it is entirely your decision.

By signing below you are acknowledging that this information has been read to you before you were interviewed about your experiences as a potential class member, or, that you have read the information yourself; that you understand the information; that you are voluntarily agreeing to proceed with the interview; and that you have not been threatened, coerced, or in any way intimidated about participating in the interview.

Printed Name: _MARK    JACOBSON_____

Signature: _____

Date: __2/12/19_____

# EXHIBIT 9

1

**DECLARATION OF ALLEN MARTINEZ**

2      I, Allen Martinez declare as follows:

3      1.      The following facts are based on my own personal knowledge and, if called as a

4      witness, I could and would testify to them.  I am providing this declaration freely and

5      voluntarily.  Matco Tools Corporation ("Matco")'s attorney has told me that I do not have to

6      provide this declaration and that whether I choose to do so or not, the decision will not affect

7      my distributorship status with Matco in any way.  I have had the opportunity to review the

8      contents of this declaration and to make any changes I believe necessary so that it is accurate.

9      I understand that Matco has the right to and may use this declaration in the case of *Emanuel*

10     *Aguilera, et al. v. Matco Tools Corporation*, Case No. 4:19-cv-00321-YGR (U.S. District

11     Court for the Northern District of California), filed by two former Matco distributors and the

12     spouse of one of the distributors, and *John Fleming, et al. v. Matco Tools Corporation, et al.*,

13     Case No. 5:19-cv-00463-WHO (U.S. District Court for the Northern District of California).

14     The allegations in these cases have already been described to me.

15     2.      I understand that by virtue of my distributorship with Matco, I am a putative

16     class member in this case, and that this declaration could be used by Matco in a manner that

17     could be against the interests of putative class members. Before talking to Matco's attorney

18     and providing this declaration, I read and voluntarily signed the Notice of Acknowledgment,

19     attached hereto as Exhibit A.

20     3.      I entered into a Distributorship Agreement (the "Agreement") with Matco in

21     September 2003.  I took a second mortgage on my house to finance my distributorship.  Matco

22     offered financing, but I declined it in favor of finding my own financing.  The amount of

23     financing was probably around $80,000, but it was a long time ago, and I don't recall

24     precisely.

25     4.      My wife co-signed on my franchise agreement, but for the most part, does not

26     take part in the business.  She does my weekly deposits, and sometimes, will run errands for

27     me or deliver parts locally.

28

5.      When I started my Matco distributorship, I was also considering Snap-On. I chose Matco because I preferred them over Snap-On. I attempted to meet with Snap-On for over a year, and didn't have a good feeling about partnering with them. When I reached out to Matco for the first time, a District Manager actually answered the phone. I felt like Matco was a more personable company, and the type of company I wanted to work for.

6.      I wanted to become a distributor because I was getting older, I was tired of the aches, pains, and grease on my hands. I had been working on cars since I was a child, and had been in the business for 21 years. I felt like it was time for a change. I thought having a Matco distributorship seemed like an interesting opportunity for later in my life, but then I just decided to start right away.

7.      I operate my business under my name. I do not run my business as a corporation or other business form. I don't have any employees, which is another reason I got into this business. When I was younger, I had my own repair shop, including tech and counter/parts employees. I did not enjoy having employees. A Matco distributorship was appealing because it was a business I could operate by myself.

8.      Owning a Matco distributorship was also appealing because I myself didn't have to be an employee. I prefer being in control. Not having the authority to call the shots is hard for me, which made being an employee hard. I don't like being told to do things in a certain way. Also, being able to decide my own hours was a huge benefit for me. As a distributor for Matco, I get to make the decisions about how best to run my business. For example, recently, I took two days off work to attend an event in Southern California. I wouldn't have been able to do that as an employee.

9.      Matco has guidelines regarding the appearance and build of distributors' mobile stores for the purpose of branding, and ensuring that the mobile stores are recognized as being associated with Matco. These guidelines are not strict requirements, however. For example, in 2013, when I re-signed as a Matco distributor, my mobile store  did not meet Matco's

1    guidelines. I did not want to purchase a new truck at the time, so I discussed the issue with

2    Matco, and I was able to re-sign with my existing truck after some improvements.

3         10.    Matco doesn't regulate what we wear, but they have recommendations. We can

4    pretty much wear whatever we want. As I understand it, there are no requirements, and Matco

5    is not policing what we wear. Matco recommends a buttoned, collared shirt, but I see guys

6    wearing all kinds of stuff, and there is a wide range of Matco-branded clothing that distributors

7    choose to wear.

8         11.    The territory in which I operate my business includes Sonoma, Novato, and

9    Sonoma Raceway. My territory used to include San Rafael and not Sonoma, but then Sanoma

10   became available, so I chose to swap out San Rafael with Sanoma. I chose this territory

11   because it was the closest to where I live. My territory is a "325" (as opposed to a "225")

12   which means it is expected that operating the distributorship will be a full-time endeavor.

13        12.    I speak with the District Manager in my territory about once per week, usually

14   on Tuesdays. The DM checks in to see if I need anything. For example, the DM might get

15   involved if a warranty issue comes up, or an issue with damaged product, or if I have a

16   customer who needs an answer I cannot provide.

17        13.    I am free to sell Matco products at whatever price I want. Matco has suggested

18   retail prices for their products, but I can increase mark-ups or otherwise change the pricing. I

19   frequently sell products at a discount.

20        14.    Many Matco products have a lifetime warranty, and a DM might get involved if

21   a product under warranty is defective or damaged. However, if a product is out of warranty, it

22   would be my responsibility to decide whether I will work with the customer and provide a

23   return or repair. For example, recently a customer bought a cordless impact gun that required

24   a $200 repair. The product was out of warranty and the customer was not happy. Because he

25   was a good customer who I know I will profit from going forward, I made the business

26   decision to take care of the bill.

27

28

15.    My bookkeeper and accountant handle the taxes for my Matco distributorship, but my understanding is that I write off many things as business expenses, such as shipping, tool repairs, truck maintenance, personal vehicle usage (for example, when my wife makes deliveries for the business or runs business-related errands).

16.    When it comes to inventory, Matco set out what inventory I should buy when I started my franchise, but thereafter, my inventory depends on my customers' needs.

17.    Matco generally has recommendations for the equipment I use for my business, such as a computer, truck, and demo tools, but it is my choice what equipment I use. I use software and a computer that I purchased through Matco, but I didn't have to purchase the computer through Matco. I chose to do so because Matco has excellent software and hardware support.

18.    I maintain a website for my business. Websites are not mandatory, but distributors have the option the website is hosted by Matco and I pay an annual fee for this. If I wanted to tailor my website, I could, but I have not chosen to do so yet.   When you become a distributor, you automatically have a website. It is not mandatory. It's matcotools.com/allenmartinez. I can choose to tailor the website, but have not yet elected to do so.

19.    Because I am self-employed, I set make my own hours. I generally work Monday through Friday, leaving the house at 7:30 a.m. and returning home by 6:00 p.m., sometimes a little earlier, sometimes, a little later.

20.    I finance credit purchases by my clients. When I am about to sell to a new customer, the first thing I will do is ask for their social security number, in the event they skip with my tools. Matco has a pretty good skip-tracing system, through which distributors can be notified of customers who have failed to pay in the past. This helps ease our minds a little bit since, as the lender, we take on financial risk whenever we sell tools on credit. Sometimes customers fail to pay, but this is part of the cost of doing business.   For the most part, customers are really good. It's really important to visit people every week for the purpose of

4

collecting payments.  Typically, when my customers purchase from me on credit, I have them make weekly payments.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on February _13_, 2019 at _12:56_ p.m. at Las Vegas, Nevada.

Allen Martinez

54867117v.1

# EXHIBIT A

## NOTICE AND ACKNOWLEDGEMENT

1.      I am a lawyer in a private law firm representing Matco Tools Corporation, NMTC, Inc. and Fortive Corporation (collectively, "Matco") in connection with two lawsuits called *Emanuel Aguilera, et al. v. Matco Tools Corporation*, Case No. 4:19-cv-00321-YGR (U.S. District Court for the Northern District of California), filed by two former Matco distributors and the spouse of one of the distributors ("*Aguilera*"), and, *John Fleming, et al. v. Matco Tools Corporation, et al.*, Case No. 5:19-cv-00463-WHO (U.S. District Court for the Northern District of California) filed by a former Matco distributor ("*Fleming*") (the *Aguilera* and *Fleming* plaintiffs are referenced collectively as the "Plaintiffs"). The lawsuits claim, among other things, that Matco misclassified distributors as independent contractors instead of as employees, and, made unlawful deductions from Plaintiffs' wages, failed to reimburse Plaintiffs for business expenses, failed to pay Plaintiffs overtime wages, failed to provide Plaintiffs with meal periods and rest breaks, failed to pay Plaintiffs for all hours of work, collected interest in excess of the permissible rate under the law and failed to provide accurate itemized wage statements. The Plaintiffs seek, among other things, back pay, damages, interest, and penalties.

In addition to themselves, Plaintiffs seek to represent all individuals who worked as distributors for Matco, and, in the *Aguilera* lawsuit, all individuals who co-signed a Matco Distributor Agreement or similar document as a spouse and who performed work for the distributorship in California.

2.      At this stage, the courts have not certified any class. Matco disputes the claims being made by the Plaintiffs and is vigorously defending the lawsuits. Counsel for Matco are interviewing Matco distributors to investigate facts that may be relevant to the lawsuits, to defend against the claims brought in the lawsuits and to defend against the Plaintiffs' attempts to have the lawsuits certified as class actions. Please tell us if you are currently represented by an attorney in any way related to your distributorship with Matco or the pending lawsuits. If you are, the rules of professional ethics do not permit us to interview you today.

3.      We represent Matco and thus the information that you provide may be shared with Matco. We do not represent any Matco distributors. We are not your personal attorneys, we do not represent your interests, and thus we cannot provide you with any advice concerning your relationship with Matco. This interview is completely voluntary, and you have no obligation to talk to us. If you choose to participate, you may stop the interview at any time or choose not to answer any question(s). If you do not wish to proceed, please tell me and we will stop. After the interview, a Matco attorney may ask you to sign a written statement known as a declaration stating under penalty of perjury that the information you provided was true. Your decision to sign a declaration, if requested, will also be voluntary.

4.      Your distributorship will not be affected in any way whether you talk to us, do not talk to us, or choose to sign or not sign a declaration. Also, your distributorship will not be affected in any way by what you tell us or don't tell us. Regardless of your decisions or what you do, you will not be penalized or retaliated against in any way. You also will not receive any benefit from Matco based on your decisions or what you do.

5.      If you choose to speak to us, and/or sign a declaration, Matco may use the information and any declaration to defend against the claims in the lawsuits or any future lawsuit, argue to the court that the classes in these lawsuits should not be certified, and/or seek to limit the recovery to the proposed classes.

6.      We want to hear your honest, candid responses.  Please do not give us information or an answer because you think that I or Matco would like the answer.  Please provide only truthful information and answers in response to our questions.

By signing this document below, you are acknowledging that you have read this document carefully and understand the following:

(a)     You are a potential member of the classes that the named Plaintiffs are seeking to represent in their respective lawsuits.  You could in theory recover money as part of the class action if the classes were to be certified and the Plaintiffs prevailed in court or Matco settled the matters.  Matco's interests in the lawsuits will be adverse to you in the event that a class is certified that includes you as a class member.

(b)     You are not currently asserting any claims against Matco and you are not represented by an attorney concerning any disputes you may have with Matco.

(c)     Your participation in the interview is entirely voluntary.  You may choose to participate or not participate, and if you choose to participate, you may terminate the interview at any time.

(d)     If you choose to participate, your only obligation is to tell the truth in response to the questions asked.

(e)     After the interview, the attorney may ask you to sign a declaration stating under the law of perjury that the information you provided was true.  You will have a chance to review the declaration and make changes.  Your decision to sign the declaration is also voluntary. This declaration may be used to present evidence to the court regarding the claims that are being made by the Plaintiffs.

(f)     No reprisals of any kind can or will be taken against you based on your decision to participate or not to participate in the interview, on your decision to sign or not sign a declaration if so requested, or on the substance of the information you provide; it is entirely your decision.

By signing below you are acknowledging that this information has been read to you before you were interviewed about your experiences as a potential class member, or, that you have read the information yourself; that you understand the information; that you are voluntarily agreeing to proceed with the interview; and that you have not been threatened, coerced, or in any way intimidated about participating in the interview.

Printed Name:   Allen Martinez

Signature:   _____

Date:   2/12/2019

# EXHIBIT 10

### DECLARATION OF ED MCNULTY

I, Ed McNulty, declare as follows:

1.      The following facts are based on my own personal knowledge and, if called as a witness, I could and would testify to them.  I am providing this declaration freely and voluntarily.  Matco Tools Corporation ("Matco")'s attorney has told me that I do not have to provide this declaration and that whether I choose to do so or not, the decision will not affect my distributorship status with Matco in any way.  I have had the opportunity to review the contents of this declaration and to make any changes I believe necessary so that it is accurate. I understand that Matco has the right to and may use this declaration in the case of *Emanuel Aguilera, et al. v. Matco Tools Corporation*, Case No. 4:19-cv-00321-YGR (U.S. District Court for the Northern District of California), filed by two former Matco distributors and the spouse of one of the distributors, and *John Fleming, et al. v. Matco Tools Corporation, et al.*, Case No. 5:19-cv-00463-WHO (U.S. District Court for the Northern District of California). The allegations in these cases have already been described to me.

2.      I understand that by virtue of my distributorship with Matco, I am a putative class member in this case, and that this declaration could be used by Matco in a manner that could be against the interests of putative class members. Before talking to Matco's attorney and providing this declaration, I read and voluntarily signed the Notice of Acknowledgment, attached hereto as Exhibit A.

3.      I entered into a Distributorship Agreement (the "Agreement") with Matco in January 2012.  I obtained financing from Matco when I entered into the Agreement. I financed approximately $80,000, which covered the purchase of initial tool and product inventory. I did not have a co-signor on this financing agreement. The term of the Agreement is 10 years. I understood that one of the significant rights I obtained through the distributorship agreement was the right to use Matco's trademark.

4.      When I signed the Matco franchise agreement, I understood that I would be operating as a Matco distributor.

5.       Prior to operating a Matco distributorship, I ran a distributorship with Snap-On Tools. I started with Snap-On in 2004. In 2008, the recession affected by business pretty badly, and by 2011 I was having difficulty paying my tool bill. At that time, Snap-On was pushing me to me take out additional loans.  They placed my on what they call an asset program, which meant I had to prepay for all my tools, which I was unable to do at the time. Around that time, a friend of mine told me that Matco had distributorship routes available, and I learned that their payment terms were much different from Snap-On. In short, Matco allowed a distributor to pay for their tools over a longer period of time, whereas Snap-on you only had 4 weeks to pay.  I decided to look into the Matco program. What I like about being a Matco distributor is that I am my own boss. I can set my own hours. I can take time off when I want, I can start late or work late. I don't have to put up with verbal abuse from a customer and if I want to end a customer relationship, I have the freedom to do that.

6.       I operate my business on my own as a sole proprietorship. I do know other Matco distributors that have their wives assist in their business, but I do not know if they need Matco's approval for that. I do follow Matco's brand standards and policies, including those relating to the use and display of the Matco trademark and the conditions of any applicable Matco warranties. Matco also supports my business by advertising and promoting the Matco brand. But in the end, the financial performance of my business falls on me and my ability to run it successfully.

7.       I leased the Matco Mobile Store from a company called HERR Displays. I understood Matco was supposed to approve my Mobile Store, but I leased my vehicle without Matco's approval. The Mobile Store displays the Matco brand, but I otherwise set it up the way I wanted to. It has been inspected by my Matco Regional Manager who has informed me I was supposed to get approval, but he has allowed me to keep the Mobile Store I obtained and has allowed me to keep it the way I set it up. The main thing Matco was concerned with was to make sure the Mobile Store was branded with Matco's name and trademark the way they wanted it.

8.      Before I began operating my Matco franchise, I attended training for two weeks in Stow, Ohio. Because I had already operated a Snap-On franchise, a lot of the training in sales strategies and techniques I knew already. But it was helpful to learn about Matco's products. When I returned home following the training in Ohio, a trainer from Stow worked with me in the field for approximately two weeks, and then my District Manager rode along with me for one week. I believe Matco decides when a new distributor is ready on a case-by-case basis. Because of my prior experience, they pretty much left me on my own after two weeks. In addition to this training there is an operations manual available online that provides information about how to balance your cash drawer, how to process product returns, how to handle repairs, and how to process orders. But again, because of my prior experience with Snap-On, much of this was pretty familiar to me.

9.      I understand that generally before you can become a Matco distributor, you have to go on a certain number of ride-alongs, where you ride with an established distributor to see how they run their business. I also understand that anyone can request more ride-alongs if they want before they make a decision as to whether to become a Matco distributor. I did not have to do this because of my prior experience with Snap-On.

10.     When I started my business, Matco provided me with a weekly call list, which consisted of a list of approximately 350 customers or potential customers. The initial goal was that I should try to visit each customer on a weekly basis. Over time, however, I learned that certain customers did not need to be visited that often, so I adjusted my schedule accordingly. I did not need Matco's approval to do this. I also make my own decisions as to how much time I spend with each customer, and when I visit each customer. On average I may spend 5-10 minutes with each customer, but sometimes I spend more than an hour with a customer. I determine on my own how much time to spend with each customer. The customers are generally located in Antioch, Brentwood, Pittsburg. While I always drive my own route, I know that there are other distributors that have been disabled for a period of time and have had

Declaration of Ed McNulty

their wives drive their truck during that period of time. I do not know whether Matco has to approve this.

11.     My customers consist of marine shops, machine shops, auto shops, body shops, and car dealerships. I make the decisions and choose the best strategy to focus on certain types of customers.

12.     I spend the vast majority of my time visiting customers. On Mondays and Thursdays, I spend my day visiting my customers in Antioch. I choose to start early and visit the customers that open early, like 7:00 a.m., first. On Tuesdays, I meet with my customers in Brentwood. On Wednesday, I visits customers anywhere depending on their needs. On Fridays, I meet with my customers in Pittsburg. I generally do my paperwork on a daily basis, which usually does not take more than 30 minutes per day. Then I usually do a bank run at least once a week.

13.     My typical work hours are from 7 or 7:30 a.m. to 4 or 5 p.m., but this definitely varies from time to time. I choose my work hours myself and I like the freedom I have to choose my own schedule. I can take time off any time I want. Matco does not require that I work a specific number of hours per week. I don't report my hours to anyone. Having my own business allows me to take time off or adjust my schedule when I need to.

14.     Matco has monthly sales meetings, with the exception of September and February, where Matco holds large conventions. I know Matco prefers distributors to attend all these meetings, but I know some distributors who don't. Personally, I like attending the meetings because Matco usually offers discounts on tools at these meetings so it's a good opportunity to stock up on inventory. As far as I am aware, nothing happens if you miss a meeting or two. If I miss one, I just call my District Manager to see if I missed anything.

15.     When I initially started my Matco distributorship, my District Manager would check in with me weekly just to see how I was doing and if I had any questions. Pretty soon I told him he did not need to check in with me that often, and that I would call him if I had any questions. He was fine with that. I will call him if I have questions about a particular customer

issue, for example, a warranty issue or if a customer is looking for a specific product that is not readily available.

16.    After I purchased my initial tool inventory, as far as I know, Matco does not require me to keep any specific inventory level. I reorder things when I need to and I don't reorder slow-selling products. My inventory now is much larger than the initial inventory I financed as my business has grown over time.

17.    Apart from a few things, I decide what tools and equipment I need to run my business. I need to use a laptop, and I purchased one from Matco that came preloaded with software that assists me in running my business, for example, with sales tracking and scheduling customer visits. I believe that the computer and software cost was approximately $2,500, but I wrote that off as a business expense. I also pay Matco $195 per year for maintenance and tech support, but again, I deduct this as a business expense. Matco has arrangements with certain cellular service providers and with Staples so I can get a discount. So, while I pay for cellular service, internet, and for office supplies, I get a discount through Matco and am able to write these costs off as business expenses. I keep a business checking and savings account separate from my personal banking accounts, and I am free to pick the bank I would like to use for my business. Running my own business gives me the flexibility to decide what equipment I need and how much to spend in order to maximize my profits.

18.    I do not maintain a website for my business, and as far as I know, Matco does not require that I do so. I know that some of the distributors maintain a group Facebook page, but I rarely check that. As far as I know, Matco has no involvement with the distributors' Facebook page.

19.    When I visit customers, I generally wear a collared shirt with a Matco logo. I am not required to have a specific number of shirts, but I generally have approximately 12-15 Matco shirts at any given time. I pay for the shirts with profits from my Matco business, and deduct the cost as a business expense. Beyond the shirt, Matco does not require us to wear anything specific. I usually wear blue or black jeans and work boots.

20.     Matco provides us with advertising brochures and inventory lists that we can give to current and prospective customers. I do not have to pay for these. I believe Matco also has some sort of social media presence. I am aware it is, I just don't participate in it yet.

21.     Matco gets a discount on insurance through Allstate. Allstate sets the rate I pay based on the type and value of my Mobile Store and on my inventory level. While I could choose to get insurance through another carrier, I use Allstate because Matco gets us a good rate. I deduct the cost of insurance as a business expense.

22.     As mentioned above, I am free to set my own work hours. If I am sick, I can take a day off and I do not need to notify anyone. I also take vacations when I choose. I usually only take 4-5 days off at a time, but this is my own choice, and I do not need to notify or get permission from anyone when I take time off. I enjoy the freedom I have to generally set my own hours and decide when to go on vacation and for how long.

23.     I am also free to take meal and rest breaks when I choose. I generally take at least 30 minutes for a meal break, and then sometimes take a short 30-minute nap afterwards. Matco does not require me to record my meal or rest breaks and I am free to take these whenever I want.

24.     While initially Matco expected me to visit my customers on a weekly basis, over time, I learned my customers' needs. Some customers I visit weekly, some less than that. I decide on my own which customers to visit, how often, and how long, based on my knowledge of my customers and what they need. Matco has never told me they had any problems with the number of customer visits I make.

25.     While the initial training I participated in did cover sales strategies and techniques, I am not required to follow any particular script when I meet with customers or potential customers. I am free to develop my own sales pitch in the way I see fit. I learned that different strategies and techniques work for different customers, and I have the freedom to determine my own sales strategies.

Declaration of Ed McNulty

26.     I have the authority to set the prices at which I sell products to my customers. I generally charge a 10% global markup on all my products above Matco's suggested retail price, and I have the freedom to do that. However, if Matco's flyers list a specific sales price, I follow that price. I also have freedom to offer discounts, and often set prices on a customer-by-customer basis.

27.     Occasionally I have to deal with customer complaints. Generally, customers complain directly to me and I determine how to resolve the issue on my own. If I cannot resolve it on my own, I may call my District Manager for assistance. For example, a customer way want to return a product even though the warranty has expired. While I certainly am allowed to replace the tool from my inventory at my own cost, I need Matco's approval to replace an item for free if it is out of warranty. If a customer complains directly to me, I am not required to inform anyone at Matco, but I may choose to do so if I need assistance or advice on how to deal with the issue. On very rare occasions, a customer might complain directly to Matco about me. For example, I had one technician complain to Matco that I forced him to purchase tools on credit. When my District Manager asked me about it, I was able to show him an email from the technician in which he requested to purchase the tools on credit.

28.     I am free to terminate my Matco distributorship at any time for any reason. In order to do so, I would return my inventory as a credit against any amount remaining on my financing. Since I am certain my inventory is worth more than the amount remaining on my financing agreement, I would get money from Matco for the difference if I were to terminate my distributorship. There is no penalty to me if I were to do that. There are very limited reasons that Matco can terminate my distributorship. If you are in violation of the franchise agreement, Matco gives you notice and an opportunity to correct the issue, for example, if your Mobile Store fails an inspection. I only know one distributor know any other whose distributorship has been terminated. I don't know the details were as to why. On this issue, Matco is very different from Snap-On, where, one you passed initial training, they told us you had to reach $5,400 in paid sales average per week or else you would be terminated.

7

Declaration of Ed McNulty

29.     When customers purchase tools from me up front, they pay me directly. I am responsible for invoicing my customers. Very rarely a customer might pay Matco directly, for example, if a customer goes out of business or changes jobs, I would not see that customer again so he or she would have to pay Matco directly. For customers who pay with a line of credit, it is interest free but I set the term. I usually prefer 10 weeks. Matco keeps 9% of the payment but this cost guarantees against any default. This relieves me from taking a loss if a customer defaults on a line of credit. If I choose to do so, I can offer customers a zero reserve account, where I can set the rate of interest and the term, but I am responsible if the customer defaults. I choose not to use zero reserve accounts for this reason, but it is my choice.

30.     If someone asked who my employer is, I would tell them I am self-employed. I also understand I am free to have another job if I want, the only limitation is that it can't be one that competes with Matco.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on February 13, 2019 at _____ 9 _____ a.m. at Las Vegas, Nevada.

Ed McNulty

54867117v.154867117v.1

Declaration of Ed McNulty

# EXHIBIT A

## NOTICE AND ACKNOWLEDGEMENT

1.      I am a lawyer in a private law firm representing Matco Tools Corporation, NMTC, Inc. and Fortive Corporation (collectively, "Matco") in connection with two lawsuits called *Emanuel Aguilera, et al. v. Matco Tools Corporation*, Case No. 4:19-cv-00321-YGR (U.S. District Court for the Northern District of California), filed by two former Matco distributors and the spouse of one of the distributors ("*Aguilera*"), and, *John Fleming, et al. v. Matco Tools Corporation, et al.*, Case No. 5:19-cv-00463-WHO (U.S. District Court for the Northern District of California) filed by a former Matco distributor ("*Fleming*") (the *Aguilera* and *Fleming* plaintiffs are referenced collectively as the "Plaintiffs"). The lawsuits claim, among other things, that Matco misclassified distributors as independent contractors instead of as employees, and, made unlawful deductions from Plaintiffs' wages, failed to reimburse Plaintiffs for business expenses, failed to pay Plaintiffs overtime wages, failed to provide Plaintiffs with meal periods and rest breaks, failed to pay Plaintiffs for all hours of work, collected interest in excess of the permissible rate under the law and failed to provide accurate itemized wage statements. The Plaintiffs seek, among other things, back pay, damages, interest, and penalties.

In addition to themselves, Plaintiffs seek to represent all individuals who worked as distributors for Matco, and, in the *Aguilera* lawsuit, all individuals who co-signed a Matco Distributor Agreement or similar document as a spouse and who performed work for the distributorship in California.

2.      At this stage, the courts have not certified any class. Matco disputes the claims being made by the Plaintiffs and is vigorously defending the lawsuits. Counsel for Matco are interviewing Matco distributors to investigate facts that may be relevant to the lawsuits, to defend against the claims brought in the lawsuits and to defend against the Plaintiffs' attempts to have the lawsuits certified as class actions. Please tell us if you are currently represented by an attorney in any way related to your distributorship with Matco or the pending lawsuits. If you are, the rules of professional ethics do not permit us to interview you today.

3.      We represent Matco and thus the information that you provide may be shared with Matco. We do not represent any Matco distributors. We are not your personal attorneys, we do not represent your interests, and thus we cannot provide you with any advice concerning your relationship with Matco. This interview is completely voluntary, and you have no obligation to talk to us. If you choose to participate, you may stop the interview at any time or choose not to answer any question(s). If you do not wish to proceed, please tell me and we will stop. After the interview, a Matco attorney may ask you to sign a written statement known as a declaration stating under penalty of perjury that the information you provided was true. Your decision to sign a declaration, if requested, will also be voluntary.

4.      Your distributorship will not be affected in any way whether you talk to us, do not talk to us, or choose to sign or not sign a declaration. Also, your distributorship will not be affected in any way by what you tell us or don't tell us. Regardless of your decisions or what you do, you will not be penalized or retaliated against in any way. You also will not receive any benefit from Matco based on your decisions or what you do.

5.      If you choose to speak to us, and/or sign a declaration, Matco may use the information and any declaration to defend against the claims in the lawsuits or any future lawsuit, argue to the court that the classes in these lawsuits should not be certified, and/or seek to limit the recovery to the proposed classes.

6.      We want to hear your honest, candid responses.  Please do not give us information or an answer because you think that I or Matco would like the answer.  Please provide only truthful information and answers in response to our questions.

By signing this document below, you are acknowledging that you have read this document carefully and understand the following:

(a)      You are a potential member of the classes that the named Plaintiffs are seeking to represent in their respective lawsuits.  You could in theory recover money as part of the class action if the classes were to be certified and the Plaintiffs prevailed in court or Matco settled the matters.  Matco's interests in the lawsuits will be adverse to you in the event that a class is certified that includes you as a class member.

(b)      You are not currently asserting any claims against Matco and you are not represented by an attorney concerning any disputes you may have with Matco.

(c)      Your participation in the interview is entirely voluntary.  You may choose to participate or not participate, and if you choose to participate, you may terminate the interview at any time.

(d)      If you choose to participate, your only obligation is to tell the truth in response to the questions asked.

(e)      After the interview, the attorney may ask you to sign a declaration stating under the law of perjury that the information you provided was true.  You will have a chance to review the declaration and make changes.  Your decision to sign the declaration is also voluntary. This declaration may be used to present evidence to the court regarding the claims that are being made by the Plaintiffs.

(f)      No reprisals of any kind can or will be taken against you based on your decision to participate or not to participate in the interview, on your decision to sign or not sign a declaration if so requested, or on the substance of the information you provide; it is entirely your decision.

By signing below you are acknowledging that this information has been read to you before you were interviewed about your experiences as a potential class member, or, that you have read the information yourself; that you understand the information; that you are voluntarily agreeing to proceed with the interview; and that you have not been threatened, coerced, or in any way intimidated about participating in the interview.

Printed Name: ___Ed McNulty_____

Signature: ___Ed McNulty_____

Date: ___2-12-19_____