United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN FLEMING, | Case No.  19-cv-00463-WHO |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART MOTION TO CERTIFY CLASS** |
| MATCO TOOLS CORPORATION, et al., | Re: Dkt. No. 58 |
| Defendants. | |

**INTRODUCTION**

Plaintiff John Fleming moves for class certification on his wage and hour claims.  Dkt. No. 58 ("Mot.").  Matco opposes the motion, arguing that Fleming has failed to meet the typicality and adequacy requirements of Rule 23(a), that common questions do not predominate under Rule 23(b), and that class treatment is not superior.  Dkt. No. 67 ("Opp.").  As discussed in detail below, Fleming's motion is GRANTED IN PART and DENIED IN PART.  Class certification is granted on the threshold question of misclassification; Matco cannot satisfy the "ABC" test under *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903 (2018), which I find applies here, nor show lack of control under *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341 (1989), if the ABC test does not apply.  Fleming's claims for expense reimbursement, wage statement and UCL (as to the wage statement claim) are also certified.  Plaintiffs have not shown that common questions predominate for the overtime, meal and rest break, waiting time, and wage deduction claims; certification is denied for them.

**BACKGROUND**

Matco manufactures and distributes professional quality mechanic's tools and service equipment.  Compl.¶ 6.  Matco's products are distributed primarily by authorized franchisee

distributors, who enter into Matco Distributorship Agreements ("DA"s) and are classified as

independent contractors by Matco.  Dkt. No. 67-1 ("Swanson Decl.") ¶ 3.

Matco franchisees pay an initial fee to Matco and agree to operate their distributorships in

line with the requirements outlined in their DAs.  *Id.*  Franchisees have the right and obligation

under their DAs to distribute Matco brand tools using the Matco system.  *Id.* ¶ 3.  New franchisees

are required to attend Matco's "New Distributor Training Program" in Ohio and pay for travel and

hotel costs associated with their stay.  Dkt. No. 58-9, ("DA")[1]  ¶¶ 3.7, 4.1.  The training program

includes a minimum of sixty hours of classroom training time as well as eighty hours of field

training with a regional trainer over a six-week period.  *Id.* ¶¶ 4.1-42.

Franchisees purchase Matco products from Matco at wholesale prices and resell them at

retail prices set by the franchisee.  *Id.* ¶ 6.2.  New franchisees purchase a preset "new distributor

starter inventory" from Matco, after which they choose which products to purchase.  *Id.*  ¶ 6.3.

Franchisees are obligated to lease or purchase a Matco Truck with "MATCO TOOLS®" branding,

which acts as their Matco "mobile store."  DA ¶ 3.6.  Franchisees agree to "only sell Products and

other merchandise approved by Matco" and not to sell products "competitive with" Matco

products without written permission.  DA ¶ 3.1.  They are given a "list of calls" and "potential

customers" and are instructed to operate their mobile stores only at the locations identified as

"potential stops along the Distributor's proposed route."  DA ¶ 1.2.  They are obligated, under the

DAs, to "make personal sales calls to at least 80%" of their potential customers each week.  DA ¶

3.4.

Franchisees are required to license and use the Matco Distributor Business System

Software.  *Id.* ¶ 3.7.  They must also allow Matco to inspect their Matco Truck during regular

business hours and correct any identified deficiencies in their operations.  *Id.* ¶ 3.1.  They are

required to wear Matco branded uniforms while operating their mobile stores.  DA ¶ 3.6.

Although they set their own prices for retail sales, they must comply with any Matco-instituted

---

[1] Fleming has submitted several versions of the Matco DAs in support of his motion.  The parties agree that in most respects, the DAs are materially identical.  All citations to the Matco DA here are to the 2010 version at MATCO 000041 - MATCO 000065, uncles otherwise specified.

1   sales or marketing programs, such as coupons, gift cards, gift certificates, and incentives.  *Id.* ¶
2   6.2.  They must also attend at least 80% of Matco-scheduled district sales meetings for the
3   franchisee's district in any 12-month period.  *Id.* ¶ 3.7.

4       Apart from the specific requirements outlined in the DAs, franchisees are "responsible for
5   managing all aspects of the Matco Business, including sales, collection of accounts receivable,
6   purchases, inventory management, and hiring of Operators, if permitted by Matco."  *Id.* ¶ 3.12.
7   Matco does not track the time or hours that franchisees work and does not require them to track
8   their time.  Swanson Decl. ¶ 6.  It does not reimburse distributors for any expenses incurred as part
9   of running their Matco franchise, as Matco considers them to be operating their own business.
10  Dkt. No. 58-4, "Matco 30(b)(6) Depo Vol. 2" at 277:20-278:10.

11      Plaintiff Fleming was a franchisee and distributor for Matco from July of 2012 through
12  December of 2018.  Compl. ¶ 9.  During part of this period he owned a second Matco franchise
13  that his son operated.  Dkt. No. 67-7, Ex. 1 "Fleming Depo" 24:13-23.  Fleming operated his
14  franchise through an S corporation, not as a sole proprietorship, called John's Tools.  *Id.* 30:11-17,
15  62:11-13, 127:24-128:20.  He had an accountant who managed payroll and taxes for the
16  franchises.  *Id.* 223:13-24, 228:12-229:11.  In 2015, Fleming's son stopped operating his franchise
17  and Fleming hired a former Matco district manager to make collections on that route.  *Id.* 136:6-
18  139:10.  Fleming reduced his list of calls in 2016 and, in doing so, signed a revised DA in which
19  he released any existing claims against Matco.  *Id.* 85:9-17, 114:11-115:17, 229:17-230:21.  He
20  terminated his franchise and DA in December 2018.  Swanson Decl. ¶ 10.

21      In his lawsuit, Fleming claims that, by allegedly misclassifying him and similarly situated
22  distributors as independent contractors, Matco has sought to avoid various duties and obligations
23  owed to employees under California's Labor Code and Industrial Welfare Commission wage
24  orders.  These included: the duty to indemnify employees for all expenses and losses necessarily
25  incurred in connection with their employment; the duty to pay overtime compensation for hours
26  worked in excess of eight hours in a day or forty hours a week; the duty to provide off-duty meal
27  periods; the duty to authorize and permit paid rest periods; the duty to furnish accurate wage
28  statements; the duty to pay employees all wages owed upon termination; and unlawful collection

United States District Court
Northern District of California

3

1   and receipt of earned wages.  *Id.* ¶ 6.

2        Fleming seeks to certify the following class under Rule 23(b)(3):

3        All persons who signed franchise Distributor Agreements in the State of California and
4        personally operated a Mobile Store at the time within four years preceding the filing of this
         action.

5   Mot. at 2.

6                                          **LEGAL STANDARD**

7        Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs

8   bear the burden of showing that they have met each of the four requirements of Rule 23(a) and at

9   least one subsection of Rule 23(b).  *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th

10  Cir. 2014) (citing *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001)).

11  The plaintiff "must actually prove – not simply plead – that their proposed class satisfies each

12  requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)."

13  *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2412 (2014) (citing *Comcast Corp v.*

14  *Behrend*, 133 S.Ct. 1426, 1431-32 (2013); *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551-

15  52 (2011)).

16       The court's "class certification analysis must be rigorous and may entail some overlap with

17  the merits of the plaintiff's underlying claim."  *Amgen Inc. v. Connecticut Retirement Plans and*

18  *Trust Funds*, 133 S.Ct. 1184, 1194 (2013) (quoting *Dukes*, 131 S.Ct. at 2551 (internal quotation

19  marks omitted)).  These analytical principles govern both Rule 23(a) and 23(b).  *Behrend*, 133

20  S.Ct. at 1342.  However, "Rule 23 grants courts no license to engage in free-ranging merits

21  inquiries at the certification stage."  *Amgen*, 133 S.Ct. at 1194-95.  "Merits questions may be

22  considered to the extent – but only to the extent – that they are relevant to determining whether

23  Rule 23 prerequisites for class certification are satisfied."  *Id.*

24       Under Rule 23(a), the class may be certified only if: (1) the class is so numerous that

25  joinder of all members is impracticable, (2) questions of law or fact exist that are common to the

26  class, (3) the claims or defenses of the representative parties are typical of the claims or defenses

27  of the class, and (4) the representative parties will fairly and adequately protect the interests of the

28  class.  *See* Fed. R. Civ. P. 23(a).  A plaintiff must also establish that one or more of the grounds

United States District Court
Northern District of California

4

for maintaining the suit are met under Rule 23(b): (1) that there is a risk of substantial prejudice from separate actions; (2) that declaratory or injunctive relief benefitting the class as a whole would be appropriate; or (3) that common questions of law or fact predominate and the class action is superior to other available methods of adjudication.  *See* Fed. R. Civ. P. 23(b).

## DISCUSSION

## I.      RULE 23(A)

### A.      Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  The party seeking certification "do[es] not need to state the exact number of potential class members, nor is a specific number of members required for numerosity."  *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005).  However, courts within the Ninth Circuit generally agree that numerosity is satisfied if the class includes forty or more members.  *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 605-06 (N.D. Cal. 2014); *In re Facebook, Inc., PPC Adver. Litig.*, 282 F.R.D. 446, 452 (N.D. Cal. 2012).

Plaintiffs have adequately established numerosity.  They state that there were 288 distributors operating during the Class Period and that most of these distributors were franchisees operating their own route.  Mot. at 11-12.  Matco does not dispute that the proposed class is sufficiently numerous under Rule 23(a)(1).

### B.      Common Questions

The "commonality" requirement of Rule 23(a)(2) is minimal.  "[C]ommonality only requires a single significant question of law or fact."  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012); *see also Dukes*, 131 S.Ct. at 2556.  Common questions support a finding of commonality where they "will generate common answers apt to drive the resolution of the litigation" or "will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 131 S. Ct. at 2551.

Matco does not dispute that commonality is met here and I agree.  The key threshold legal issue underlying the case is whether the putative class members were misclassified as independent contractors instead of employees under California law.  This is a common issue that is subject to

common resolution for the class, as discussed in detail in my predominance analysis below. *See Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 606 (N.D. Cal. 2014) (holding that "threshold issue" of whether class members were properly classified as independent contracts satisfied commonality); *Bowerman v. Field Asset Servs., Inc.*, Case No. 13-cv-00057-WHO, 2015 WL 1321883, at *14 (N.D. Cal. Mar. 24, 2015). Fleming has satisfied Rule 23(a)(2)'s commonality requirement.

### C. Typicality & Adequacy

Rule 23(a)(3) requires that "the [legal] claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The "test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). A plaintiff's claims are considered typical if they are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020). A plaintiff may not be typical if she is "subject to unique defenses which threaten to become the focus of the litigation." *Id. Hanon*, 976 F.2d at 508.

Rule 23(a)(4) requires that the putative class representative must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (internal quotations omitted). "[T]he typicality and adequacy inquiries tend to significantly overlap" and are often resolved together. *James v. Uber Techs., Inc.*, Case No. 19-cv-06462-EMC, 2021 WL 2543030, at *6 (N.D. Cal. Jan. 26, 2021).

Matco argues that Fleming is not a typical or adequate representative because he is a former franchisee and therefore cannot adequately represent current franchisees, many of whom it says do not want to be classified as employees and instead want to continue operating their

1    businesses as independent contractors.  Opp. at 7-9.  It submits a number of declarations from

2    current franchisees who note that they have invested significant time and resources into their

3    franchise businesses and are satisfied with their existing independent contractor status.  *See* Opp.

4    at 8 (citing Dkt Nos. 67-7 – 67-8, Lloyd Decl. Exs. 2-16.).  It asserts that "Fleming's goal is to

5    strip away the freedoms franchisees enjoy, and, squander their considerable investments and sweat

6    equity, by obtaining a Court order declaring that franchisees are not independent

7    businesspersons—an order which will have no impact on him because he is no longer a

8    franchisee."  Opp. at 8.

9        While some courts have held that former franchisees are not adequate to represent current

10   franchisees, *see e.g. Free World Foreign Cars, Inc. v. Alfa Romeo, S.p.A.*, 55 F.R.D. 26, 29

11   (S.D.N.Y. 1972) ("Plaintiff's interest as a former and terminated franchisee is not co-extensive

12   and consistent with those of the present franchisees[.]"), more recent decisions have tended to

13   reject this framing and adopted a more nuanced view, *see e.g. Standard Petroleum Co. v. Faugno*

14   *Acquisition LLC*, 330 Conn. 40, 57 (Conn. 2018) (rejecting older decisions stating that "a conflict

15   of interest renders former customers/franchisees per se inadequate representatives of current

16   customers/franchisees" and holding that "the better reasoned authority takes a more nuanced

17   view").  The question is therefore whether Fleming's claims are reasonably co-extensive with

18   those of the other class members.

19       Matco does not dispute that Fleming's claims are reasonably coextensive with other class

20   members' claims.  The primary thrust of its argument is that Fleming is inadequate to represent

21   current franchisees because many current franchisees are happy with the status quo and do not

22   support the litigation.  But "happy camper" declarations and disagreements among class members

23   are generally not sufficient to defeat a finding of adequacy or typicality.  *See Nash v. Horizon*

24   *Freight Sys., Inc.*, Case No. 19-cv-01883-VC, 2020 WL 7640878, at *1 (N.D. Cal. Dec. 23, 2020)

25   ("Many courts have expressed skepticism about the use of these 'happy camper' declarations to

26   defeat a motion for class certification in wage and hour cases") (collecting cases); *Guifu Li v. A*

27   *Perfect Franchise, Inc.*, No. 5:10-cv-01189-LHK, 2011 WL 4635198, at *9 (N.D. Cal. Oct. 5,

28   2011) ("The fact that all proposed class members may not like each other, or even that some

United States District Court<br>Northern District of California

7

1   potential class members may prefer their current employment situation, is not sufficient to defeat

2   adequacy.").  I agree with these courts and conclude that Fleming is not inadequate or atypical

3   simply because some class members do not support the litigation.

4        Matco also argues that Fleming is atypical and inadequate because franchisees who signed

5   the 2019 and 2020 versions of the DAs are – in Matco's view – subject to arbitration, while

6   Fleming is not.  Opp. at 10.  It notes that while the arbitration agreement in Fleming's DA was

7   found invalid due to a PAGA waiver, the 2019 and 2020 versions of the DA do not contain a

8   PAGA waiver and therefore, may be enforceable.  *Id.*

9        While some courts have found that variations in contracts containing arbitration clauses

10  may preclude a finding of typicality, *see e.g. In re Titatnium Dioxide Antitrust Litig.*, 962 F. supp.

11  2d 840, 861 (D. Md. 2013), I do not think this difference renders Fleming atypical or inadequate in

12  this case.  Although he may not be subject to the same potential arbitration defenses as certain

13  class members, adequacy and typicality does not require perfect identity of claims.  Further, in

14  contrast to some of the cases Matco cites, it is unlikely that resolving this arbitration question will

15  require significant time or resources.  *See Pablo v. ServiceMaster Global Holdings Inc.*, 2011 WL

16  3476473, at *2 (N.D. Cal. Aug. 9, 2011) ("the evidence currently before the Court supports an

17  inference that a significant number [of the class members signed arbitration agreements], and that

18  a significant portion of this litigation would be devoted to discovering which class members

19  signed such agreements and enforcing those agreements").  Matco does not suggest that it would

20  be difficult to identify which class members signed the 2019 or 2020 versions of its DA.  Further,

21  whether these class members are obligated to arbitrate can resolved with common questions, as the

22  arbitration clause will be the same for all such individuals.  Accordingly, the presence of a

23  potential arbitration defense does not defeat typicality or adequacy.

24        Finally, Matco argues that Fleming is atypical because he released all claims against Matco

25  as of November 3, 2016.  Opp. at 10.  But Matco does not dispute that Fleming continued to work

26  as a Matco distributor for two years after that and that he did not release claims related to this later

27  period.  That Fleming released some of his claims goes only to damages, which will already vary

28  among class members.  Fleming's 2016 release does not defeat typicality or adequacy.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    For these reasons I conclude that Fleming has satisfied the adequacy and typicality

2    requirements of Rule 23(a).

3    **II.    PREDOMINANCE**

4    "The predominance test of Rule 23(b)(3) is 'far more demanding' than the commonality

5    test under Rule 23(a)(2)." *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 607 (N.D. Cal. 2014).

6    Predominance is satisfied only "when common issues 'represent a significant aspect of the case

7    and they can be resolved for all members of the class in a single adjudication.'" *Edwards v. First*

8    *Am. Corp.*, 798 F.3d 1172, 1182 (9th Cir. 2015). "[T]he focus of the predominance inquiry" is

9    whether "a proposed class is 'sufficiently cohesive to warrant adjudication by representation.'"

10   *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 469 (2013). However,

11   predominance "does not require a plaintiff seeking class certification to prove that each element of

12   their claim is susceptible to class-wide proof." *Castillo*, 980 F.3d at 730.

13   **A.    Misclassification**

14   The parties dispute whether common issues predominate with regard to the threshold

15   question of whether the putative class members were improperly classified as employees. At the

16   outset, the parties dispute whether the ABC test set out by the California Supreme Court in

17   *Dynamex*, or the earlier common law *Borello* test applies to this action. Fleming argues that the

18   ABC test applies – but asserts that common questions predominate under either test. Matco

19   argues that the *Borello* test should apply – but asserts that individual issues predominate under

20   either test. Here, I conclude that while the ABC test likely applies to the present case and relevant

21   claims, common questions predominate under either standard.

22   **1.    The Applicable Standard**

23   In *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903 (2018), the California

24   Supreme Court adopted a new test for distinguishing between employees and independent

25   contractors in wage order cases, called the "ABC" test. Under the "ABC" test, a worker is

26   presumed to be an employee unless the "hiring entity" can establish that the worker meets three

27   conditions:

28

(a)   that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and*

(b) that the worker performs work that is outside the usual course of the hiring entity's business; *and*

(c) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

*Id.* at 34 (emphasis added).  If the hiring entity cannot satisfy any of these three requirements, the worker is presumed an employee.  *Id.*  The California legislature subsequently codified the ABC test outlined in *Dynamex* in Assembly Bill No. 5 (AB 5).  *See* Cal. Labor Code § 2775.  On January 14, 2021, the California Supreme Court held that the ABC test applies retroactively to "all cases not yet final as of the date our decision in *Dynamex* became final." *Vazquez v. Jan-Pro Franchising Int'l, Inc.,* 273 Cal. Rptr. 3d 741, 743 (2021).

Matco's arguments against application of the ABC test are not persuasive.  First Matco argues that *Dynamex* does not apply to it because it is not a "hiring entity" because (1) franchisees enter into a commercial franchise relationship with Matco, they are not "hired"; (2) franchisees do not provide labor or services to Matco – instead they make sales and provide services to their own customers, who purchase Matco products from them; and (3) Matco does not compensate franchisees – they make profits on the Matco products they sell at retail prices.  Opp. at 14.  The California Court of Appeal recently rejected this same argument in *People v. Uber Techs., Inc.*, 56 Cal. App. 5th 266, 287 (2020), holding that it would not "import a threshold 'hiring entity' inquiry" into the ABC test.  *People v. Uber Techs., Inc.*, 56 Cal. App. 5th 266, 287 (2020).  As the court explained, "the phrase 'hiring entity,' . . . is intended to be expansive for reasons specific to California wage and hour laws and the longstanding social safety net objective of those laws in this state." *Id.*  The Hon. Edward M. Chen also rejected this argument in his recent class certification order in *James v. Uber Techs., Inc.*, following the California Court of Appeal's decision.  No. 19-CV-06462-EMC, 2021 WL 254303, at *5 (N.D. Cal. Jan. 26, 2021).  I agree with these courts and conclude that the term "hiring entity" does not create a separate threshold inquiry into whether the ABC test applies at all to a particular entity.

1    Matco's second argument against application of the ABC test is that the test should not

2  apply to franchise relationships like those between Matco and the putative class members.  Opp. at

3  15.  But as Matco acknowledges, in *Vazquez v. Jan-Pro Franchising Intn'l, Inc.*, the Ninth Circuit

4  determined that the ABC test applied to a misclassification case involving franchisees classified as

5  independent contractors.  923 F.3d 575, 594 (9th Cir. 2019) (instructing district court to apply

6  *Dynamex* on remand) *reh'g granted, opinion withdrawn*, 930 F.3d 1107 (9th Cir. 2019), *opinion*

7  *reinstated in part on reh'g*, 939 F.3d 1050 (9th Cir. 2019).  The court specifically rejected the idea

8  that policy concerns justified altering or modifying the test when applied to franchisees,

9  explaining:

> *Dynamex* favorably cited two Massachusetts decisions that applied the ABC test in
> the franchise context.  *See Dynamex*, 232 Cal.Rptr.3d 1, 416 P.3d at 40
> (citing *Awuah v. Coverall North America, Inc.*, 707 F.Supp.2d 80 (D. Mass. 2010),
> and *Coverall N. Am., Inc. v. Comm'r of Div. of Unemployment Assistance*, 447
> Mass. 852, 857 N.E.2d 1083 (2006) ).  The general policy arguments that
> [defendant] and the [International Franchise Association] raise are of limited
> persuasive value.  Their concerns would apply just as much in Massachusetts,
> where courts have routinely applied the codified ABC test to franchises (and have
> routinely held against franchisors).  Furthermore, in adopting the ABC
> test, *Dynamex* laid out multiple public policy arguments, many of which equally
> apply in the franchise context.  *See Dynamex*, 232 Cal.Rptr.3d 1, 416 P.3d at 31–
> 36.
>
> Thus, the franchise context does not alter the *Dynamex* analysis, and the district
> court need not look to *Patterson* in applying the ABC test.

20  *Vazquez*, 923 F.3d at 595. [2]

21    Matco attempts to distinguish the specific facts of *Vazquez*, highlighting differences

22  between the franchises at issue in that case and Matco's franchises.  Opp. at 15.  But nothing in

23  *Vazquez* suggests that the specific type of franchise makes any difference – the Ninth Circuit's

24  analysis indicates that the ABC test would apply to any franchise.  *Vazquez*, 923 F.3d at 595

25

---

26  [2] The Ninth Circuit ultimately withdrew its initial *Vazquez* opinion and issued a new opinion
certifying a question to the California Supreme Court as to whether *Dynamex* applies retroactively.

27  In its opinion on rehearing the court explained that it was not withdrawing its conclusion that "the
district court's reliance on *Patterson* and the 'special features of the franchise relationship' was

28  misplaced" and incorporated those prior conclusions by reference.  *See Vazquez v. Jan-Pro*
*Franchising Int'l, Inc.*, 939 F.3d 1045, 1049 (9th Cir. 2019).

United States District Court
Northern District of California

1    ("[T]he franchise context does not alter the *Dynamex* analysis.").  The one case Matco cites in

2    support of this argument is not on point.  In *Haitayan v. 7-Eleven, Inc.*, a district court

3    distinguished the facts of *Vazquez* in *applying* Part B of the ABC test – the court did not hold or

4    suggest that the ABC test might not apply to certain franchise relationships.  *See Haitayan v. 7-*

5    *Eleven, Inc.,* No. CV 17-7454 DSF (ASX), 2020 WL 1290613, at *8 (C.D. Cal. Feb. 19, 2020)

6    (distinguishing *Vazquez* in concluding that there were material facts in dispute as to whether 7-

7    Eleven franchisees were engaged in the same business as 7-Eleven at summary judgment).

8         Matco also notes that a court may decline to apply the ABC test if it "cannot be applied to

9    a particular context."  Cal. Lab. Code § 2775(b)(3).  But Matco has not convincingly shown this to

10   be such a situation.  As Matco acknowledges, the Ninth Circuit's *Vazquez* decision applied the

11   ABC test to a complex three-tier franchise scheme where "'master franchisees' were responsible

12   for contracting with customers, determining the prices for the janitors' services, and, billing,

13   collection and paying the unit franchisees" and the putative class of unit franchisees had no direct

14   relationship with the defendant.  Opp. at 15.  Matco's franchise structure here more closely mirrors

15   a typical employee-employer relationship as the putative class involves franchisees who

16   contracted directly with Matco and who personally operated a Matco mobile store.  If it was

17   possible to apply the ABC test to the franchises at issue in *Vazquez*, I see no reason why the test

18   cannot be applied to the franchises at issue in this case.

19        For these reasons, I conclude that the ABC test likely applies to this case.  To the extent it

20   does not apply to specific claims, the *Borello* test applies.  I will analyze whether common

21   questions predominate under both standards.

22                    **2.      Common Questions Predominate Under The ABC Test**

23                              **a.      Prong A**

24        Under Prong A of the ABC test, a hiring entity must establish "that the worker is

25   free from the control and direction of the hirer in connection with the performance of the

26   work, both under the contract for the performance of the work and in fact."  *Dynamex*, 4

27   Cal. 5th at 958.  "[A] worker who is subject, either as a matter of contractual right or in

28   actual practice, to the type and degree of control a business typically exercises over

United States District Court
Northern District of California

United States District Court
Northern District of California

1   employees would be considered an employee . . ."  *Id.*  "[T]he relevant inquiry is the level

2   of control the alleged employer retained, not actually exercised."  *Soares v. Flowers*

3   *Foods, Inc.*, 320 F.R.D. 464, 477-78 (N.D. Cal. 2017); *Bowerman*, 242 F. Supp. 3d 910,

4   928 (N.D. Cal. 2017) ("the defendant's right to control the manner and means by which the

5   plaintiff's work is accomplished, rather than the amount of control actually exercised, is

6   the principal factor in assessing whether a plaintiff is an employee or an independent

7   contractor").  While "the rights spelled out in a contract may not be conclusive if other

8   evidence demonstrates a practical allocation of rights at odds with the written terms . . . the

9   existence of variations in the extent to which a hirer exercises control does not necessarily

10  show variation in the extent to which the hirer possesses a right of control."  *Ayala v.*

11  *Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 535 (2014).

12          Here, the putative class members are subject to substantively identical contracts

13  with Matco that outline their rights and obligations as franchisees and establish Matco's

14  contractual rights to control their activities.  Matco does not dispute that the terms of the

15  DAs are common across the putative class or that they establish certain contractual rights

16  to control the distributors.  *See* Opp. at 16.  Instead, it argues that the contractual control

17  that the DAs provide to Matco is "geared specifically toward quality control and

18  maintenance of brand standard" and is therefore no more control than exists in any

19  franchise relationship.  Opp. at 17 (*quoting Salazar v. McDonald's Corp.*, 944 F.3d 1024,

20  1032 (9th Cir. 2019).  But whether the contractual control that Matco retains over

21  distributors by virtue of the DAs is sufficient to demonstrate "control" under Prong A –

22  and whether the franchise relationship impacts analysis of this Prong - are common

23  question going to the merits.  Matco does not dispute that these issues can be resolved with

24  common proof.

25          Matco next argues that, because, as it claims, the DAs alone cannot establish

26  "control" over the distributors, resolution of Prong A will require individualized proof.

27  Opp. at 17.  But, as discussed above, whether the DAs alone can or cannot establish

28  "control" over the distributors is a merits question that is common to the class.  Further,

while Matco identifies variations in franchisees' experiences, the evidence it cites primarily indicates that it selectively or unevenly enforced the contractual rights set out in the DAs – not that it actually had different *rights* to control the various franchisees.  For example, it highlights several instances in which it declined to enforce contractual rights, noting that (1) some franchisees declined to participate in its training, even though the DAs required them to; (2) some district managers did not do "ride-alongs" with their franchisees, even though this was mandatory under the DAs; (3) some franchisees sold non-Matco tools, even though the DAs prohibited this absent Matco approval; and (4) some franchisees hired contractors to perform their work without Matco approval, even though the DAs required them to obtain such approval.  *See* Opp. at 18.  While this evidence demonstrates uneven enforcement of the DA terms, nothing about this variation suggests that Matco could not have enforced the DA requirements against these franchisees had it wanted to.

The only evidence Matco points to that potentially indicates that it sometimes exercised "control" *beyond* the terms of the contract is that two franchisees testified that they could not adjust their routes and lists of calls entirely at their own discretion and that their district managers closely managed any changes to their routes.  *See* Dkt. No. 67-9, Lloyd Decl., Ex. 22, 166:19-169:13 (testifying that manager would not let him change the order in which he made customer calls without permission because he was too junior); Lloyd Decl., Ex. 23, 150:7-151:24, 157:10-159:8 (testifying that district manager was very strict about keeping to list of calls at the beginning).  But whether this level of control actually exceeds Matco's right to control under the DAs is a close question of fact.  The common DA terms state, *"*The Distributor will operate the Distributorship only at those locations identified as potential stops along the Distributor's proposed route" and that distributors cannot offer products to persons or businesses not on the list "Unless the List of Calls or Potential Customer List is adjusted or modified by Matco and the Distributor."  DA ¶ 1.2.  The DA terms also require distributors to undergo 80 hours of field training with their district managers, who will "assist and advise the Distributor in the operation of

14

United States District Court
Northern District of California

1   his Matco business." *Id.* at 4.2.  Given that the DAs impose contractual limitations

2   concerning where the distributors can operate and that distributors are required to submit to

3   a certain amount of oversight by district managers, that some district managers closely

4   monitored franchisees' routes does not appear to meaningfully alter the "control" analysis.

5       In sum, I conclude that common questions predominate for Prong A of the ABC

6   test.  The DAs, which the parties agree are common to class, are likely to resolve whether

7   Matco retained sufficient "control" over the distributors such that they should be

8   considered employees.

9                           **b.      Prong B**

10      Under Prong B of the ABC test, a hiring entity must show "that the worker

11  performs work that is outside the usual course of the hiring entity's business." *Dynamex*, 4

12  Cal. 5th at 917.  Matco argues that the relevant question under this prong is "are

13  franchisees' businesses legitimate, or, are they shams?"  Opp. at 19.  Based on this reading

14  of Prong B, it points to a host of variations among the franchisees such as (1) how they

15  legally structured their franchises; (2) whether they filed business taxes; (3) whether they

16  kept business and personal funds separate; (3) whether they received financing from

17  Matco; (4) whether they had their own businesses before contracting with Matco; and (5)

18  whether they sold to customers outside their designated list of calls.  Opp. at 19.  But

19  Matco does not point to any decision that supports its reading of Prong B.  I conclude that

20  this is not the correct test.

21      As the court explained in *Dynamex*, to satisfy Prong B of the ABC test, "a hiring

22  entity must establish that the worker performs work that is outside the usual course of its

23  business . . ."  4 Cal. 5th at 961.  This question requires analysis of the nature of the hiring

24  entity's business and the nature of the putative class members' work.  As the Ninth Circuit

25  has explained, "courts have framed the Prong B inquiry in several ways.  They have

26  considered whether the work of the employee is necessary to or merely incidental to that of

27  the hiring entity, whether the work of the employee is continuously performed for the

28  hiring entity, and what business the hiring entity proclaims to be in." *Vazquez*, 923 F.3d at

597. Matco's argument actually indicates that common questions would predominate under any of these framings. It argues that its business involves (1) settling tools at wholesale to franchisees; (2) selling tools directly to certain commercial accounts; (3) and providing financing to franchisees. Opp. at 18. Franchisees, in contrast, sell tools at retail to their customers. *Id.* Matco asserts that "[w]hile both sell tools, they are in distinct businesses." *Id.* In making this argument, Matco does not dispute that the type of work franchisees are engaged in – selling tools to retail customers – is common across the class.

In sum, Prong B involves a comparison of the nature of Matco's business to the nature of the franchisee's work. Because the type of work franchisees engage in – selling tools and providing service to retail customers – is common across the class, I conclude that common questions predominate as to Prong B.

### c.     Prong C

Under Prong C of the ABC test, a hiring entity must demonstrate "that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed." *Dynamex*, 4 Cal. 5th at 961. Matco argues that this question turns on whether the worker took "the usual steps to establish and promote his or her independent business" and that this would require an individualized inquiry into each franchisee. Opp. at 20. In support of its position, Matco points to its analysis of Prong B, where it identified various differences in the way franchisees structured and operated their businesses, and several additional points of variation including: (1) that some franchisees continued to operate tool businesses after ending their Matco distributorships; (2) that some franchisees operated their distributorships under long-standing business names; and (3) that some franchisees consulted with attorneys before signing their DAs, while others did not. Opp. at 20.

While the factors Matco highlights could be key in certain cases, in this case I conclude that any variations in the factors Matco describes are dwarfed by the common questions that the DAs present. All of the putative class members entered into franchise agreements with Matco. Further, under the DAs, Matco distributors contractually agreed

United States District Court
Northern District of California

(1) to "promote, market, and work" with regard to their Matco distributorship on a "full-time basis," DA ¶ 3.1; (2) to "only sell Products and other merchandise approved by Matco" and not sell products "competitive with" Matco products, *id.* ¶ 3.2; and (3) to only sell to the persons and businesses identified on their potential customers list, *id*. These common facts and common contractual obligations – which appear to require distributors to work full-time exclusively as Matco distributors – will be key to determining whether franchisees are "customarily engaged in an independently established trade, occupation, or business."

The facts here are distinct from other cases where courts have found that individual inquiries predominate due to variations among class members. For example, in *James v. Uber*, Judge Chen recently determined that common questions did not predominate as to Prong C because some of the putative class members did not drive exclusively for Uber and "[a] finder of fact could plausibly conclude that some of these putative class members are engaged in an independently established business under prong C." *James*, 2021 WL 2543030, at \*11. Here, while Matco points to several instances of franchisees selling non-Matco products or selling to non-approved customers, it does not dispute that this conduct was expressly prohibited under the DAs, which set out common obligations across the class.

Because the DAs obligated all franchisees to operate their Matco distributorships on a full-time basis selling only Matco-approved produced to approved customers, common questions will predominate concerning whether these franchisees are "customarily engaged in an independently established trade, occupation, or business."

### 3.        Common Questions Predominate Under the *Borello* Test

Common questions also predominate under the *Borello* test. The primary factor under the *Borello* test is "whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *Alexander v. FedEx Ground Package Sys.*, 765 F.3d 981, 988 (9th Cir. 2014) (*citing S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341 (1989)). Courts also consider secondary factors, including: (1) whether the workers

United States District Court
Northern District of California

1    are engaged in a distinct occupation or business; (2) whether the workers operate under the

2    direction of the defendant, or without supervision; (3) whether the workers perform work that is

3    regular or an integral part of the defendant's business; and (4) whether the parties believe they are

4    creating the relationship of employer-employee. *Borello*, 48 Cal. 3d at 351.

5         Matco argues that the first factor of "control" cannot be resolved with common proof. As

6    discussed with regard to Prong A of the ABC test above, I disagree and conclude that common

7    questions predominate on the issue of whether Matco had the right to "control" franchisees in the

8    way a business typically controls employees. Further, as discussed above with regard to Prongs B

9    and C, common questions predominate concerning whether workers perform work that is regular

10   or an integral part of the defendant's business and whether workers are engaged in a distinct

11   occupation or business. Further, whether workers operate under the direction of the defendant, or

12   without supervision, is subject to common proof given the common terms and obligations set out

13   in the DAs, which set out common relevant obligations such as mandatory trainings, district

14   manager ride-alongs, and attendance at regular district sales meetings. DA ¶¶ 3.4, 3.8. Finally,

15   while there may be individual questions regarding whether individual franchisees believed they

16   were entering into employee-employer relationships, as the *Borello* court noted, the "label placed

17   by the parties on their relationship is not dispositive." *Borello*, 48 Cal. 3d at 349. The Ninth

18   Circuit has echoed this, holding that "[u]ltimately, neither [the defendant's] nor the [class

19   members'] own perception of their relationship as one of independent contracting is dispositive."

20   *Alexander v. FedEx Ground Package Sys. Inc.*, 765 F.3d 981, 997 (9th Cir. 2014). Accordingly,

21   individual questions on this factor of the *Borello* test will not overwhelm the many common

22   questions.

23        For these reasons, common questions predominate under the *Borello* test.

24        **B.     Individual Claims**

25        After concluding that common questions predominate on the threshold issue of

26   misclassification, I must separately assess whether common questions predominate under the

27   specific individual claims. *See Norris-Wilson v. Delta-T Group, Inc.*, 270 F.R.D. 596, 607 (S.D.

28   Cal. 2010); *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 609 (N.D. Cal. 2014).

1

### 1.    Outside Sales Exemption

Matco argues that individual questions will predominate on its affirmative defense that the outside sales exemption bars the overtime and meal/rest break claims.  Opp. at 22.  I agree and conclude that, as a result of the outside sales exemption, individual issues will predominate on Fleming's overtime, meal/rest break, and waiting time claims.

California's outside sales exemption exempts employers from the normal obligations to pay employees overtime and to provide meal and rest breaks.  The exemption applies to "outside saleperson[s]" defined as any individual who "customarily and regularly works more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products[.]"  Cal. Lab. Code § 1171.  If "an employee travels to a destination to engage in both sales and nonsales activities, the travel time must be apportioned among the two types of activities for purposes of determining the total amount of time spend doing sales and nonsales work."  *Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785, 801 (1999).  Nonexempt work that is incidental to sales is not exempt under California law.  *Id.* at 797.  "Under California law, a court evaluating the applicability of the outside salesperson exemption must conclude an individualized analysis of the way each employee actually spends his or her time, and not simply review the employer's job description."  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 945 (9th Cir. 2009); *In re Wells Fargo Home Motg. Overtime Pay Litig.*, 268 F.R.D. 604, 612 (N.D. Cal. 2012) (""the court has been unable to locate any case in which a court permitted a plaintiff to establish the non-exempt status of class members, especially with respect to the outside sales exemption, through statistical evidence or representative testimony").

Here, Matco has a strong argument that the outside sales exemption applies to at least some of the franchisees.  There is no dispute that franchisees spend the bulk of their time traveling to and visiting with customers in their Matco trucks.  *See* Opp. at 23; Reply at 14.  However, franchisees engage in a combination of sales and non-sales activities when visiting customers, including: (1) selling products; (2) delivering products, (3) making collections on tools bought on credit; and (4) providing warranty service or repairs.  *See e.g.* Dkt. No. 67-8, Lloyd Decl., Ex. 11 ¶ 12; Ex. 18, 48:25-49:3, 71:4-7, 88:11-89;1; Ex. 21, 137:17-138:11.  Given that California law

1    requires courts applying the outside sales exemption to engage in an "individualized analysis of

2    the way each employee actually spends his or her time," *Vinole*, 571 F.3d at 945, and that courts

3    have routinely rejected the use of statistical or representative testimony to establish the exemption,

4    it appears that resolution of this issue will necessarily result in significant individualized inquiries

5    into how each class member divides his or her time between sales and nonsales work.

6         Fleming makes several arguments that the outside sales exemption should not bar class

7    certification on these claims, but none are convincing.  Fleming asserts that, given the common

8    threshold question of misclassification, the outside sales exemption can simply be bifurcated and

9    resolved later.  Reply at 12-13.  While I agree that the outside sales exemption does not justify

10   denying certification altogether, courts routinely separately consider whether certification of

11   specific claims is warranted under the predominance standard.

12        The cases Fleming cites are distinguishable.  In both *Rehberg v. Flowers Baking Co. of*

13   *Jamestown, LLC*, and *Alfred v. Pepperidge Farm, Inc.*, the outside sales exemption was not likely

14   to apply to the putative class members whose primary duties did not involve sales.  *Rehberg*, No.

15   3:12-CV-00596-MOC, 2015 WL 1346125, at *18 (W.D.N.C. Mar. 24, 2015) (holding that

16   defendant's assertion of outside sales exemption did not bar certification of class of delivery

17   drivers); *Alfred*, 322 F.R.D. 519, 547 (C.D. Cal. 2017) (holding that outside sales exemption did

18   not bar certification where defendant "has not submitted any affirmative evidence that any of the

19   Distributors spent a material amount of time on exempt activities").  Here, in contrast, one of

20   distributors' primary duties, and the only way they make money, is through sales.  As a result,

21   there is a much stronger likelihood that the outside sales exemption would eventually bar liability

22   on these claims.  And in *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 487 (E.D. Cal.

23   2006), the court concluded that resolution of the outside sales exemption was likely to "require the

24   Court to make a single factual finding."  Here, in contrast, I conclude that resolution of the outside

25   sales exemption is likely to require individualized inquiries for each class member.

26        Fleming also argues that common questions predominate because he will make several

27   broad challenges to application of the outside sales exemption.  Reply at 13.  While these

28   arguments present common questions, they are not likely to succeed and are not likely to resolve

United States District Court
Northern District of California

the outside sales exemption issue.

Fleming first contends that the exemption does not apply because an "outside salesperson" must spend more than half her time away from "the employer's place of business" and the franchisee's "Mobile Stores," where franchisees spend most of their time, *are* Matco's place of business. Reply at 13. Fleming reaches this conclusion by noting that "place of business" under California law is defined broadly and can include "property . . . owned or controlled by the[] employer," and can be transitory. *Id.* (*citing* California Division of Labor Standards Enforcement ("DLSE") Opinion Letter, September 8, 1998, available at http://www.dir.ca.gov/dlse/opinions/1998-09-08.pdf ("1998 DLSE Letter"), 1-2 (opining that temporary trailers and model homes located at a tract housing site could qualify as a "place of business")). As Fleming notes, the rationale behind the outside salesperson exemption is "because it's very difficult to control their hours and working conditions. They set their own time, and they're on the road, they call on their customers . . . . [R]arely do you know what they're doing on an hour-to-hour basis." *Id.* at 2 (*quoting* Transcript of IWC Meeting 1/23/96, p. 148). These same justifications remain true regardless of whether an employer owns the salesperson's car or has some level of control over it. I am therefore skeptical that Fleming will be able to demonstrate that franchisees' "mobile stores" are Matco's "place of business" within the meaning of the outside sales exemption.

Fleming's second broad attack on the outside sales exemption is that the exemption does not apply to "workers like 'routemen' who do not create the customer relationship and instead merely call on existing accounts to, in part, service sale-related needs." Reply at 14. He cites to *Hodgson v. Klages Coal & Ice Co.*, 435 F.2d 377, 383-84 (6th Cir. 1970), in which the Sixth Circuit held that the FLSA's outside sales exemption did not apply to routemen who serviced existing company accounts, where store managers established all customer relationships and had sole authority to enter binding sales agreements. While he notes that Matco distributors service a pre-set "list of calls," Fleming does not dispute that Matco distributors establish their own relationship with potential customers and that one of the distributors' primary contractual obligations under their franchise agreements is to "work to increase Product sales." DA ¶ 3.1.

Indeed, Matco's distributor franchises are structured entirely around the resale of Matco products and franchisees do not make any money except through the profits they earn through these sales. *See id.* ¶¶ 3.4 (setting requirement that distributors make weekly "sales calls"); 1.3 ("The Distributorship is a business which operates principally from a vehicle, and which resells the Products to retail customers"); 1.4.1 (noting that distributors have the right to resell Matco products bought at wholesale). The idea that distributors somehow do not make sales and are "routemen" seems farfetched; Fleming is not likely to succeed on this argument.

Finally, Fleming argues that the outside sales exemption is subject to common proof because there is a "standard policy governing how employees spend their time." Reply at 14-15. He states that "Matco admits employees spend the bulk of their time engaged in the same activity—on their List of Calls operating their Mobile Store." *Id.* at 15. But this "admission" does nothing to resolve how distributors divide their time between sales and nonsales activities, both of which distributors engage in while "operating their Mobile Stores." Fleming also points to language in the DA stating that the "Distributor will, on a **full-time basis**, diligently promote, market, and work to increase Product sales." Reply at 15 (*quoting* DA ¶ 3.1 (emphasis in Reply). He seems to cite this language to suggest that distributors are "full-time" salesmen – an odd argument given that this would make his overtime and meal/rest break claims unviable. But importantly, Fleming's quote misleadingly excludes language from the DA making clear that distributors have additional responsibilities as well. The full quote reads: "The Distributor will on a full-time basis diligently promote, market, and work to increase Product sales, *to increase the Customer base, and to provide quality service and warranty support to the Customers*." DA ¶ 3.1 (emphasis added). Accordingly, this language does not help parse the extent to which distributors split their time between sales and nonsales activities.

For these reasons, I conclude that common questions do not predominate on the overtime and meal/rest break claims, to which the outside sales exemption applies. Accordingly, I decline to certify the class for these claims. Because the waiting time claim for penalties resulting from failure to timely pay all wages is derivative of the overtime claim, *see* Mot. at 23-24, I also decline to certify a class as to this claim.

### 2.     Expense Reimbursement Claim

Fleming seeks class certification on his claims for expense reimbursement under Labor Code Section 2802(a), which provides that "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties. . . ."  Fleming seeks reimbursement for several expenses: "fuel; maintenance; registration; the cost of [] computers, printers, and MDBS system; internet service; cell phones; uniforms; insurance; the cost of unsold or returned tools; and franchise fees.  Mot. at 21-22.

There is no dispute that Matco has a uniform policy of not reimbursing distributors for these expenses.  *See* Matco 30(b)(6) Depo Vol. 2, 277:20-278:10 ("The distributor owns his own business, so we do not reimburse the distributor for his expenses.").  It also tracks "estimated expenses" for distributors to help them make budgeting and business decisions.  Matco 30(b)(6) Depo Vol, 1, 234:3-235:9.  Fleming argues that, given these facts, common questions predominate on the reimbursement claims.  *See Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 609-610 (N.D. Cal. 2014) (holding that reimbursement claim under section 2802 "lends itself to class treatment to the extent that [defendant] has a uniform policy as what is reimburse and what is not"); *Hopkins v. Stryker Sales Corp.*, No. 5:11-cv-02786-LHK, 2012 WL 1715091, at *9 (N.D. Cal. May 14, 2012) (common questions predominated where "whether Defendant's uniform reimbursement policy . . . complies with *Gattsuo* can be answered on a classwide basis).

Matco argues that the reimbursement claim is not susceptible to common proof because it does not maintain data regarding franchisees' actual expenses – as opposed to estimated expenses. Opp. at 27.  Matco argues that individualized questions will predominate in determining the proper damages on the reimbursement questions because there is "no common source from which franchisees' actual expense information can be pulled."  Opp. at 27.

This argument is not convincing.  Individual questions going to damages generally do not justify denying class certification and courts have rejected this argument with regard to Section 2802 reimbursement claims.  *See Hopkins*, 2012 WL 1715091, at *9 (rejecting argument that individualized damages inquiry required denial of class certification on Section 2802 claim);

23

1  *Shulz v. QualxServ, LLC*, Case No. 09-CV-17-AJB (MDD), 09-CV-2081 (S.D. Cal. Apr. 26,

2  2012) (rejecting argument that individual inquiries regarding "amount of damages incurred by an

3  individual technician" barred class certification where question of "whether Defendants' uniform

4  reimbursement policy" complied with California law could be resolved on class-wide basis).  As

5  in these cases, potential individual inquiries going to the damages on the reimbursement claims do

6  not bar certification.

7        Matco further argues that there will be individual inquiries into whether each franchisee

8  incurred the expenses personally, or whether the expenses were paid from a business fund or by a

9  corporate entity, claiming that only individuals who *personally* paid the expenses can be

10  reimbursed.  Opp. at 28.  Matco does not cite any convincing authority for this position.  *USS-*

11  *Posco Indus. v. Case*, 244 Cal. App. 4th 197, 205 (2016), which Matco cites, held that an

12  employee could not recover expenses where he "made no expenditure" because the employer had

13  "fronted the costs."  This is distinctly different from the situation here where Matco does not

14  dispute that franchisees had to expend costs.  Regardless, whether payment through corporate

15  accounts would bar a franchisee from recovering expenses is a common legal question that is itself

16  suitable to class-wide treatment.  To the extent the use of "business accounts" may raise individual

17  questions as to the specific damages recoverable by particular franchisees, this question does not

18  bar certification.

19        Matco also argues that individual inquiries would be necessary to determine whether some

20  franchisees earned revenues that exceeded or covered the costs of their expenses in order to

21  prevent them from receiving a windfall through additional reimbursement.  Opp. at 28.  It cites

22  *Branche v. Hetzel*, 241 Cal. App. 2d 801, 807 (1996), which notes that "[w]here one obtains a

23  benefit which he may not justly retain, he is unjustly enriched[.]"  But succeeding on a claim for

24  reimbursement under Section 2802 is not an example of "unjust enrichment."  Matco offers no

25  explanation why it would be unjust for franchisees who earned revenues in excess of their

26  expenses to also receive reimbursements.  If franchisees are in fact employees under California

27  law, then Section 2802 requires that Matco reimburse them for certain expenses.  These

28  obligations are on top of obligations Matco would owe to its employees to pay them minimum

United States District Court
Northern District of California

1    wage and otherwise comply with California Labor law.  To the extent this "unjust enrichment"

2    argument does present a bar to reimbursement, that common legal question can be addressed on a

3    class-wide basis.

4         Finally, Matco argues that there will be individual inquiries into whether specific expenses

5    were reasonable and necessary.  Again, these questions go to the ultimate potential damages under

6    the Section 2802 claim.  Such individualized damages inquiries do not bar certification of this

7    claim.

8         For these reasons I conclude that common questions predominate on the Section 2802

9    claim.

10                    **3.    Wage Deduction Claims**

11        Fleming's motion for class certification barely mentions his Section 221 and 400-410

12   claim for wage deductions.  He includes one sentence acknowledging the claim in his discussion

13   of the reimbursement claim, which states: "California Labor Code Section 221 makes it unlawful

14   for an employer to receive from employees any portion of wages paid them."  Mot. at 21.  In his

15   reply, Fleming argues that he discussed the Section 211 claim "in conjunction with the Section

16   2802 expense reimbursement claim as all three claims arise from the same set of facts (and will be

17   subject to the same defenses).  Reply at 19.

18        Matco opposes certification of the section 211 and 400-410 claim.  It argues that Fleming

19   failed to carry his burden to show predominance and that he failed to present any evidence that

20   Matco paid wages to franchisees or withheld deductions.  Opp. at 67.

21        I agree with Matco that Fleming has failed to carry his burden on the section 221 claim.

22   Fleming's single sentence supporting the section 221 claim does not explain why common

23   questions predominate or provide any explanation of the facts and evidence that support it.  In his

24   reply, Fleming states that the same facts relevant to reimbursement are relevant to the section 221

25   claim but he offers no explanation why.

26        There is a difference between failing to reimburse employees for expenses they have

27   personally incurred and in withholding wages or making deductions to the wages paid to

28   employees.  The evidence Fleming cites in support of his reimbursement claim indicates that

United States District Court
Northern District of California

franchises paid for the relevant expenses themselves.  Fleming cites no evidence that Matco withheld these costs from franchisees' "wages," and it is not clear how Matco would have done so since franchisees were compensated entirely off the profits they earned on resale of Matco products.

Because Fleming bears the burden of establishing that class certification is appropriate on the section 221 claim and included no meaningful discussion of it, I conclude that class certification is not appropriate for it.

### 4.   UCL & Pay Stub Claims

Fleming seeks to certify a class as to his UCL claims and his claims for wage statement penalties under Labor Code section 226.  The UCL claim is derivative of Fleming's overtime, reimbursement, and meal and rest break claims.  While I have concluded that class treatment is not appropriate on Fleming's overtime and meal and rest break claims, as discussed above, common questions predominate on Fleming's reimbursement claim.  Accordingly, common questions also predominate on his UCL claim to the extent it is derivative of the reimbursement claim.

The parties agree that the wage statement claim largely rises or falls with the misclassification question.  Because I have concluded that common questions predominate with regard to the misclassification issue, common questions also predominate with regard to the wage statement claim.

## III.   SUPERIORITY

Certification under Rule 23(b)(3) requires a showing that class treatment is "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Factors relevant to this determination include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  *Id.*  "A consideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under [Rule 23(b)(3)] are those that can be adjudicated most profitably on a representative

United States District Court
Northern District of California

26

1   basis." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (internal

2   quotation marks omitted).

3         Matco focuses on the first and fourth factors.  With regard to the first factor, Matco argues

4   that franchisees have a significant interest in controlling their claims because they have "invested

5   thousands of dollars and spent years developing their customer base and goodwill," and thus have

6   high potential damages.  Opp. at 29.  It further argues that "a class action puts the very existence

7   of their businesses at risk."  *Id.*  And it argues that "a declaration that franchisees should have been

8   classified as employees" may force franchisees to pay Matco "years of profits."  *Id.*

9         While large potential damages may give franchisees a greater interest in directing their

10  own cases, the potential damages here are not so significant that this alone would defeat

11  superiority.  Matco's other two arguments on this point go to the idea that certain class members

12  may not want to participate in the class or bring claims at all out of concern that it might

13  jeopardize their businesses.  Several courts have rejected the idea that disagreement among the

14  class – or lack of support for a class action, defeat certification.  "Just because potential class

15  members disagree with the spirit of an action doesn't mean it shouldn't be certified.  It will almost

16  always be the case that some putative class members are happy with things as they are."  *Norris-*

17  *Wilson v. Delta T. Grp., Inc.*, 270 F.R.D. 596, 606 (S.D. Cal. 2010).

18        Further, Matco's suggestion that a misclassification finding would result in franchisees

19  having to turn over years of profits to Matco is not plausible.  If franchisees are reclassified as

20  employees, any profits they have earned would likely be considered "wages" that are not

21  recoverable by employers once paid.  Cal. Labor Code § 221 ("It shall be unlawful for any

22  employer to collect or receive from an employee any part of wages theretofore paid by said

23  employer to said employee.").  To the extent franchisees do not wish to bring claims against

24  Matco at all, they may opt out of the class.

25        With regard to the fourth factor, Matco rehashes its arguments regarding predominance

26  and individual questions going to damages.  But as discussed above, common questions will

27  predominate on the key question of misclassification and on the reimbursement, UCL, and wage

28  statement claims.  To the extent there are individual questions going to damages, these questions

United States District Court
Northern District of California

United States District Court
Northern District of California

1    can be addressed in a separate damages phase if necessary, as Fleming proposes.

2                                        **CONCLUSION**

3           For the reasons discussed above, Fleming's motion for class certification is GRANTED on

4    the issues of misclassification and claims regarding reimbursement, wage statement and UCL (as

5    to the wage statement claim).  The motion is DENIED with respect to the overtime, meal and rest

6    breaks, waiting time, and wage deduction claims.

7           **IT IS SO ORDERED.**

8    Dated: February 21, 2021



William H. Orrick
United States District Judge

28